**No. 25 – 1038**

In the
## United States Court of Appeals
### for the Fourth Circuit

**MORAG BLACK POLASKI; SHAWANA ALMENDAREZ; NORTH CAROLINA JUSTICE FOR ALL PROJECT**,

*Plaintiffs–Appellants,*

*v.*

**ERNIE LEE**, in his official capacity as District Attorney for the 5th Prosecutorial District of the State of North Carolina; **BENJAMIN R. DAVID**, in his official capacity as District Attorney for the 6th Prosecutorial District of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; **ASHLIE SHANLEY**, in her official capacity as District Attorney for the 25th Prosecutorial District of the State of North Carolina; **SPENCER B. MERRIWEATHER, III**, in his official capacity as District Attorney for the 26th Prosecutorial District of the State of North Carolina; **MATTHEW W. SMITH**, in his official capacity as President of the North Carolina State Bar and Chair of the Executive Committee of the North Carolina State Bar,

*Defendants–Appellees.*

**On Appeal from the United States District Court
for the Eastern District of North Carolina**

---

### OPENING BRIEF OF APPELLANTS

---

Vince Eisinger
CRANFILL SUMNER LLP
5420 Wade Park Blvd., Suite 300
Raleigh, NC 27607
Phone: (919) 863-8703

Paul M. Sherman
Christian W. Lansinger
INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
Phone: (703) 682-9320

*Counsel for Plaintiffs–Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1038__    Caption: __Morag Polaski, et al v. Ernie Lee, et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Shawana Almendarez_____
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

12/01/2019 SCC                          - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _/s/ Paul M. Sherman_____     Date: _____01/28/2025_____

Counsel for: _Appellants_____

- 2 -

Print to PDF for Filing

iii

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1038</u>     Caption: <u>Morag Polaski, et al v. Ernie Lee, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>North Carolina Justice for All Project</u>
(name of party/amicus)

_____

who is _____<u>Appellant</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.     Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

12/01/2019 SCC        - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Paul M. Sherman _____       Date: _____01/28/2025_____

Counsel for: Appellants _____

- 2 -

v

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1038__       Caption: __Morag Polaski, et al v. Ernie Lee, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Morag Black Polaski__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                                    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?          ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Paul M. Sherman                         Date:         01/28/2025

Counsel for: Appellants

- 2 -

Print to PDF for Filing

vii

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENTS ........................................... ii

TABLE OF CONTENTS ................................................................. viii

TABLE OF AUTHORITIES ............................................................. xi

JURISDICTIONAL STATEMENT .......................................................... 1

ISSUES PRESENTED ...................................................................... 1

STATEMENT OF THE CASE .............................................................. 2

    I.    North Carolina provides court-created forms for people to use without lawyers ............................................................ 2

    II.    Plaintiffs want to provide limited advice about those forms ...... 4

    III.    North Carolina prohibits Plaintiffs from giving that advice ...... 6

    IV.    The prohibition worsens North Carolina's access-to-justice crisis ................................................................................ 8

    V.    The proceedings below ............................................................ 10

SUMMARY OF ARGUMENT ............................................................. 13

STANDARD OF REVIEW .................................................................. 16

ARGUMENT ................................................................................. 16

    I.    *Holder* and *Chiles* confirm that Plaintiffs' advice is speech ..... 16

A. *Holder* supplies the controlling as-applied test, and Plaintiffs' proposed advice is speech ..................................... 17

B. This Court is not bound to classify Plaintiffs' advice as conduct under earlier precedent, which has been abrogated by *Chiles* ............................................................................... 21

C. It is irrelevant that the prohibition on Plaintiffs' speech is a licensing law ....................................................................... 27

II.   North Carolina's advice ban is content based, and no recognized exception removes it from strict scrutiny ................................. 30

A. *Reed* supplies the rule: subject-matter restrictions are content based ...................................................................... 30

B. *NIFLA* and *Chiles* recognize only two narrow professional-speech exceptions, and neither applies here ........................ 32

C. History supplies no exception for banning out-of-court legal advice by nonlawyers ....................................................... 35

III.  Because the First Amendment applies, this case cannot be dismissed at the pleadings stage ............................................... 40

A. The government cannot satisfy strict scrutiny at the pleadings stage ................................................................... 41

B. Even under intermediate scrutiny, the district court applied the wrong evidence-free standard ...................................... 42

IV.   JFAP independently states a First Amendment claim ............ 46

CONCLUSION ................................................................................... 48

REQUEST FOR ORAL ARGUMENT......................................................48

CERTIFICATE OF COMPLIANCE.......................................................50

x

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*360 Virtual Drone Servs. LLC v. Ritter,*
102 F.4th 263 (4th Cir. 2024) .................................. 11–13, 43, 44, 48

*Billups v. City of Charleston,*
961 F.3d 673 (4th Cir. 2020) ........................................................... 45

*Boos v. Barry,*
485 U.S. 312 (1988) ........................................................................ 35

*Brokamp v. District of Columbia,*
No. 20-cv-3574 (TJK), 2026 WL 1826172 (D.D.C. June 24, 2026) ..... 29

*Brokamp v. James,*
66 F.4th 374 (2d Cir. 2023) ............................................................. 28

*Brown v. Ent'm't Merchs. Ass'n,*
564 U.S. 786 (2011) ........................................................................ 39

*Cap. Associated Indus., Inc. v. Stein,*
922 F.3d 198 (4th Cir. 2019) ............................... 11, 13, 25, 26, 47, 48

*Chamber of Comm. v. Lierman,*
151 F.4th 530 (4th Cir. 2025) .......................................................... 16

*Chiles v. Salazar,*
146 S. Ct. 1010 (2026) ............................................................ *passim*

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
596 U.S. 61 (2022) .......................................................................... 32

*Edenfield v. Fane,*
507 U.S. 761 (1993) ........................................................................ 42

*Edwards v. City of Goldsboro,*
  178 F.3d 231 (4th Cir. 1999)................................................................. 16

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010).................................................... 12, 14, 17–19, 29, 32

*In re Primus,*
  436 U.S. 412 (1978)............................................................................. 46

*McCullen v. Coakley,*
  573 U.S. 464 (2014)............................................................................. 44

*NAACP v. Button,*
  371 U.S. 415 (1963)....................................................................... 20, 46

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
  585 U.S. 755 (2018)............................................................... 28, 32, 33

*People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.,*
  60 F.4th 815 (4th Cir. 2023) ............................................................... 40

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)............................................... 14, 24, 25, 30–32

*Reynolds v. Middleton,*
  779 F.3d 222 (4th Cir. 2015)............................................................... 44

*Richwine v. Matuszak,*
  148 F.4th 942 (7th Cir. 2025) ....................................................... 28, 29

*Rosemond v. Markham,*
  135 F. Supp. 3d 574 (E.D. Ky. 2015) ................................................. 35

*Short v. Hartman,*
  87 F.4th 593 (4th Cir. 2023) ............................................................... 21

*Thomas v. Collins,*
    323 U.S. 516 (1945)................................................................28

*United States v. Playboy Ent. Grp., Inc.,*
    529 U.S. 803 (2000)................................................................42

*United States v. Stevens,*
    559 U.S. 460 (2010)................................................................36

*Upsolve, Inc. v. James,*
    604 F. Supp. 3d 97 (S.D.N.Y. 2022)....................................12

*Upsolve, Inc. v. James,*
    155 F.4th 133 (2d Cir. 2025)........................................27, 28

## CONSTITUTIONAL PROVISIONS

Ind. Const. of 1851, art. VII, § 21............................................37

## RULES AND STATUTES

28 U.S.C. § 1291 ....................................................................1

28 U.S.C. § 1331 ....................................................................1

28 U.S.C. § 1343 ....................................................................1

42 U.S.C. § 1983 ....................................................................1

Fed. R. Civ. P. 12(b)(6) .....................................................1, 16

N.C. Gen. Stat. § 84-2.1(a) ...................................................6

N.C. Gen. Stat. § 84-4............................................................6

N.C. Gen. Stat. § 84-5............................................................6

N.C. Gen. Stat. § 84-7............................................................7

N.C. Gen. Stat. § 84-37.................................................................7

**OTHER AUTHORITIES**

A.B.A. Comm'n on Nonlawyer Prac.,
*Nonlawyer Activity in Law-Related Situations: A Report with
Recommendations* (1995) ....................................................38

Barlow F. Christensen,
*The Unauthorized Practice of Law: Do Good Fences Really Make
Good Neighbors—or Even Good Sense?*, 5 A.B.A. Found. Rsch. J. 159
(1980)................................................................... 37, 38

Bernard Schwartz,
*The Law in America: A History* 78 (1974) ...........................37

Carol Rice Andrews,
*Standards of Conduct for Lawyers: An 800-Year Evolution*, 57 SMU
L. Rev. 1385 (2004) .............................................................38

Derek A. Denckla,
*Nonlawyers and the Unauthorized Practice of Law: An Overview of
the Legal and Ethical Parameters*, 67 Fordham L. Rev. 2581
(1999)................................................................... 36, 39

James Willard Hurst,
*The Growth of American Law: The Law Makers* 279 (1950) ....... 37, 38

Laurel A. Rigertas,
*The Birth of the Movement to Prohibit the Unauthorized Practice of
Law*, 37 Quinnipiac L. Rev. 97 (2018) .................................. 36, 37, 39

Nora Freeman Engstrom & James Stone,
*Auto Clubs and the Lost Origins of the Access-to-Justice Crisis*, 134
Yale L.J. 123 (2024) .........................................................39

Paul M. Sherman & Daniel Nelson,
   *The (Weak) Historical Case for Licensing Speech*, 3 Tex. A&M J. of L.
   & Civil Governance (forthcoming 2027), available at
   https://ssrn.com/abstract=6183159 ..................................................... 36

*People's Lawyer: Globe to Abandon Column as Result of New Law*,
   Bos. Globe, Sept. 9, 1935 .................................................................. 39

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs brought claims under the First and Fourteenth Amendments and 42 U.S.C. § 1983. JA 38–41.

The district court entered an order granting Defendants' Rule 12(b)(6) motion and dismissing the amended complaint in its entirety on December 16, 2024. JA 1–10. The clerk entered judgment the same day. JA 11–12. Plaintiffs filed a timely notice of appeal on January 10, 2025. JA 110–11. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Plaintiffs are experienced North Carolina Certified Paralegals and a nonprofit access-to-justice organization. They seek to give willing listeners individualized legal advice about how to complete court-created forms. Did the district court err in treating that provision of pure legal advice as professional conduct rather than speech?

2. Under *Holder v. Humanitarian Law Project* and *Chiles v. Salazar*, a law that generally functions as a regulation of conduct regulates speech as applied when the conduct triggering coverage consists of communicating a message. North Carolina's UPL statutes prohibit Plaintiffs' advice because it concerns legal rights, rather than some other

1

subject, and because that advice is individualized, rather than general. As applied to Plaintiffs' speech, are the statutes content-based?

3. The district court dismissed at the pleadings stage by applying a relaxed intermediate-scrutiny standard under which Defendants could rely on "common sense" and "need not rely on specific evidence." Did the court err by dismissing Plaintiffs' First Amendment claims without requiring Defendants to carry the evidentiary and tailoring burden required by strict scrutiny or, at minimum, ordinary intermediate scrutiny?

4. Did the district court separately err by dismissing Plaintiff North Carolina Justice for All Project's nonprofit, free-advice claim as though it were indistinguishable from a commercial trade association seeking to practice law for employer-members?

## STATEMENT OF THE CASE

### I.  North Carolina provides court-created forms for people to use without lawyers.

North Carolina has created court forms for ordinary people to use without lawyers. The North Carolina Administrative Office of the Courts (NCAOC) makes more than a thousand statewide judicial forms and more than a thousand local forms available online for attorneys and pro

2

se litigants to complete themselves. JA 27. It also provides packets, instructions, landing pages, and Guide & File software that walks users through prompts and generates legal documents. JA 28–29.

Those resources cover the very areas where ordinary people most often need help: summary ejectment, divorce, domestic violence protective orders, custody, estates, probate, and related matters. JA 27, JA 35–37. The State thus recognizes that many North Carolinians will navigate these legal processes without lawyers.

But the forms are not self-executing. NCAOC's own resources warn users that they provide legal information, not legal advice; that only lawyers may explain legal rights; and that because the user has no lawyer, "it is *your* job to make sure the forms and information you file to the Court are correct and complete." JA 29, JA 35. And according to the North Carolina Equal Access to Justice Commission, roughly 80 percent of Guide & File users do not make it through the prompts to generate a form. JA 29.

Plaintiffs' experience confirms the problem. Many North Carolinians have legitimate civil legal needs but, because they are unfamiliar with legal procedures or are experiencing the turmoil of

eviction, divorce, domestic violence, debt, or probate, they cannot complete the forms timely or correctly without help. JA 29. Some forms contain terms ordinary people may not understand without prior exposure, such as "implied warranty of habitability" or "right of survivorship." JA 30. With guidance from someone familiar with the forms, however, the forms can often be completed in under an hour and are readily explainable to laypeople. JA 30.

## II. Plaintiffs want to provide limited advice about those forms.

Plaintiffs seek to provide that missing guidance. Plaintiff North Carolina Justice for All Project (JFAP) is an unincorporated nonprofit association founded in 2020 to bridge North Carolina's access-to-justice gap. JA 25. Its mission is to promote equality, efficiency, and fairness in the North Carolina legal system, especially for North Carolinians who need limited legal help but cannot afford full representation. JA 23, JA 25. JFAP's team consists of certified paralegals with years of legal-industry experience. JA 25.

Plaintiffs Morag Black Polaski and Shawana Almendarez are charter members of JFAP and North Carolina Certified Paralegals with more than twenty years of experience each. JA 27. Polaski has worked in

4

what she calls "people law": personal injury, debt collection, Social Security disability, workers' compensation, real estate, wills, probate, and family law. JA 27. Over more than two decades, she has developed extensive familiarity with court-created forms and has filled them out countless times under attorney supervision. JA 27.

Almendarez's experience lies in family law and state and local government administration. JA 27. She worked for years as a family-law paralegal and later served as a Family Court Case Coordinator for NCAOC, running self-service clinics for pro se litigants and distributing information packets. JA 27. Because she was not a lawyer, she was required to provide only legal information, not legal advice. JA 27. That meant she regularly had to refrain from answering questions she knew the answers to, leaving pro se litigants frustrated and confused. JA 27.

Plaintiffs want to answer those questions. They seek to speak with people about their factual circumstances and legal goals and advise them what a court-created form does, how forms interact, what terms mean, what local rules to know, what forms to file, and what information belongs on those forms. JA 28–31. That advice would be individualized, but limited. Plaintiffs do not seek to represent clients in court, act as

5

counsel of record, hold client funds, create binding legal obligations, sign or file papers for anyone, or take over litigation. *See* JA 38, JA 40. Their clients would remain pro se. The relief Plaintiffs seek is limited to advice about court-created forms.

Polaski and Almendarez would charge a fee for some of that advice. JA 31–32. JFAP would provide free advice through clinics and programming designed for people who otherwise lack meaningful legal help. JA 31. Plaintiffs allege that both free and lower-cost paid advice are necessary to address the needs of low-income North Carolinians and the "missing middle"—people who earn too much to qualify for legal aid but too little to afford a lawyer. JA 31.

## III. North Carolina prohibits Plaintiffs from giving that advice.

North Carolina prohibits any person who is not a licensed North Carolina attorney from practicing law. N.C. Gen. Stat. §§ 84-4, 84-5. The practice of law is defined broadly to include "performing any legal service for any other person, firm or corporation, with or without compensation" and "assisting by advice, counsel, or otherwise in any legal work; and to advise or give opinion upon the legal rights of any person, firm or corporation." *Id.* § 84-2.1(a). District attorneys may seek injunctions and

6

bring criminal misdemeanor charges against UPL violators. *Id*. § 84-7. The State Bar may investigate and seek civil injunctions. *Id*. § 84-37.

There is no North Carolina license authorizing certified paralegals to give unsupervised legal advice, and no statutory exception permits them to do so. JA 32–35. The UPL statutes draw no distinction based on whether the advice is simple, limited, free, paid, or related to court-created forms designed for pro se use. JA 32–35. Advising a person which box applies on an eviction answer form triggers the same prohibition as entering a guilty plea on behalf of a criminal defendant. *See* JA 32–35.

The State Bar's guidance confirms the breadth of the prohibition. Its "Guidelines for Use of Paralegals in Rendering Legal Services" prohibit nonlawyers from "giving oral or written legal advice or a legal opinion to a client." JA 32 (emphasis omitted). The State Bar's website also confirms that nonlawyers may not assist with filling out legal forms. JA 33. In short, the line Plaintiffs may not cross is the line between general information and individualized legal advice.

Because of that threat, Plaintiffs have self-censored for years. JA 36. They have declined to answer questions for friends, family members, and members of the public. JA 36. And JFAP has diverted

7

resources from direct legal help to advocacy and lobbying. JA 37. Plaintiffs stand ready to provide the advice they seek to provide, but for the credible threat that Defendants will enforce the UPL statutes against them. JA 37.

## IV. The prohibition worsens North Carolina's access-to-justice crisis.

North Carolina's ban on Plaintiffs' advice does not operate in a vacuum. It operates against a documented access-to-justice crisis.

North Carolina has just 2.5 attorneys per 1,000 residents and only one legal-aid attorney per 7,500 residents. JA 22. Forty-eight of North Carolina's 100 counties qualify as "legal deserts," with fewer than one attorney per 1,000 residents; ten counties have fewer than ten attorneys. JA 22. Legal Aid of North Carolina can serve only one in ten households needing legal help, and its services are limited to selected subject-matter areas. JA 23.

The unmet need is severe. In a given year, 71 percent of North Carolina's low-income families experience at least one civil legal problem, but 86 percent of those legal needs go unmet. JA 22. The areas of greatest need include summary ejectment, divorce, debt collection, domestic violence, foreclosure, custody, and civil no-contact orders—the same

8

areas in which court-created forms are often available and in which Plaintiffs seek to provide limited help. JA 23. Unmet civil legal needs can lead to loss of housing, safety concerns, future criminal problems, loss of property, family instability, and forfeiture of legal rights. JA 22.

The crisis also includes the "missing middle." Many North Carolinians are ineligible for legal aid but still lack enough disposable income to hire an attorney for full representation. JA 23. Plaintiffs allege that most traditional attorneys do not offer or advertise narrow services limited to advising pro se litigants about court-created forms. JA 30. That leaves many people with an all-or-nothing choice: hire a lawyer they cannot afford, or proceed alone with forms they may not understand.

Plaintiffs tried to address that gap through reform before suing. JFAP submitted a limited-licensing proposal to both the North Carolina Supreme Court and the State Bar in 2021. JA 25. The proposal would have created a second tier of legal-service providers permitted to help in selected high-need practice areas like family law and landlord-tenant law. JA 25. JFAP's co-founders were then appointed to the State Bar's Issues Subcommittee on Regulatory Change. JA 26. In January 2022, that subcommittee unanimously recommended that the State Bar

9

Council develop and implement a limited-lawyer-licensing program targeting the areas of highest need identified in the 2021 legal-needs assessment. JA 26. It also recommended exploring liberalization of the UPL statutes to permit nonlawyers to help draft certain documents and provide limited legal services. JA 26.

Meaningful reform never came. The State Bar created an Access to Justice Committee, but JFAP was not included. JA 26. When State Bar representatives made clear that they would not pursue initiatives requiring legislative approval, JFAP refocused on the General Assembly. JA 26. In 2023, JFAP submitted another proposal, recommending both liberalization for free legal services and limited licenses for legal professionals in high-need areas. JA 26. Nothing came of it. JA 27.

## V.    **The proceedings below.**

Plaintiffs filed this First Amendment lawsuit in January 2024 and amended their complaint in March 2024. JA 13–14. The amended complaint pleaded two as-applied First Amendment claims: Count I challenges the UPL statutes as applied to free legal advice about court-created forms; Count II challenges the statutes as applied to paid legal advice by Polaski and Almendarez about those same forms.

10

JA 38-41. Plaintiffs do not challenge North Carolina's UPL laws as applied to any other activity regulated as the practice of law, such as representing clients in court, acting as an agent, or handling client funds.

Defendants moved to dismiss. They argued that this case was controlled by *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019) ("*CAI*"), and *360 Virtual Drone Services LLC v. Ritter*, 102 F.4th 263 (4th Cir. 2024). In their view, those cases established that North Carolina's UPL statutes regulate professional conduct with only an incidental effect on speech, and that Plaintiffs' claims therefore failed at the pleadings stage under a relaxed form of intermediate scrutiny.

The district court granted the motion. JA 1–10. The court recognized that Plaintiffs challenge the statutes "solely as applied to legal advice regarding court-created forms." JA 4. It also recognized that Plaintiffs allege the UPL statutes chill their "pure legal speech." JA 4. But the court believed that *CAI* addressed "precisely the issue presented" here: whether giving legal advice in North Carolina should be viewed as "speech as speech" and subject to strict scrutiny. JA 6. Relying on *CAI* and *360 Virtual Drone*, the court concluded that North Carolina's UPL

11

statutes are a "classic regulation of conduct with an incidental burden on speech." JA 6 (quoting *360 Virtual Drone*, 102 F.4th at 275).

The court then rejected Plaintiffs' reliance on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). JA 7. *Holder* held that a law may be described as directed at conduct, but still regulate speech as applied when "the conduct triggering coverage under the statute consists of communicating a message." JA 7 (quoting *Holder*, 561 U.S. at 28). The district court held that *Holder* "simply did not implicate" professional-licensing concerns. JA 7. It likewise dismissed *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97 (S.D.N.Y. 2022), which had applied *Holder* to a materially similar UPL challenge, as unpersuasive in light of *CAI*. JA 7–8.

Finally, the court held that dismissal was appropriate at the pleadings stage because Defendants were "permitted to show that the challenged statutes satisfy the applicable level of scrutiny using common sense" and "need not rely on specific evidence." JA 4–5. Applying that evidence-free version of intermediate scrutiny, the court held that North Carolina's total prohibition on individualized legal advice by nonlawyers reasonably fit the State's interests in client protection and professional

12

regulation. JA 8–9. The court dismissed the complaint. JA 9. This appeal followed.

## SUMMARY OF ARGUMENT

This appeal raises a narrow legal issue: whether individualized advice about how to complete court-created legal forms is "speech" protected by the First Amendment.

The district court held that it was not. Relying primarily on this Court's decisions in *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019) ("*CAI*"), and *360 Virtual Drone Services LLC v. Ritter*, 102 F.4th 263 (4th Cir. 2024), the court below held that North Carolina's total prohibition on this advice by nonlawyers regulated only professional conduct, not speech. But that holding cannot stand after the Supreme Court's recent ruling in *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), which establishes that prohibitions on professional advice implicate the First Amendment and that government may not evade First Amendment scrutiny by relabeling speech as "professional conduct."

First, *Chiles* confirms that the test for distinguishing regulations of speech from regulations of conduct does not change merely because a case involves professional regulation. That test, set forth in *Holder v.*

13

*Humanitarian Law Project*, 561 U.S. 1, 28 (2010), provides that even when a law may function as a regulation of conduct, applications of that law must be analyzed under the First Amendment when they are triggered by communicating a message. That is the case here, where Plaintiffs are subject to North Carolina's UPL prohibition solely because the messages they wish to communicate to North Carolinians are about those individuals' legal rights. To the extent this Court's earlier rulings suggest otherwise, they are no longer good law. Under *Chiles*, these facts may go to the strength of the government's interest or the degree of tailoring under First Amendment scrutiny, but they are not a reason to evade that scrutiny altogether.

*Chiles* also confirms that North Carolina's regulation of Plaintiffs' speech is content-based, because it singles out speech on a particular subject: individualized advice about legal rights. Reaffirming *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the Court explained that, even in the context of occupational regulations, "laws regulating speech based on its subject matter or 'communicative content' are 'presumptively unconstitutional.'" *Chiles*, 146 S. Ct. at 1021 (quoting *Reed*, 576 U.S. at 163). That rule is subject to only narrow exceptions, none of which apply

14

here. Because there is no long-settled historical tradition of prohibiting nonlawyers from giving out-of-court legal advice to willing listeners, the government bears a heavy burden of justifying its total prohibition on Plaintiffs' legal advice.

The government cannot carry that burden at the motion-to-dismiss stage under strict or intermediate scrutiny. Because this case involves a regulation of "speech as speech," it is, at a minimum, subject to ordinary intermediate scrutiny, which imposes an affirmative evidentiary burden on the government. That burden requires real evidence and cannot be satisfied by mere speculation or "common sense." *See* JA 4.

Finally, even if this Court affirms the dismissal of the individual Plaintiffs' claims to provide paid legal advice, it should reverse the dismissal of JFAP's separate claim to provide free legal advice. JFAP has plausibly alleged that its limited provision of legal advice to those who otherwise lack access to the courts raises none of the concerns about ownership structure, conflict of interest, or profit motive that were present in *CAI*.

This Court should reverse the decision below and remand for further proceedings.

15

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of a Rule 12(b)(6) motion. In reviewing dismissal, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. A Rule 12(b)(6) motion tests the legal sufficiency of the complaint; it does not resolve factual disputes, weigh evidence, or decide whether the government ultimately can carry its burden under First Amendment scrutiny. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999).

First Amendment questions, including the level of scrutiny and the constitutionality of a speech restriction as applied to the pleaded facts, are questions of law that are reviewed de novo. *Chamber of Comm. v. Lierman*, 151 F.4th 530, 535 n.2 (4th Cir. 2025).

## ARGUMENT

### I.   *Holder* and *Chiles* confirm that Plaintiffs' advice is speech.

North Carolina created court forms for ordinary people to use without lawyers. But when those people have questions, North Carolina makes it a crime for an experienced certified paralegal to answer them. Polaski may study the form, understand the form, and explain general

16

information about the form. What she may not do is tell the person sitting across from her which box applies to her case.

But telling people things is speech. And after the Supreme Court's recent decision in *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), it cannot be dismissed as professional conduct merely because North Carolina places the speech inside a licensing regime. As explained in Section A, *Chiles* confirms that *Holder v. Humanitarian Law Project* supplies the applicable test for distinguishing regulations of speech from regulations of conduct. As explained in Section B, the earlier Circuit cases on which the district court relied to conclude otherwise have been abrogated to the extent they conflict with *Chiles*. As explained in Section C, the fact that North Carolina's prohibition on Plaintiffs' speech takes the form of an occupational-licensing law changes none of this.

**A.    *Holder* supplies the controlling as-applied test, and Plaintiffs' proposed advice is speech.**

The Supreme Court's test for distinguishing regulations of speech from regulations of conduct is set forth most clearly in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). *Holder* involved a federal material-support statute that, in many applications, regulated conduct. The plaintiffs, however, challenged the statute only as applied to their

17

proposed speech: training and expert advice about how designated foreign organizations could pursue peaceful relief through legal and international institutions. *Id.* at 14–15, 24–25.

The government defended the statute much as North Carolina defends its UPL laws here. It argued that "the only thing truly at issue" was "conduct, not speech," and that any burden on expression was merely "incidental[]." *Id.* at 26. The Supreme Court rejected that argument as applied. The relevant question was not whether the statute could be described at a high level of generality as a conduct regulation. It was whether "the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28. Because the plaintiffs faced liability for communicating training and expert advice, as opposed to general advice, the statute regulated speech as applied. *Id.* at 27–28. And because whether plaintiffs may speak to the foreign organizations under the statute "depends on what they say," the law was content based. *Id.* at 27.

That rule decides this case. Plaintiffs may discuss legal topics in general. North Carolina's UPL laws become enforceable only when Plaintiffs communicate individualized advice to a willing listener about

18

that listener's legal rights or legal form. As applied here, then, "the conduct triggering coverage under the statute consists of communicating a message." *Holder*, 561 U.S. at 28. That is speech.

The district court reached the opposite conclusion only because it treated professional regulation as an exception to *Holder*. The court held that *Holder* "simply did not implicate" professional-licensing concerns and therefore did not control a case involving who may practice a profession. JA 7. On that basis, the court treated Plaintiffs' advice as professional conduct rather than speech, declined to apply ordinary content-based scrutiny, and held that the State could prevail on the pleadings without evidence. JA 6–9.

*Chiles* confirms that was wrong. Like this case, *Chiles* involved individualized professional advice. Colorado restricted what licensed mental-health professionals could say to clients in counseling. Colorado defended that law as a regulation of professional conduct rather than speech. The Supreme Court rejected that framing. It did not treat *Holder* as a terrorism-specific outlier. It treated *Holder* as one of the core cases governing whether a law that often regulates conduct nevertheless regulates speech "in the case at hand." *Chiles*, 146 S. Ct. at 1023–24.

19

*Holder* illustrated the point, *Chiles* explained, because the government there threatened to prosecute "lawyers, doctors, and others" for providing spoken training and expert advice. *Id.* at 1022. That application regulated speech because the law was triggered by what the speakers said. *Id.* So too here. The fact that Plaintiffs' advice is expert, practical, individualized, paid in some cases, or offered in a regulated field may bear on the State's interest or tailoring. But it does not change the threshold question of whether that advice is speech. Under *Holder*, it is.

Nor can the State avoid that conclusion by calling the speech the "conduct" of practicing law. *Chiles* rejected the same relabeling move. Speech does not become conduct "just because the State may call it that" or because it is described as treatment, a professional modality, or anything else. *Id.* at 1023. "The First Amendment is no word game," and constitutional rights cannot be circumscribed "by 'mere labels.'" *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 429 (1963)). The same is true here. North Carolina may call Plaintiffs' advice "the practice of law," but that label does not answer the First Amendment question. Because

20

Plaintiffs' proposed advice is speech, the UPL laws regulate speech as applied.

**B.   This Court is not bound to classify Plaintiffs' advice as conduct under earlier precedent, which has been abrogated by *Chiles*.**

The next question is whether this Court's prior decisions in *Capital Associated Industries, Inc. v. Stein* and *360 Virtual Drone Services LLC v. Ritter* require this panel to reach the same result as the district court, even following *Chiles*. They do not.

Under this Court's prior-panel rule, "previous panel precedent . . . is not binding if it subsequently proves untenable considering Supreme Court decisions." *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) (cleaned up). A Supreme Court decision abrogates prior circuit precedent when the two are "impossible to reconcile." *Id.*

That standard is met here as to Plaintiffs' narrow proposed activity. Plaintiffs do not ask this Court to discard *CAI* or *360 Virtual Drone* wholesale. Those decisions may remain binding for applications unlike this one: corporate legal practice, nonlawyer control over attorney-employees, courtroom representation, signing or filing

21

documents as counsel, fiduciary handling of funds, surveying conduct, and other non-speech incidents of regulated professions.

The question here is narrower: Do *CAI* and *360 Virtual Drone* bind this Court to classify Plaintiffs' pure speech as professional conduct merely because their advice is expert, consequential, private, or subject to a licensing regime?

After *Chiles*, the answer is no. As a review of the ruling below shows, for every major point of First Amendment doctrine on which the district court relied on *CAI* or *360 Virtual Drone*, the Supreme Court's ruling in *Chiles* provides an irreconcilable answer.

First, the district court relied on *CAI* and *360 Virtual Drone* to treat professional licensing as a reason not to apply *Holder*. It began from the premise that "states have long held the authority to license professionals and regulate their practice," and concluded that *Holder* "simply did not implicate" those concerns. JA 7. But *Chiles* rejects that distinction. The Supreme Court applied *Holder* in a professional-client speech case. It emphasized that *Holder* involved threatened prosecution of "lawyers, doctors, and others" for providing spoken training and expert advice. *Chiles*, 146 S. Ct. at 1022. A rule that excludes *Holder* because a case

22

involves professional regulation cannot be reconciled with a decision that applies *Holder* to professional advice.

Second, the district court relied on *CAI* for the proposition that the UPL laws regulate "who may engage in the practice of law" rather than speech. JA 7. That reasoning may remain valid for applications involving the non-speech incidents of law practice. But it cannot decide this case, where that "practice" takes the form of pure speech. Colorado likewise argued that its law regulated professional treatment rather than speech. The Supreme Court rejected the argument because the regulated activity, as applied, was speech. *Chiles*, 146 S. Ct. at 1023. A State cannot avoid the First Amendment by redescribing speech as professional practice. *Id.* That is exactly what North Carolina does here when it treats individualized advice about legal rights as unprotected conduct.

Third, the district court relied on *360 Virtual Drone*'s "guideposts" for identifying professional conduct. It emphasized that Plaintiffs' advice would have legal and economic consequences, would occur in private, and did not appear to target unpopular or dissenting speech. *See* JA 6–7. Those factors are impossible to reconcile with *Chiles* on the threshold speech/conduct test. *Chiles* did not ask whether the speech was

23

consequential, private, expert, or controversial. It asked whether the law restricted speech because it was integral to separately unlawful conduct, or whether the law regulated expressive conduct for reasons unrelated to content. 146 S. Ct. at 1025–26. Those are the relevant categories. Plaintiffs' advice fits neither. Their proposed speech is not integral to separately unlawful conduct. As in *Chiles*, "[a]ll [Plaintiffs] do[] is speak—and, as far as [they are] concerned, speech is all [North Carolina] seeks to regulate." *Id.* at 1025. And North Carolina does not regulate expressive conduct for content-neutral reasons; it prohibits advice because of its legal subject matter.

Fourth, the district court relied on *CAI* and *360 Virtual Drone* to bypass ordinary content-based scrutiny. Once it classified the UPL laws as professional-conduct regulations, the court declined to ask whether the laws regulate speech based on subject matter or communicative content. *See* JA 7. *Chiles* makes that move unavailable. Reaffirming *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the Court explained that "laws regulating speech based on its subject matter or 'communicative content' are 'presumptively unconstitutional'" and subject to strict scrutiny unless a recognized exception applies. *Chiles*, 146 S. Ct. at 1021 (quoting *Reed*,

576 U.S. at 163). North Carolina's laws are triggered here only when Plaintiffs provide individualized advice about legal rights and not other issues. That is a content-based restriction on speech.

Fifth, the district court relied on *360 Virtual Drone*'s relaxed intermediate-scrutiny standard. Because it viewed the UPL laws as professional-conduct regulations, the court held that the State could justify dismissal through "common sense" and without "specific evidence." JA 4–5. But that relaxed rule depends on the very classification *Chiles* rejects. Once the application is recognized as a content-based restriction on speech, the government bears the burden to prove that its restriction is narrowly tailored to serve compelling interests. *Chiles*, 146 S. Ct. at 1021. The State cannot keep *360 Virtual Drone*'s no-evidence rule after losing *360 Virtual Drone*'s conduct premise.

The irreconcilability is especially clear because this case presents the very application *CAI* said was not before it. *CAI* reasoned that North Carolina's UPL statutes do not target "the communicative aspects of practicing law, such as the advice lawyers may give to clients," but instead regulate more broadly "who may conduct themselves as a

25

lawyer." 922 F.3d 198, 208 (4th Cir. 2019). Plaintiffs challenge the UPL laws precisely as applied to "the communicative aspects" of law practice: individualized advice to willing listeners. They do not seek to appear in court, hold funds, bind clients, or sign filings as counsel. If *CAI* is read to control this advice-only application, it cannot be reconciled with *Chiles*. If *CAI* is read more narrowly, it remains good law for applications not involving pure advice.

The same is true of *360 Virtual Drone*. Its guideposts may remain relevant in cases involving surveying conduct or other non-communicative professional activity. But after *Chiles*, those guideposts cannot supply the test for deciding whether pure advice is speech. Legal consequences, economic consequences, private delivery, professional expertise, and the absence of unpopular or dissenting viewpoints may matter under the applicable level of First Amendment scrutiny, when the State attempts to prove an interest and tailoring. But under *Chiles* they are not and cannot be a reason to evade that scrutiny.

In short, the only way to harmonize *CAI* and *360 Virtual Drone* with *Chiles* is to read those decisions narrowly as controlling cases in which the State regulates non-speech professional conduct or the non-speech

26

incidents of a profession. They do not bind this Court to classify Plaintiffs' individualized legal advice as conduct. Because North Carolina's UPL laws are triggered here by Plaintiffs' communication of legal advice, *Chiles* controls.

### C. It is irrelevant that the prohibition on Plaintiffs' speech is a licensing law.

Plaintiffs anticipate that Defendants will try to distinguish *Holder* and *Chiles* on the ground that this case involves a licensing law. They made that argument below, insisting that *Holder* is not a "meaningful part of the analysis" because it "did not involve the regulation of who could practice a profession." Defs.' Reply Br. Supp. Mot. Dismiss, D. Ct. ECF No. 36, at 3. But that distinction cannot survive *Chiles*, which confirms that *Holder* supplies the relevant rule of decision when a law is triggered by speech on a particular subject matter, no matter the context.

Courts applying *Holder* to as-applied challenges to occupational-licensing regimes have reached the same conclusion. In *Upsolve, Inc. v. James*, for example, the Second Circuit considered a materially similar challenge to New York's UPL statutes. 155 F.4th 133 (2d Cir. 2025). Upsolve trained nonlawyer "Justice Advocates" to advise pro se defendants how to complete a one-page, check-the-box answer form in

27

debt-collection cases. *Id.* at 136–38. The New York Attorney General argued that the UPL statutes regulated conduct, not speech. But the Second Circuit rejected that argument. In doing so, the court was not at all bothered by the fact that the burden on plaintiffs' speech took the form of a licensing requirement. As the court emphasized, in challenges like this one, courts must "consider '[t]he restriction's effect, as applied, in a very practical sense.'" *Id.* at 142 (quoting *Thomas v. Collins*, 323 U.S. 516, 536 (1945)). "Otherwise, states would have 'unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement.'" *Id.* (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 773 (2018) ("*NIFLA*")).[1]

The Seventh Circuit reached the same conclusion in *Richwine v. Matuszak*, 148 F.4th 942 (7th Cir. 2025). There, an unlicensed "death doula"—who provided pure advice to clients about end-of-life issues— challenged Indiana's funeral-services licensing law as applied to her

---

[1] Applying pre-*Chiles* circuit precedent, the Second Circuit went on to conclude that the challenged law was content-neutral. 155 F.4th at 143 (citing *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023)). That holding is no longer tenable in light of *Chiles. See infra* Section II. And even if it were correct, the government would still not be able to carry its evidentiary burden under this Circuit's intermediate-scrutiny precedent. *See infra* Section III.B.

speech. *Id.* at 946. Indiana argued that the statute was triggered by the lack of a license, not by speech. *Id.* at 954. But the Seventh Circuit still applied *Holder*, concluding that the "conduct triggering coverage under the statute consists of communicating a message" and, thus, "[t]he statute clearly burdens speech." *Id.* at 954 (quoting *Holder*, 561 U.S. at 28).

Even more recently, in what appears to be the first decision to consider the issue following the Supreme Court's decision in *Chiles*, the District Court for the District of Columbia reached the same conclusion in *Brokamp v. District of Columbia*, No. 20-cv-3574 (TJK), 2026 WL 1826172 (D.D.C. June 24, 2026). There, a Virginia-licensed counselor who wished to provide teletherapy to clients in the District of Columbia challenged the District's licensing requirement as applied to her talk therapy. *Id.* at *2–4. The court, citing *Chiles*, rejected the argument that professional licensing was subject to unique rules. *See id.* at *6. Instead, applying *Holder*, the Court found it "clear" that "Brokamp's activity regulated by the licensure law is protected speech, not conduct that only incidentally involves speech." *Id.*

29

These cases confirm the narrow point Plaintiffs press here. A state may license conduct-focused professional activity. But a licensing requirement is not a First Amendment escape hatch. When a licensing requirement functions to prohibit speech with a particular content, that application of the law is a restriction on speech and must be analyzed as such.

## II. North Carolina's advice ban is content based, and no recognized exception removes it from strict scrutiny.

Once the Court recognizes that Plaintiffs' advice is speech, the content question is straightforward. North Carolina prohibits Plaintiffs from speaking because of the subject of their speech: individualized advice about legal rights. Under *Reed*, that is content-based regulation. Under *NIFLA* and *Chiles*, the fact that the speech occurs in a professional or occupational setting creates no freestanding exception. And history supplies no narrow, long-settled tradition of banning nonlawyers from giving out-of-court legal advice to willing listeners. Strict scrutiny therefore applies.

### A. *Reed* supplies the rule: subject-matter restrictions are content based.

Under the Supreme Court's precedents, a law is content based if it regulates speech based on its "topic," "subject matter," or "communicative

30

content." *Reed*, 576 U.S. at 163–64. Such laws are "presumptively unconstitutional" and subject to strict scrutiny. *Id.* at 163. *Chiles* reaffirmed the same rule: "laws regulating speech based on its subject matter or 'communicative content' are 'presumptively unconstitutional'" and may be justified only if the government proves narrow tailoring to compelling interests. 146 S. Ct. at 1021 (quoting *Reed*, 576 U.S. at 163).

North Carolina's UPL laws are content based as applied to Plaintiffs. A certified paralegal may talk with a person about almost anything. She may discuss politics, finances, family problems, housing conditions, or the difficulties of navigating court forms. She may provide general legal information. She may study the relevant law and form an opinion about what a person should write on a court-created form.

The prohibition begins when she communicates individualized legal advice. She may not tell a tenant what the law means for her summary-ejectment answer. She may not tell a domestic-violence victim which facts matter on a protective-order form. She may not tell a pro se litigant what information belongs on a divorce, custody, probate, or estate form. The trigger is the legal subject matter of the advice, applied to the listener's circumstances.

31

That is content-based regulation. A law does not become content neutral because it bans all speech on a subject rather than favoring one side of a debate. *Reed* rejects that distinction. *See Reed*, 576 U.S. at 168–69. A rule that singles out advice because it is *legal* advice regulates speech based on subject matter. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022) (holding that "overt subject-matter discrimination is facially content based"). And *Holder* confirms the same point in the expert-advice context: when a plaintiff's right to speak "depends on what they say," the restriction is content based. 561 U.S. at 27.

So too here. Whether Plaintiffs may speak depends on what they say. General information is allowed. Individualized legal advice is forbidden. That is enough to trigger strict scrutiny unless the State can identify a recognized exception.

## B. *NIFLA* and *Chiles* recognize only two narrow professional-speech exceptions, and neither applies here.

The State cannot avoid strict scrutiny by invoking the professional or occupational setting. *NIFLA* rejected the notion that "professional speech" is a separate category of diminished First Amendment protection. 585 U.S. at 767. The Court warned that if states could reduce

32

protection "by simply imposing a licensing requirement," they would have a powerful tool to suppress speech on disfavored subjects. *Id.* at 773.

*NIFLA* identified only two circumstances in which professional speech has received lesser protection. Neither applies here.

First, this case does not involve a compelled disclosure of factual, noncontroversial information in commercial speech. *See id.* at 768. Plaintiffs challenge a prohibition on advice, not a disclosure requirement. Although North Carolina likely could require Plaintiffs to disclose to their clients that they are not licensed attorneys—and doing so would certainly be more narrowly tailored than what the State has done—here we deal with a ban on speech.

Second, this case does not involve regulation of professional conduct that incidentally burdens speech. *See id.* at 769. *Chiles* explains the limits of that doctrine. A law may incidentally burden speech when it regulates noncommunicative conduct and speech is merely incidental to that conduct. 146 S. Ct. at 1025–26. The classic examples are informed-consent laws, which are triggered not by speech but by "separate physical conduct that would, without the patient's consent,

33

amount to an assault." *Id.* at 1028 (cleaned up). But the doctrine does not apply when the regulated activity, as applied, is speech itself.

That is this case. Plaintiffs do not seek to appear in court, hold client funds, bind clients, sign or file papers for anyone, or create legal obligations on another person's behalf. Their clients will remain pro se. The clients will complete and submit their own court-created forms. The only thing Plaintiffs seek to do is communicate advice about those forms.

There is no separately unlawful conduct to which Plaintiffs' speech is incidental. The State cannot create such conduct by defining the advice itself as the illegal unauthorized practice of law. That would make the exception swallow the rule. Any State could avoid the First Amendment by declaring speech unlawful and then saying the speech is integral to that newly created illegality. Thus, this exception has always been tied to "separately unlawful conduct like a traditional crime." *Chiles*, 146 S. Ct. at 1026. But here, as in *Chiles*, no one disputes that the people to whom Plaintiffs would give advice "may lawfully undertake" the actions Plaintiffs recommend, *i.e.*, the filling out of court-created legal forms expressly designed for use by pro se parties. *Id.*

34

Nor is North Carolina regulating expressive conduct for content-neutral reasons. The problem, from the State's perspective, is not some noncommunicative act—it is that the content of Plaintiffs' legal advice may not be as good as advice provided by a North Carolina-licensed lawyer. "This justification focuses *only* on the content of the speech and the direct impact that speech has on its listeners." *Boos v. Barry*, 485 U.S. 312, 321 (1988). Because, as applied to Plaintiffs, the law "regulates speech due to its potential primary impact . . . it must be considered content-based." *Id.*; *see also Rosemond v. Markham*, 135 F. Supp. 3d 574, 582 (E.D. Ky. 2015) (holding application of state psychology licensing law content-based as to unlicensed newspaper columnist where "the Board acted out of a concern that the content of [the] advice column might harm Kentucky readers"). In short, as in *Chiles*, "[a]ll [Plaintiffs] do[] is speak," and "speech is all [the State] seeks to regulate." 146 S. Ct. at 1025.

## C.    History supplies no exception for banning out-of-court legal advice by nonlawyers.

The State's only remaining means of escaping ordinary First Amendment scrutiny would be showing the existence of a historical but previously unrecognized tradition of regulating individualized legal

35

advice. Here again, *Chiles* provides guidance. That ruling forbids defining the tradition at a high level of generality. Governments may not aggregate discrete traditions into a broad new "First Amendment Free Zone" for speech they consider substandard professional practice. 146 S. Ct. at 1026–28 (quoting *United States v. Stevens,* 559 U.S. 460, 469 (2010)).

Thus, the relevant tradition is not "regulation of lawyers." Nor is it "regulation of professions." The relevant tradition would have to be a long-settled tradition of prohibiting nonlawyers from giving out-of-court legal advice to willing listeners.

That tradition does not exist. Indeed, the historical sources—stretching back to the Founding—show the opposite.[2]

Begin with the colonies, where nonlawyers were "free to engage in a wide range of activities" that would today be called UPL, including "giving legal advice and preparing legal documents." Derek A. Denckla, *Nonlawyers and the Unauthorized Practice of Law: An Overview of the*

---

[2] The following history is summarized from Paul M. Sherman & Daniel Nelson, *The (Weak) Historical Case for Licensing Speech,* 3 Tex. A&M J. of L. & Civil Governance (forthcoming 2027), available at https://ssrn.com/abstract=6183159.

36

*Legal and Ethical Parameters*, 67 Fordham L. Rev. 2581, 2583 (1999). Scholars of UPL history have found "no evidence that colonists concerned themselves with the activities of lay persons outside the courthouse." Laurel A. Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 Quinnipiac L. Rev. 97, 104 (2018); *see also* Barlow F. Christensen, *The Unauthorized Practice of Law: Do Good Fences Really Make Good Neighbors—or Even Good Sense?*, 5 A.B.A. Found. Rsch. J. 159, 169, 174 (1980).

Early American regulation likewise focused on admission to court, courtroom conduct, discipline, and litigation-related abuses—not out-of-court advice. State statutes commonly set admission standards, oaths, fees, and disciplinary rules. *See* James Willard Hurst, *The Growth of American Law: The Law Makers* 279 (1950). But those rules did not create a general monopoly over legal advice. To the contrary, early American practice was strikingly open. By 1860, more than three-fourths of the states opened courtroom practice to "anyone" who swore an oath and demonstrated good moral character. Bernard Schwartz, *The Law in America: A History* 78 (1974). Some states constitutionalized that openness. *See, e.g.*, Ind. Const. of 1851, art. VII, § 21.

Where pre-Civil War courts confronted nonlawyer activity, the challenges targeted courtroom appearances or signing pleadings, not out-of-court advice. Christensen, *supra*, at 174. Courts made "little effort . . . to prevent nonlawyers from practicing law," and the few disputes that arose generally appeared as procedural objections within litigation, not as broad prohibitions on legal counseling outside court. *Id.*; *see also* Carol Rice Andrews, *Standards of Conduct for Lawyers: An 800-Year Evolution*, 57 SMU L. Rev. 1385, 1419–20 (2004).

Nor did broad UPL restrictions on nonlawyer advice appear in the period immediately after the Fourteenth Amendment. From 1870 to 1920, "most" UPL statutes "dealt only with appearances in court by persons not licensed as lawyers." Christensen, *supra*, at 180–81. The ABA Commission on Nonlawyer Practice reported that "[n]onlawyers continued to provide legal and law-related services to the public outside of courtrooms." A.B.A. Comm'n on Nonlawyer Prac., *Nonlawyer Activity in Law-Related Situations: A Report with Recommendations* 16 (1995). Title companies closed real-estate transactions without lawyers; collection agencies handled debt matters; accountants advised on tax law;

38

financial institutions advised on estates and trusts; and banks drafted wills. Hurst, *supra*, at 320–21; Christensen, *supra*, at 178.

The broad modern UPL campaign came much later. Bar associations' efforts to prohibit nonlawyer practice expanded dramatically in the late 1920s and 1930s. *See* Rigertas, *supra*, at 98–100, 139–43; Denckla, *supra*, at 2583–84. Contemporary examples confirm that out-of-court legal advice had existed openly before the new prohibitions. In 1935, the *Boston Globe* discontinued its long-running "People's Lawyer" column only after Massachusetts enacted a new law forbidding corporations from giving legal advice outside their business. *People's Lawyer: Globe to Abandon Column as Result of New Law*, Bos. Globe, Sept. 9, 1935, at 5. Similarly, auto clubs provided members with legal advice concerning automobile ownership and use until the organized bar's UPL campaign targeted them. Nora Freeman Engstrom & James Stone, *Auto Clubs and the Lost Origins of the Access-to-Justice Crisis*, 134 Yale L.J. 123, 145, 171, 193–98 (2024).

That late, limited history cannot establish a First Amendment exception, particularly where the burden of demonstrating that tradition rests on the government. *See Brown v. Ent'm't Merchs. Ass'n*, 564 U.S.

786, 791–92 (2011). And, as *Chiles* makes clear, a tradition of regulating courtroom representation cannot be bootstrapped into a tradition of banning out-of-court advice. For most of American history, there was no broad prohibition on out-of-court legal advice by nonlawyers. "That history must control, for it ensures that the First Amendment's shield falls away only from those narrow categories of speech for which the Constitution never intended protection, not from those forms of speech that the legislative majority"—or those who successfully lobby the legislative majority—"just prefers not to protect." *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 823 (4th Cir. 2023), cert. denied, 144 S. Ct. 325 (2023).

## III. Because the First Amendment applies, this case cannot be dismissed at the pleadings stage.

Once Plaintiffs' advice is recognized as speech, the judgment must be reversed even if this Court does not resolve every question about the precise level of scrutiny. Strict scrutiny applies because North Carolina's UPL laws single out speech on a particular subject: individualized advice about legal rights. But at minimum, ordinary intermediate scrutiny would apply. Under either standard, the government bears the burden to justify its restriction on speech. That burden cannot be satisfied at the

pleadings stage by invoking "common sense," JA 4, positing generalized harms, or relying on the very professional-conduct label that *Chiles* rejects. That's particularly true where, as here, Plaintiffs have pleaded the existence of less-restrictive alternatives whose inadequacy it is the State's burden to prove.

## A.    The government cannot satisfy strict scrutiny at the pleadings stage.

Because North Carolina's UPL laws are content based as applied to Plaintiffs' advice, strict scrutiny governs. The government therefore bears the burden to prove that its restriction is narrowly tailored to serve a compelling interest. *Chiles*, 146 S. Ct. at 1021. That is a demanding burden in any case. It is not a burden the State can carry on a motion to dismiss unless the complaint itself establishes that the restriction satisfies strict scrutiny.

That is not the case here. Plaintiffs allege that they seek only to provide advice about court-created forms designed for pro se litigants. JA 28, JA 30, JA 38–39. They do not seek to appear in court, hold client funds, bind clients, sign or file papers for anyone, or otherwise perform the non-speech incidents of law practice. JA 38–40. They allege that North Carolina's total ban suppresses advice in areas of acute need,

41

including housing, divorce, domestic violence, and probate—advice that they are competent to provide. JA 23, JA 28–31. And they allege that less restrictive alternatives are available to address the State's concerns, including disclosures, scope limits, limited licensing, training requirements, registration, consumer-protection enforcement, and prohibitions on the very conduct Plaintiffs do not seek to perform. *See* JA 39–41.

Accepting those allegations as true, Plaintiffs have stated a claim under the First Amendment. On remand, the State will have the opportunity to try to prove that nothing short of a criminal ban on all individualized legal advice by nonlawyers will protect consumers or the administration of justice. But it must do so with real evidence, not speculation and conjecture. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816–17 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *see also Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993) (holding that, even under intermediate scrutiny, "[t]his burden is not satisfied by mere speculation or conjecture").

**B.    Even under intermediate scrutiny, the district court applied the wrong evidence-free standard.**

This Court can reverse the ruling below even if it is not ready to resolve whether strict scrutiny is the appropriate standard. Once this is treated as a speech case, the minimum standard of review is ordinary intermediate scrutiny.

This Court's ruling in *360 Virtual Drone*—read in light of the Supreme Court's decision in *Chiles*—confirms as much. In *360 Virtual Drone*, this Court distinguished between two types of cases that receive intermediate scrutiny under the First Amendment: those involving "a regulation aimed at conduct that incidentally burdens speech, and a content-neutral regulation of speech as speech." 102 F.4th 263, 276 (4th Cir. 2024).

This Court further held that this distinction matters because it affects the amount of evidence the government must bring forward to carry its burden. "[F]or most content-neutral restrictions on speech, intermediate scrutiny requires the government to produce actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary." *Id.* at 277–78 (cleaned up). But, this Court held, where the government imposes a

43

restriction "primarily aimed at professional conduct and only incidentally burden[ing] speech, intermediate scrutiny does *not* require such evidence." *Id.* at 278.

The district court applied the second, evidence-free form of intermediate scrutiny because it concluded, in light of *CAI*, that North Carolina's UPL prohibition burdened Plaintiffs' speech only incidentally. But, as shown above, *Chiles* rejects that reasoning: As applied to Plaintiffs, North Carolina's prohibition on legal advice by nonlawyers regulates "speech as speech." *Chiles*, 146 S. Ct. at 1026. Accordingly, at a minimum, Plaintiffs' claims should be reviewed with the evidence-based scrutiny that applies to "most content-neutral restrictions on speech." *360 Virtual Drone*, 102 F.4th at 277–78.

And as this Court's precedents show, that scrutiny is not toothless. The government must show that its asserted harms are real, that its restriction will materially alleviate those harms, and that the law does not burden substantially more speech than necessary. *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015). This Court has required the government to support that showing with evidence, not lawyer argument or intuition. *Id.* It has also held, applying *McCullen v. Coakley*, 573 U.S.

44

464 (2014), that the government must show it "seriously undertook" to address the problem through less intrusive tools than occupational licensing. *Billups v. City of Charleston*, 961 F.3d 673, 688–89 (4th Cir. 2020).

The government cannot carry that burden at this stage. Plaintiffs' complaint identifies a variety of alternative regulatory schemes that might serve the government's purported interests without imposing a categorical ban on individualized advice by nonlawyers. It could require speakers to disclose that they are not lawyers and do not represent clients in court. *See* JA 32. It could exempt advice pertaining to court-created forms that nonlawyers are already expected to fill out by themselves. *See* JA 35. It could create limited licensing that would be less onerous than full-blown lawyer licensing, as several states have already done. *See* JA 24, JA 39, JA 41. And it could enforce fraud, misrepresentation, and consumer-protection laws.

Under this Circuit's precedent and the Supreme Court's ruling in *McCullen*, the burden is on the government to show that those less restrictive alternatives would be inadequate. Because the government

45

cannot make that showing at the pleadings stage, the decision below must be reversed.

## IV.    JFAP independently states a First Amendment claim.

Even if this Court affirmed the dismissal of the claim by the individual Plaintiffs, this Court should reverse the dismissal of JFAP's claim. The Court's ruling in *Chiles* confirms that JFAP's legal advice is speech. And the factual distinctions between JFAP and the plaintiff in *CAI* provide an independent reason to hold that *CAI* does not control this case.

To begin, the Supreme Court has long recognized the importance of pro bono legal assistance to securing meaningful access to courts. *See, e.g., NAACP v. Button*, 371 U.S. at 428–31; *In re Primus*, 436 U.S. 412, 431–32 (1978). Those cases do not create an unlimited right for any organization to practice law in any way. But they make clear that many of the concerns motivating regulations of legal services are reduced or absent when those services are provided pro bono.

Indeed, it was on precisely these grounds that this Court in *CAI* distinguished this line of cases. CAI was a commercial trade association seeking to provide legal services to employer-members through a

46

corporate structure that the State contended raised entity-control and conflict concerns, and whose members largely already had access to counsel. 922 F.3d at 203 ("State Bar representatives expressed concerns about nonlawyers controlling litigation and receiving attorney fees, confidentiality, excessive fees, and the State Bar's inability to discipline corporations."); *id.* at 206 ("As described in the record, CAI's members have consistently had access to legal services and the courts."). Characterizing the issue as "admittedly close," this Court ultimately concluded that CAI's proposed practice was distinguishable from these cases because, among other things, it "would be for commercial ends," "would not facilitate access to the courts," and "would pose ethical concerns not present in the *Button* cases." 922 F.3d at 206.

This case could hardly be more different. JFAP is a nonprofit access-to-justice organization. JA 25. It seeks to provide free form-specific advice to people who often cannot obtain counsel at all. JA 28, JA 30–31. It does not seek to employ attorneys in a corporate legal department, control litigation, collect attorney fees, or operate a law firm for revenue. Its mission is to promote equality, efficiency, and fairness in the legal system. JA 25.

47

In short, *CAI* and JFAP were created for different purposes, have different structures, and offer different services to different types of people. Plaintiffs have plausibly alleged that those differences mitigate all the concerns that underlay this Court's ruling in *CAI*. Under any applicable form of First Amendment scrutiny, it was error to dismiss JFAP's claim at the pleadings stage. *See* JA 38.

## CONCLUSION

The district court's judgment should be reversed. The Court should remand with instructions to deny the motion to dismiss and allow Plaintiffs' as-applied First Amendment claims to proceed.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs-Appellants request oral argument. This appeal concerns the constitutionality of North Carolina's unauthorized-practice-of-law regime as applied to pure speech, and it requires this Court to apply the Supreme Court's intervening decision in *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), to this Court's prior decisions in *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019), and *360 Virtual Drone Services LLC v. Ritter*, 102 F.4th 263 (4th Cir. 2024). Oral argument would aid the Court in resolving those important First Amendment questions.

48

Dated: July 1, 2026

Respectfully submitted,

*/s/ Paul M. Sherman*

Paul M. Sherman
Virginia Bar No. 73410
Christian W. Lansinger
Maryland Bar No. 2211290007
INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org
        clansinger@ij.org

Vince Eisinger
North Carolina Bar No. 57646
CRANFILL SUMNER LLP
5420 Wade Park Blvd., Suite 300
Raleigh, NC 27607
Phone: (919) 863-8703
Fax: (919) 863-3459
Email: veisinger@cshlaw.com

*Counsel for Plaintiffs–Appellants*

49

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(a)(7) because it contains 9,222 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Century Schoolbook.

Date: July 1, 2026                 */s/ Paul M. Sherman*
                                   Paul M. Sherman
                                   *Counsel for Plaintiffs–Appellants*