## No. 25 – 1038

In the

# United States Court of Appeals
### for the Fourth Circuit

**MORAG BLACK POLASKI; SHAWANA ALMENDAREZ; NORTH CAROLINA JUSTICE FOR ALL PROJECT**,

*Plaintiffs–Appellants,*

*v.*

**ERNIE LEE**, et al.,

*Defendants–Appellees.*

**On Appeal from the United States District Court
for the Eastern District of North Carolina**

---

## JOINT APPENDIX

---

Elizabeth Curran O'Brien
James W. Doggett
NORTH CAROLINA DEPARTMENT OF JUSTICE
P.O. Box 629
Raleigh, NC 27602
Phone: (919) 716-0091
*Counsel for Defendants–Appellees*

Alan William Duncan
Stephen McDaniel Russell, Jr.
MULLINS DUNCAN HARRELL & RUSSELL PLLC
300 North Greene St.
Greensboro, NC 27401
Phone (336) 645-3325
*Counsel for Defendant–Appellee Matthew W. Smith*

Paul M. Sherman
Christian W. Lansinger
INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
Phone: (703) 682-9320

Vince Eisinger
CRANFILL SUMNER LLP
5420 Wade Park Blvd., Suite 300
Raleigh, NC 27607
Phone: (919) 863-8703
*Counsel for Plaintiffs–Appellants*

| Document | Filing Date | ECF | JA |
|---|---|---|---|
| Order granting Motion to Dismiss for Failure to State a Claim | December 16, 2024 | 40 | JA 1 |
| Judgment | December 16, 2024 | 41 | JA 11 |
| District Court Docket Report | | | JA 13 |
| Amended Complaint for Declaratory and Injunctive Relief | March 18, 2024 | 16 | JA 18 |
| Exhibit A to Amended Complaint | March 18, 2024 | 17-1 | JA 44 |
| Exhibit B to Amended Complaint | March 18, 2024 | 17-2 | JA 50 |
| Exhibit C to Amended Complaint | March 18, 2024 | 17-3 | JA 55 |
| Joint Motion to Dismiss for Failure to State a Claim | May 20, 2024 | 30 | JA 57 |
| Official Transcript for Hearing on Motion to Dismiss held on November 1, 2024 | December 12, 2024 | 39 | JA 62 |
| Notice of Appeal | January 10, 2025 | 42 | JA 110 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:24-CV-4-BO-BM

MORAG BLACK POLASKI, SHAWANA )
ALMENDAREZ, and NORTH CAROLINA )
JUSTICE FOR ALL PROJECT, )
                                               )
               Plaintiffs, )
                                               )
v.                              )         O R D E R
                                               )
ERNIE LEE, in his official capacity as )
District Attorney for the 5th Prosecutorial )
District of the State of North Carolina; )
BENJAMIN R. DAVID, in his official )
capacity as District Attorney for the 6th )
Prosecutorial District of the State of North )
Carolina; NANCY LORRIN FREEMAN, )
in her official capacity as District Attorney )
for the 10th Prosecutorial District of the )
State of North Carolina; ASHLIE )
SHANLEY, in her official capacity as )
District Attorney for the 25th Prosecutorial )
District of the State of North Carolina; )
SPENCER B. MERRIWEATHER III, in his )
official capacity as District Attorney for the )
26th Prosecutorial District for the State of )
North Carolina; and A. TODD BROWN, in )
his official capacity as President of the )
North Carolina State Bar and Chair of the )
Executive Committee of the North Carolina )
State Bar, )
                                               )
              Defendants. )

        This cause comes before the Court on defendants' joint motion to dismiss plaintiffs'

amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs

have responded, defendants have replied, and a hearing on the motion was held before the

**JA 1**

undersigned on November 1, 2024, at Raleigh, North Carolina. In this posture, the motion is ripe for ruling. For the reasons that follow, the motion is granted.

## BACKGROUND

Plaintiffs are two North Carolina Certified Paralegals and a nonprofit organization dedicated to expanding access to justice in North Carolina, in particular to those North Carolinians who cannot afford a lawyer to represent them but earn too much to qualify for free legal assistance. Plaintiffs seek to provide simple legal advice to North Carolinians regarding completing common, court-related forms, such as those used for summary ejectments, absolute divorces, and protective orders. But North Carolina prohibits the unauthorized practice of law by anyone who is not an attorney. Plaintiffs now challenge North Carolina's unauthorized practice of law (UPL) statutes under the First Amendment to the United States Constitution, alleging that they impermissibly restrict speech, specifically legal advice.

Defendants, five North Carolina District Attorneys and the President of the State Bar, have moved to dismiss plaintiffs' First Amendment challenge. Defendants argue that the outcome of plaintiffs' First Amendment challenge is controlled by *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir 2019), which held that North Carolina's UPL statutes regulate conduct with only an incidental impact on speech. The UPL statutes are thus evaluated under intermediate scrutiny, which defendants argue even at the pleadings stage demonstrates that plaintiffs' First Amendment challenges fail.

## DISCUSSION

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Papasan v. Allain*, 478 U.S. 265, 283 (1986). When acting on a motion to dismiss under Rule 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable

2

**JA 2**

to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and mere recitals of the elements of a cause of action supported by conclusory statements do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, the facts alleged must allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009).

In North Carolina, the General Assembly defines the practice of law, who may engage in the practice of law, and sets the consequences for the unauthorized practice of law. *See* N.C. Gen. Stat. §§ 84-2.1; 84-4; 84-5; 84-7; 84-37; *see also* Amd. Compl. ¶¶ 98-104; 111-113. The practice of law is defined as, *inter alia*, "performing any legal service for any other person, firm or corporation, with or without compensation" and "assisting by advice, counsel, or otherwise in any legal work; and to advise or give opinion upon the legal rights of any person, firm or corporation." *Id.* § 84-2.1(a). District Attorneys are to seek to enjoin those who engage in the unauthorized practice of law and may further bring criminal charges against such persons or entities. *Id.* § 84-7. The State Bar may also investigate and enjoin the unauthorized practice of law. *Id.* § 84-37.

Plaintiffs allege that they seek "to provide simple legal advice on a variety of court-created forms in family law, landlord-tenant law, and estate planning and probate services." Amd. Compl. ¶ 66. Plaintiffs seek to "go beyond basic legal information" when providing assistance to individuals filling out court-created forms, and specifically want to offer legal advice "tailored to the litigant's factual circumstances and legal goals." *Id.* ¶¶ 84-86. This legal advice and assistance

3

**JA 3**

`

would be provided for a fee, or without a fee by the Justice for All Project. *Id.* ¶¶ 89-91. Plaintiffs recognize that none of the UPL exceptions provided by state law permit them to give legal advice. *See* N.C. Gen. Stat. § 84-2.1; Amd. Compl. ¶¶ 114-116; *see also* Amd. Compl. ¶ 117 (describing circumstances under federal law where nonlawyers may provide advice or representation). Plaintiffs allege that, as they face the credible threat of prosecution by defendants should they provide legal advice in violation of North Carolina law, they have had to self-censor and refrain from providing beneficial legal advice to litigants, including friends and family. Plaintiffs allege that the credible threat of prosecution has chilled and silenced their pure legal speech in violation of the First Amendment. *Id.* ¶¶ 126-130.

Plaintiffs' complaint alleges two as-applied challenges to North Carolina's UPL statutes under the First Amendment: plaintiffs' right to provide free legal advice (Count I) and the individual plaintiffs' right to provide paid legal advice (Count II). Plaintiffs have limited their challenges "solely as applied to legal advice regarding court-created forms." *Id.* ¶¶ 141; 158. Plaintiffs allege that the First Amendment's Free Speech Clause protects their oral and written legal advice as it relates to these forms, and that North Carolina's UPL statutes, as they are applied to plaintiffs' legal advice, are content-based prohibitions of "pure speech." *Id.* ¶¶ 146-47; 163-64.

A. *Procedural posture*

The Court is considering plaintiffs' as-applied challenges at the pleadings stage. "In order to prevail on an as-applied First Amendment challenge, a plaintiff 'must show that the regulations are unconstitutional as applied to their particular speech activity.'" *Fusaro v. Howard*, 19 F.4th 357, 368 (4th Cir. 2021) (citation omitted). Typically, this is a fact-based inquiry. *Id.* As is discussed more fully below, however, because defendants are permitted to show that the challenged statutes satisfy the applicable level of scrutiny using common sense, and need not rely

4

**JA 4**

on specific evidence, the Court determines that disposition at the pleadings stage in this instance

is appropriate. *See 360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 278 (4th Cir. 2024); *see*

*also Brokamp v. James*, 66 F.4th 374, 406 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1095 (2024)

(affirming dismissal of First Amendment challenge to mental health counselor licensing

requirements and applying intermediate scrutiny to pleadings).

B. *Intermediate scrutiny applies*

The First Amendment, made applicable to the states by the Fourteenth Amendment,

prohibits laws which abridge freedom of speech. U.S. Const. amend. I; *Billups v. City of*

*Charleston, S.C.*, 961 F.3d 673, 682 (4th Cir. 2020).

> Laws that impinge upon speech receive different levels of judicial scrutiny
> depending on the type of regulation and the justifications and purposes underlying
> it. On the one hand, regulations that discriminate against speech based on its content
> "are presumptively invalid," and courts usually "apply the most exacting scrutiny".
> On the other hand, "areas traditionally subject to government regulation," such as
> commercial speech and professional conduct, typically receive a lower level of
> review.

*Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014) (cleaned up, citations omitted). The first step

in considering a First Amendment challenge is thus to determine which level of scrutiny applies,

and "the precedent of this [circuit] and the Supreme Court establish that professional regulations—

like other regulations implicating speech—are subject to various levels of scrutiny, depending on

their nature." *360 Virtual Drone*, 102 F.4th at 271.

Plaintiffs argue that the UPL laws regulate speech, not conduct; that they regulate speech

based on its content; and that, as content-based restrictions on speech, the UPL laws are subject to

strict scrutiny. Strict scrutiny means that North Carolina's UPL statutes regulating legal advice

would survive only if they are "the least restrictive means of achieving a compelling state interest."

*McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

Recently, however, the Fourth Circuit determined that North Carolina's UPL statute which prohibits the corporate practice of law is "a regulation of professional conduct that incidentally burdens speech, which only needs to survive intermediate scrutiny." *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019) (hereinafter "*CAI*") (citing *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018) (hereinafter "*NIFLA*"). The *CAI* court addressed precisely the issue presented by plaintiffs here – whether in North Carolina giving legal advice should be viewed as "speech as speech," and thus subject to strict scrutiny – and held

> The UPL statutes don't target the communicative aspects of practicing law, such as the advice lawyers may give to clients. Instead, they focus more broadly on the question of who may conduct themselves as a lawyer. Licensing laws inevitably have some effect on the speech of those who are not (or cannot be) licensed. But that effect is merely incidental to the primary objective of regulating the conduct of the profession.

*Id.* at 208. The *CAI* court did not, as plaintiffs contend, apply the professional speech doctrine that the Supreme Court rejected in *NIFLA*; the *CAI* court considered and applied *NIFLA* and nonetheless reached the conclusion above.

The Fourth Circuit also later examined and reaffirmed the *CAI* decision, holding that where an "Act is a regulation of professional conduct that only incidentally impacts speech, . . . [this circuit] appl[ies] a more relaxed form of intermediate scrutiny that mandates only that the restriction be 'sufficiently drawn' to protect a substantial state interest." *360 Virtual Drone*, 102 F.4th at 271. Defendants thus need only show a "reasonable fit" between the UPL statutes and North Carolina's substantial interests. *Id.* at 279.

The Court has been presented with no argument which convinces it that the circuit court's treatment of the UPL statute at issue in *CAI* is somehow distinguishable from the UPL statutes at issue here. As in *CAI*, the targeted UPL statutes "involve[] a classic regulation of conduct with an incidental burden on speech: the law prohibit[s] certain entities from offering legal services or

6

**JA 6**

.

advice (speech that has economic and legal consequences), and ha[s] no readily apparent implications for unpopular or dissenting speech." *360 Virtual Drone*, 102 F.4th at 275; *see also id.* at 272-276 (discussing guideposts to be used in drawing line between speech and conduct). Plaintiffs do not challenge the UPL statutes because they are prohibited by them from providing a certain type of legal advice or a specific message; rather, they challenge the UPL statutes because they are prevented from giving any legal advice at all because they are not lawyers. Just as in *CAI*, this regulation targets conduct, not speech, as it regulates who may engage in the practice of law rather than what those engaged in the practice of law must or must not say. *Compare Stuart*, 774 F.3d at 253 (law which compels physician to deliver state's preferred message "treads . . . heavily on the physicians' free speech rights").

Plaintiffs argue that the Court should rely on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), and apply strict scrutiny, but again their argument is not persuasive. In *Humanitarian Law Project*, the Supreme Court held, in a challenge to a law prohibiting providing material support to terrorists, that the statute at issue regulated content, such as providing specialized training on the use of international law, not conduct. *Id.* 561 U.S. at 28 ("the law here may be described as directed at conduct, . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message."). But, as described in both *CAI* and *360 Virtual Drone*, the starting point of the analysis in this case is that states have long held the authority to license professionals and regulate their practice. *See CAI*, 922 F.3d at 207-208. *Humanitarian Law Project* simply did not implicate these concerns. Plaintiffs further rely on *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 114 (S.D.N.Y. 2022), which applied *Humanitarian Law Project* to conclude that providing legal advice was speech, not conduct, and considered the

7

**JA 7**

challenged UPL statute using strict scrutiny. *Upsolve* is not binding on this Court, nor is it persuasive in light of *CAI*.

C.  *The challenged statutes satisfy intermediate scrutiny*

*CAI* held that the UPL statute prohibiting the corporate practice of law satisfies relaxed intermediate scrutiny. The same is true here. First, "North Carolina's interest in regulating the legal profession to protect clients is at least substantial." *CAI*, 922 F.3d at 209. Second, there is a "reasonable fit" between prohibiting nonlawyers from giving legal advice and North Carolina's regulation of the legal profession in order to protect its citizens.

Restricting the practice of law, including the provision of legal advice, to lawyers who have training, oversight, confidentiality restrictions, and against whom clients have recourse, plainly fits within the State's substantial interest in protecting its citizens. *See CAI*, 922 F.3d at 209 (noting that professional integrity may suffer if state permits corporate practice of law). North Carolina attorneys are also governed by the Rules of Professional Conduct, which imposes, *inter alia*, duties of competence and loyalty and requires attorneys to avoid conflicts of interests. N.C. R. Prof'l Conduct r. 1.1; 1.7-1.13. Plaintiffs would not be governed by these rules, and, although they allege they want to provide only "simple legal advice," they also seek to provide advice in circumstances which can have wide-reaching effects, such as child custody matters.

Moreover, the restriction on the provision of legal advice does not prevent plaintiffs from sharing and distributing legal information. *See* Amd. Compl. Ex. B at 4 ("Generalized legal statements and opinions, not tailored to any specific or particular situation, do not constitute the unauthorized practice of law."). Paralegals may also assist clients with filling out forms, provided there is appropriate supervision by an attorney. Amd. Compl. ¶¶ 60, 77. In other words, North Carolina has struck a balance between limiting the practice of law and provision of legal advice to

8

**JA 8**

licensed attorneys and recognizing that paralegals are well-equipped to assist in the delivery of legal services. Plaintiffs argue that other jurisdictions have adopted different approaches and allow paralegals to provide additional services directly to clients. Plaintiffs also note their own efforts in trying to persuade the North Carolina General Assembly to do the same. That "[a]nother state legislature might balance the interests differently" does not mean that the balance struck by North Carolina runs afoul of the First Amendment. *CAI*, 922 F3d at 209. North Carolina's current limits on the practice of law and the provision of legal advice reasonably fit within its interest in regulating the legal profession.

In sum, plaintiffs spend the majority of their brief arguing that the Court should apply strict scrutiny to the UPL statutes and that in order to do so the case must proceed to summary judgment. The court of appeals has considered substantially similar First Amendment challenges and arguments in *CAI* and *360 Virtual Drone*, and this Court has been presented with no persuasive argument that those cases do not control the outcome here. Further, though *CAI* and *360 Virtual Drone* were both decided at summary judgment, the *360 Virtual Drone* court made plain that evidence is *not* needed to determine whether a state's professional regulation which only incidentally impacts speech survives intermediate scrutiny, and thus the Court can decide this case at the 12(b)(6) stage.

## CONCLUSION

Accordingly, for the foregoing reasons, defendants' joint motion to dismiss [DE 30] is GRANTED.

The complaint is DISMISSED in its entirety.

The clerk is DIRECTED to enter judgment and close the case.

9

Case 7:24-cv-00004-BO-BM    Document 40    Filed 12/16/24    Page 9 of 10

**JA 9**

SO ORDERED, this _13_ day of December 2024.

_Terrence Boyle_

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

10

**JA 10**

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

MORAG BLACK POLASKI, SHAWANA            )
ALMENDAREZ, and NORTH CAROLINA          )
JUSTICE FOR ALL PROJECT,                )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )          **JUDGMENT**
                                        )
ERNIE LEE, in his official capacity as District   )    7:24-CV-4-BO-BM
Attorney for the 5th Prosecutorial District of the )
State of North Carolina; BENJAMIN R. DAVID,       )
in his official capacity as District Attorney for  )
the 6th Prosecutorial District of the State of North )
Carolina, NANCY LORRIN FREEMAN, in her            )
official capacity as District Attorney for the 10th )
Prosecutorial District of the State of North Carolina )
ASHLIE SHANLEY, in her official capacity          )
as District Attorney for the 25th Prosecutorial   )
District of the State of North Carolina;          )
SPENCER B. MERRIWEATHER, III,                     )
in his official capacity as District Attorney for  )
the 26th Prosecutorial District for the State of North )
Carolina, and A. TODD BROWN, in his official      )
capacity as President of the North Carolina State  )
Bar and Chair of the Executive Committee of the   )
State of North Carolina State Bar,                )
                                        )
                    Defendants.         )
                                        )

**Decision by Court.**
This cause comes before the Court on defendants' joint motion to dismiss plaintiffs' amended complaint pursuant to Rule l 2(b )(6) of the Federal Rules of Civil Procedure.

**IT IS ORDERED, ADJUDGED AND DECREED** that defendants' joint motion to dismiss [DE 30] GRANTED.

The complaint is DISMISSED in its entirety.

This case is closed.

JA 11

**This judgment filed and entered on December 16, 2024, and served on:**
Paul Sherman (via CM/ECF NEF)
Christian W. Lansinger (via CM/ECF NEF)
Vince R. Eisinger (via CM/ECF NEF)
Carl M. Newman (via CM/ECF NEF)
Chris D. Agosto Carreiro (via CM/ECF NEF)
Elizabeth O'Brien (via CM/ECF NEF)
Alan W. Duncan (via CM/ECF NEF)
Stephen McDaniel Russell, Jr. (via CM/ECF NEF)

December 16, 2024

PETER A. MOORE, JR., CLERK OF COURT

*Lindsay Stauch*
By: Deputy Clerk

JA 12

APPEAL,CLOSED,MEDIATION

**U.S. District Court**
**EASTERN DISTRICT OF NORTH CAROLINA (Southern Division)**
**CIVIL DOCKET FOR CASE #: 7:24−cv−00004−BO−BM**

| | |
|---|---|
| Black Polaski et al v. Stein<br>Assigned to: District Judge Terrence W. Boyle<br>Referred to: Magistrate Judge Brian S. Meyers<br>Case in other court:  SCA, 25−01038<br>Cause: 42:1983 Civil Rights Act | Date Filed: 01/04/2024<br>Date Terminated: 12/16/2024<br>Jury Demand: None<br>Nature of Suit: 440 Civil Rights: Other<br>Jurisdiction: Federal Question |

| Date Filed | # | Docket Text |
|---|---|---|
| 01/04/2024 | 1 | **COMPLAINT** against Josh Stein ( Filing fee $ 405 receipt number ANCEDC−7417676.), filed by Morag Black Polaski, North Carolina Justice For All Project, Shawana Almendarez. (Attachments: # 1 Exhibit A – Guidelines on the Use of Paralegals, # 2 Exhibit B– UPL FAQs, # 3 Exhibit C – NC eCourts Guide and File Disclaimers Page, # 4 Civil Cover Sheet, # 5 Proposed Summons) (Eisinger, Vince) (Entered: 01/04/2024) |
| 01/04/2024 | 2 | Notice of Appearance filed by Vince R. Eisinger on behalf of All Plaintiffs. (Eisinger, Vince) (Entered: 01/04/2024) |
| 01/04/2024 | 3 | Financial Disclosure Statement by Morag Black Polaski (Eisinger, Vince) (Entered: 01/04/2024) |
| 01/04/2024 | 4 | Financial Disclosure Statement by Shawana Almendarez (Eisinger, Vince) (Entered: 01/04/2024) |
| 01/04/2024 | 5 | Financial Disclosure Statement by North Carolina Justice For All Project (Eisinger, Vince) (Entered: 01/04/2024) |
| 01/04/2024 | 6 | Notice of Special Appearance for non−district by Paul Sherman on behalf of All Plaintiffs. (Sherman, Paul) (Entered: 01/04/2024) |
| 01/04/2024 | 7 | Notice of Special Appearance for non−district by Christian W Lansinger on behalf of All Plaintiffs. (Lansinger, Christian) (Entered: 01/04/2024) |
| 01/04/2024 | 8 | Summons Issued as to Josh Stein. *(\*NOTICE: Counsel shall print the attached summons and serve with other case opening documents in accordance with Fed.R.Civ.P. 4.\*)* (Rudd, D.) (Entered: 01/04/2024) |
| 01/09/2024 | 9 | SUMMONS Returned Executed by Morag Black Polaski, North Carolina Justice For All Project, Shawana Almendarez. Josh Stein served on 1/5/2024, answer due 1/26/2024. (Sherman, Paul) (Entered: 01/09/2024) |
| 01/19/2024 | 10 | Notice of Appearance filed by Carl M. Newman on behalf of All Defendants. (Newman, Carl) (Entered: 01/19/2024) |
| 01/19/2024 | 11 | Financial Disclosure Statement by Josh Stein (Newman, Carl) (Entered: 01/19/2024) |
| 01/19/2024 | 12 | MOTION for Extension of Time to File Answer filed by Josh Stein. (Attachments: # 1 Text of Proposed Order) (Newman, Carl) (Entered: 01/19/2024) |
| 01/22/2024 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 12 MOTION for Extension of Time to File Answer. (Stouch, L.) (Entered: 01/22/2024) |
| 01/22/2024 | | TEXT ORDER granting Defendant's Motion for Extension of Time 12 . For good cause shown, it is ordered that Defendant has up to and including February 26, 2024, within which to answer or otherwise respond to the Complaint 1 . Signed by Peter A. Moore, Jr., Clerk of Court on 1/22/2024. (Hockaday, A.) (Entered: 01/22/2024) |
| 02/01/2024 | | Case Selected for Mediation – A printable list of certified mediators for the Eastern District of North Carolina is available on the court's Website, http://www.nced.uscourts.gov/attorney/mediators.aspx. Please serve this list on all parties. (Sellers, N.) (Entered: 02/01/2024) |

**JA 13**

| 02/26/2024 | 13 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction filed by Josh Stein. (Newman, Carl) (Entered: 02/26/2024) |
|---|---|---|
| 02/26/2024 | 14 | Memorandum in Support regarding 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Josh Stein. (Newman, Carl) (Entered: 02/26/2024) |
| 02/26/2024 | 15 | ORDER FOR DISCOVERY PLAN sent to all parties. Signed by Peter A. Moore, Jr., Clerk of Court on 2/26/2024. (Stouch, L.) (Entered: 02/26/2024) |
| 03/18/2024 | 16 | **AMENDED COMPLAINT** against Ernie Lee, Benjamin R. David, Nancy Lorrin Freeman, Ashlie Shanley, Spencer B. Merriweather III, A. Todd Brown, filed by Morag Black Polaski, North Carolina Justice For All Project, Shawana Almendarez. (Attachments: # 1 Proposed Summons Ernie Lee, in his official capacity, # 2 Proposed Summons Benjamin R. David, in his official capacity, # 3 Proposed Summons Nancy Lorrin Freeman, in her official capacity, # 4 Proposed Summons Ashlie Shanley, in her official capacity, # 5 Proposed Summons Spencer B. Merriweather III, in his official capacity, # 6 Proposed Summons A. Todd Brown, in his official capacity) (Sherman, Paul) (Entered: 03/18/2024) |
| 03/18/2024 | 17 | Notice filed by Shawana Almendarez, Morag Black Polaski, North Carolina Justice For All Project regarding 16 Amended Complaint,, . (Attachments: # 1 Exhibit A to First Amended Complaint, # 2 Exhibit B to First Amended Complaint, # 3 Exhibit C to First Amended Complaint) (Sherman, Paul) (Entered: 03/18/2024) |
| 03/21/2024 | 18 | Summonses Issued as to A. Todd Brown, Benjamin R. David, Nancy Lorrin Freeman, Ernie Lee, Spencer B. Merriweather III, Ashlie Shanley. *(\*NOTICE: Counsel shall print the attached summons and serve with other case opening documents in accordance with Fed.R.Civ.P. 4.\*)* (Sellers, N.) (Entered: 03/21/2024) |
| 03/21/2024 | 19 | Waiver of Service Returned Executed filed by North Carolina Justice For All Project, Shawana Almendarez, Morag Black Polaski. A. Todd Brown waiver sent on 3/21/2024, answer due 5/20/2024. (Sherman, Paul) (Entered: 03/21/2024) |
| 03/22/2024 | 20 | Notice of Appearance filed by Alan W. Duncan on behalf of A. Todd Brown. (Duncan, Alan) (Entered: 03/22/2024) |
| 03/22/2024 | 21 | Notice of Appearance filed by Stephen McDaniel Russell, Jr on behalf of A. Todd Brown. (Russell, Stephen) (Entered: 03/22/2024) |
| 03/22/2024 | 22 | Financial Disclosure Statement by A. Todd Brown (Russell, Stephen) (Entered: 03/22/2024) |
| 03/22/2024 | 23 | Waiver of Service Returned Executed filed by North Carolina Justice For All Project, Shawana Almendarez, Morag Black Polaski. Ernie Lee waiver sent on 3/22/2024, answer due 5/21/2024. (Sherman, Paul) (Entered: 03/22/2024) |
| 03/22/2024 | 24 | Waiver of Service Returned Executed filed by North Carolina Justice For All Project, Shawana Almendarez, Morag Black Polaski. Benjamin R. David waiver sent on 3/22/2024, answer due 5/21/2024. (Sherman, Paul) (Entered: 03/22/2024) |
| 03/22/2024 | 25 | Waiver of Service Returned Executed filed by North Carolina Justice For All Project, Shawana Almendarez, Morag Black Polaski. Nancy Lorrin Freeman waiver sent on 3/22/2024, answer due 5/21/2024. (Sherman, Paul) (Entered: 03/22/2024) |
| 03/22/2024 | 26 | Waiver of Service Returned Executed filed by North Carolina Justice For All Project, Shawana Almendarez, Morag Black Polaski. Ashlie Shanley waiver sent on 3/22/2024, answer due 5/21/2024. (Sherman, Paul) (Entered: 03/22/2024) |
| 03/22/2024 | 27 | Waiver of Service Returned Executed filed by North Carolina Justice For All Project, Shawana Almendarez, Morag Black Polaski. Spencer B. Merriweather III waiver sent on 3/22/2024, answer due 5/21/2024. (Sherman, Paul) (Entered: 03/22/2024) |
| 04/19/2024 | | Motion Submitted to District Judge Terrence W. Boyle regarding 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and for Lack of Jurisdiction. (Stouch, L.) (Entered: 04/19/2024) |

**JA 14**

| | | |
|---|---|---|
| 04/24/2024 | | TEXT ORDER – In light of the filing of the amended complaint, the motion to dismiss the original complaint [DE 13] filed by defendant Stein is DENIED AS MOOT. *See Fawzy v. Wauquiez Boats SNC,* 873 F.3d 451, 455 (4th Cir. 2017). Entered by District Judge Terrence W. Boyle on 4/24/2023. (Stouch, L.) (Entered: 04/24/2024) |
| 05/15/2024 | 28 | Notice of Appearance filed by Chris D. Agosto Carreiro on behalf of Benjamin R. David, Nancy Lorrin Freeman, Ernie Lee, Spencer B. Merriweather III, Ashlie Shanley. (Agosto Carreiro, Chris) (Entered: 05/15/2024) |
| 05/16/2024 | 29 | Notice of Appearance filed by Elizabeth Curran O'Brien on behalf of Benjamin R. David, Nancy Lorrin Freeman, Ernie Lee, Spencer B. Merriweather III, Ashlie Shanley. (O'Brien, Elizabeth) (Entered: 05/16/2024) |
| 05/20/2024 | 30 | Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by A. Todd Brown, Benjamin R. David, Nancy Lorrin Freeman, Ernie Lee, Spencer B. Merriweather III, Ashlie Shanley. (Russell, Stephen) (Entered: 05/20/2024) |
| 05/20/2024 | 31 | Memorandum in Support regarding 30 Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by A. Todd Brown, Benjamin R. David, Nancy Lorrin Freeman, Ernie Lee, Spencer B. Merriweather III, Ashlie Shanley. (Russell, Stephen) (Entered: 05/20/2024) |
| 05/29/2024 | 32 | Consent MOTION for Extension of Time to File Response/Reply as to 30 Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Shawana Almendarez, Morag Black Polaski, North Carolina Justice For All Project. (Attachments: # 1 Text of Proposed Order) (Sherman, Paul) (Entered: 05/29/2024) |
| 06/05/2024 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 32 Consent MOTION for Extension of Time to File Response as to 30 Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Stouch, L.) (Entered: 06/05/2024) |
| 06/05/2024 | | TEXT ORDER granting Plaintiffs' Unopposed Motion for Extension of Time 32 . For good cause shown, it is ordered that Plaintiffs have up to and including June 24, 2024, within which respond to the Joint Motion to Dismiss 30 . Signed by Peter A. Moore, Jr., Clerk of Court on 6/5/2024. (Hockaday, A.) (Entered: 06/05/2024) |
| 06/24/2024 | 33 | RESPONSE in Opposition regarding 30 Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Shawana Almendarez, Morag Black Polaski, North Carolina Justice For All Project. (Sherman, Paul) (Entered: 06/24/2024) |
| 06/28/2024 | 34 | Consent MOTION for Extension of Time to File Response/Reply as to 33 Response in Opposition to Motion, 30 Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Joint Consent Motion for Extension of Time* filed by A. Todd Brown, Benjamin R. David, Nancy Lorrin Freeman, Ernie Lee, Spencer B. Merriweather III, Ashlie Shanley. (Attachments: # 1 Text of Proposed Order (Proposed Order Granting Defendants' Joint Consent Motion for Extension of Time)) (Russell, Stephen) (Entered: 06/28/2024) |
| 07/03/2024 | | Motion Submitted to District Judge Terrence W. Boyle regarding 34 Consent MOTION for Extension of Time to File Reply as to 33 Response in Opposition to Motion, 30 Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Joint Consent Motion for Extension of Time*. (Stouch, L.) (Entered: 07/03/2024) |
| 07/08/2024 | 35 | ORDER granting 34 Consent MOTION for Extension of Time to File Reply as to 33 Response in Opposition to Motion. Reply due by 7/15/2024. Signed by District Judge Terrence W. Boyle on 7/3/2024. (Stouch, L.) (Entered: 07/08/2024) |
| 07/12/2024 | 36 | REPLY to Response to Motion regarding 30 Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Reply Brief in Support of Motion to Dismiss* filed by A. Todd Brown, Benjamin R. David, Nancy Lorrin Freeman, Ernie Lee, Spencer B. Merriweather III, Ashlie Shanley. (Russell, Stephen) (Entered: 07/12/2024) |
| 10/17/2024 | | Motion Submitted to District Judge Terrence W. Boyle regarding 30 Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Stouch, L.) (Entered: 10/17/2024) |

**JA 15**

| | | |
|---|---|---|
| 10/17/2024 | | Set Hearing as to 30 Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM – Motion Hearing set for 11/1/2024 at 10:00 AM in Raleigh – 7th Floor – Courtroom 2 before District Judge Terrence W. Boyle. (Stouch, L.) (Entered: 10/17/2024) |
| 10/22/2024 | 37 | MOTION for Hearing regarding Set/Reset Motion and M&R Hearings *Unopposed Motion to Reschedule Hearing* filed by A. Todd Brown. (Attachments: # 1 Text of Proposed Order Proposed Order Granting Unopposed Motion to Reschedule Hearing) (Russell, Stephen) (Entered: 10/22/2024) |
| 10/24/2024 | | Motion Submitted to District Judge Terrence W. Boyle regarding 37 MOTION for Hearing regarding Set/Reset Motion and M&R Hearings *Unopposed Motion to Reschedule Hearing*. (Stouch, L.) (Entered: 10/24/2024) |
| 10/24/2024 | | TEXT ORDER **denying** 37 Unopposed Motion to Reset Hearing. Entered by District Judge Terrence W. Boyle on 10/24/2024. (Stouch, L.) (Entered: 10/24/2024) |
| 10/28/2024 | | Reset Hearing as to 30 Joint MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. Motion Hearing reset for 11/1/2024 at **10:30 AM** in Raleigh – 7th Floor – Courtroom 2 before District Judge Terrence W. Boyle. **Time change only.** (Stouch, L.) (Entered: 10/28/2024) |
| 11/01/2024 | 38 | Minute Entry for proceedings held in Raleigh, NC before District Judge Terrence W. Boyle: Motion Hearing held on 11/1/2024. All parties present and ready to proceed. Oral argument held. Written order to follow. (Court Reporter Jenny Carroll, Official Court Reporter) (Stouch, L.) (Entered: 11/04/2024) |
| 12/04/2024 | 39 | OFFICIAL TRANSCRIPT of Proceedings on Motion to Dismiss held on 11/01/2024, before Judge Terrence W. Boyle. Court Reporter Jenny Carroll (jenny_carroll@nced.uscourts.gov). Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website Redaction Request due 12/28/2024. Redacted Transcript Deadline set for 1/7/2025. Release of Transcript Restriction set for 3/7/2025. (Carroll, Jennifer) (Entered: 12/04/2024) |
| 12/04/2024 | | NOTICE of Filing of Official Transcript 39 Motion to Dismiss. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Carroll, Jennifer) (Entered: 12/04/2024) |
| 12/16/2024 | 40 | ORDER granting 30 Motion to Dismiss for Failure to State a Claim. Signed by District Judge Terrence W. Boyle on 12/13/2024. (Stouch, L.) (Entered: 12/16/2024) |
| 12/16/2024 | 41 | JUDGMENT – IT IS ORDERED, ADJUDGED AND DECREED that defendants' joint motion to dismiss [DE 30] is GRANTED. The complaint is DISMISSED in its entirety. This case is closed. Signed by deputy clerk for Peter A. Moore, Jr., Clerk of Court on 12/16/2024. (Stouch, L.) (Entered: 12/16/2024) |
| 01/10/2025 | 42 | Notice of Appeal filed by Morag Black Polaski, Shawana Almendarez, North Carolina Justice For All Project as to 40 Order on Motion to Dismiss for Failure to State a Claim. Filing fee, receipt number ANCEDC–7932171. (Sherman, Paul) (Entered: 01/10/2025) |
| 01/13/2025 | 43 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 42 Notice of Appeal. (Foell, S.) (Entered: 01/13/2025) |
| 01/14/2025 | 44 | US Court of Appeals Case Number 25–1038 (Ganna Aboutabl, Case Manager) as to 42 Notice of Appeal filed by Shawana Almendarez, North Carolina Justice For All Project, Morag Black Polaski. (Foell, S.) (Entered: 01/15/2025) |
| 02/03/2025 | 45 | ORDER of US Court of Appeals placing this case in abeyance pending a decision by the United States Supreme Court in 360 Virtual Drone Services LLC v. Ritter, No. 24–279. Counsel shall immediately notify this court upon issuance of a decision by the |

**JA 16**

| | | |
|---|---|---|
| | | Supreme Court, as to 42 Notice of Appeal filed by Shawana Almendarez, North Carolina Justice For All Project, Morag Black Polaski. (Foell, S.) (Entered: 02/03/2025) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**

No.7:24-cv-00004-BO-BM

| | |
|---|---|
| MORAG BLACK POLASKI; SHAWANA ALMENDAREZ; and NORTH CAROLINA JUSTICE FOR ALL PROJECT, <br><br> *Plaintiffs*, <br><br> v. <br><br> ERNIE LEE, in his official capacity as District Attorney for the 5th Prosecutorial District of the State of North Carolina; BENJAMIN R. DAVID, in his official capacity as District Attorney for the 6th Prosecutorial District of the State of North Carolina; NANCY LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; ASHLIE SHANLEY, in her official capacity as District Attorney for the 25th Prosecutorial District of the State of North Carolina; SPENCER B. MERRIWEATHER III, in his official capacity as District Attorney for the 26th Prosecutorial District of the State of North Carolina; and A. TODD BROWN, in his official capacity as President of the North Carolina State Bar and Chair of the Executive Committee of the North Carolina State Bar, <br><br> *Defendants*. | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION[1]**

1.       This First Amendment lawsuit challenges North Carolina's prohibition on the unauthorized practice of law ("UPL") as applied to pure legal advice. Plaintiffs are two North Carolina Certified Paralegals and the North Carolina Justice for All Project ("JFAP"), a nonprofit

---

[1] On February 26, 2024, Attorney General Josh Stein filed a motion to dismiss Plaintiffs' original Complaint. ECF No. 13. Plaintiffs file this First Amended Complaint as a matter of course. *See* Fed. R. Civ. 15(a)(1)(B).

organization founded in 2020 to expand access to justice in North Carolina. Both the individual plaintiffs and JFAP want to provide simple legal advice to North Carolinians about how to properly fill in common, court-created legal forms. But North Carolina's broad UPL prohibition makes it a crime for anyone to give legal advice—paid or unpaid—unless they are a fully licensed attorney.

2.      The forms Plaintiffs want to help North Carolinians fill out, concerning simple legal matters such as summary ejectments, absolute divorces, and protective orders, are not complicated. The North Carolina Administrative Office of the Courts ("NCAOC") provides them online for pro se litigants to fill out themselves, by hand or through the website's interactive software. But the forms can still be confusing, and many pro se litigants filling out these forms would benefit from simple advice.

3.      Unfortunately, hiring a lawyer to provide that advice is too expensive for many North Carolinians. This is true not just for the poor, but for the "missing middle"—those North Carolinians who earn too much money to qualify for free legal assistance from groups like Legal Aid, but not enough to afford an attorney. To help narrow this gap in access to justice, Plaintiffs Morag Black Polaski and Shawana Almendarez—both charter members of JFAP—want to provide this advice at a lower price than licensed attorneys in the same geographical area. And JFAP wants to provide this advice for free at legal clinics open to the public and through an on-demand video library.

4.      Plaintiffs have a First Amendment right to give this advice, and the North Carolinians they would advise have a First Amendment right to hear it. That is because advice—including even expert advice on technical subjects—is speech. That is true regardless of the topic discussed or whether the speaker is paid. It is true regardless of whether that advice is delivered through a book, which is legal in North Carolina, or through one-on-one conversations, which is illegal. And it is true here, for, as one court colorfully put it: "If speaking to clients is not speech, the world is truly upside down." *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020).

2

**JA 19**

5.      Because advice is speech within the First Amendment's protection, the government may not prohibit Plaintiffs' advice based on its legal subject matter unless the government can carry its heavy burden under strict scrutiny of showing that North Carolina's UPL prohibition, as applied to pure legal advice, is narrowly tailored to serve a compelling government interest. The government must also show that its interests could not be achieved equally well through less restrictive regulatory schemes—such as limited practice rights for paralegals, as already exists in Arizona and Utah, or simply allowing nonlawyers to give paid legal advice, as is already the case in countries such as England and Wales. Because the government cannot carry that burden, this Court should hold that North Carolina's UPL prohibition is unconstitutional as applied to Plaintiffs' pure legal advice.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this civil rights lawsuit under the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

7.      Plaintiffs seek declaratory and injunctive relief against Defendants' future enforcement of North Carolina's UPL statutes, N.C. Gen. Stat. § 84-1 *et seq.*; regulations promulgated under North Carolina's UPL statutes, 27 N.C. Admin. Code 1A.0101 *et seq.*; and Defendants' policies and practices that deny Plaintiffs' ability to provide pure legal advice to others.

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9.      Venue lies in this Court under 28 U.S.C. § 1391(b).

## PARTIES

10.      Plaintiff Morag Black Polaski is a charter member of JFAP, a North Carolina Certified Paralegal, and a resident of Jacksonville, North Carolina.

11.      Plaintiff Shawana Almendarez is a charter member of JFAP, a North Carolina Certified Paralegal, and a resident of Kannapolis, North Carolina.

3

**JA 20**

12.      Plaintiff North Carolina Justice For All Project is a North Carolina unincorporated nonprofit association organized under the Uniform Unincorporated Nonprofit Association Act, N.C. Gen. Stat. § 59B-1 *et seq.* JFAP is headquartered in Raleigh, North Carolina, and has members in Cabarrus, Mecklenburg, New Hanover, Onslow, and Wake Counties.

13.      Defendant Ernie Lee is the District Attorney for the 5th Prosecutorial District of North Carolina. He is responsible for the prosecution of crimes in the 5th Judicial District, including Onslow County. He is sued in his official capacity.

14.      Defendant Benjamin R. David is the District Attorney for the 6th Prosecutorial District of North Carolina. He is responsible for the prosecution of crimes in the 6th Judicial District, including New Hanover County. He is sued in his official capacity.

15.      Defendant Nancy Lorrin Freeman is the District Attorney for the 10th Prosecutorial District of North Carolina. She is responsible for the prosecution of crimes in the 10th Judicial District, including Wake County. She is sued in her official capacity.

16.      Defendant Ashlie Stanley is the District Attorney for the 25th Prosecutorial District of North Carolina. She is responsible for the prosecution of crimes in the 25th Judicial District, including Cabarrus County. She is sued in her official capacity.

17.      Defendant Spencer Merriweather is the District Attorney for the 26th Prosecutorial District of North Carolina. He is responsible for the prosecution of crimes in the 26th Judicial District, including Mecklenburg County. He is sued in his official capacity.

18.      Defendant A. Todd Brown is the President of the North Carolina State Bar and Chair of the Executive Committee of the North Carolina State Bar. In these capacities he is responsible for authorizing the Bar Counsel to initiate legal proceedings to enjoin the unauthorized practice of law. He is sued in his official capacity.

4

## FACTUAL ALLEGATIONS

### North Carolina's Access to Justice Gap

19.    North Carolina faces an "access to justice gap"—a gap between the civil legal needs of lower-income residents and the legal resources available to meet those needs.

20.    This access to justice gap leads to significant harm to lower-income North Carolinians. Litigants with legitimate claims may waive or forfeit their legal rights due to a technicality or delay. Unmet civil legal needs can lead to loss of housing, safety concerns, and future criminal problems.

21.    In North Carolina, there are just 2.5 attorneys per 1,000 residents, and there is just one legal aid attorney per 7,500 residents. *2023 ABA Profile of the Legal Profession* 21 (2023); *Legal Aid of North Carolina, Inc. Program Profile*, Legal Servs. Corp., https://www.lsc.gov/grants/our-grantees/legal-aid-north-carolina-inc-program-profile.

22.    Forty-eight of North Carolina's 100 counties qualify as a "legal desert"—defined as counties with less than one attorney per 1,000 residents. Alicia Mitchell-Mercer, N.C. Just. for All Project, *Looking Beyond Lawyers to Bridge the Civil Access to Justice Gap* 21 (2023). Ten North Carolina counties have fewer than ten attorneys. Camille Stell, *Legal Deserts: A Threat to Justice in Rural North Carolina*, Laws. Mutual (May 11, 2022), https://www.lawyersmutualnc.com/risk-management-resources/articles/legal-deserts-a-threat-to-justice-in-rural-north-carolina.

23.    In North Carolina, 46.7% of attorneys are in Wake County and Mecklenburg County, and 63% are in five counties (Wake, Mecklenburg, Guilford, Durham, and Forsyth). Mitchell-Mercer, *supra*, at 21.

24.    In a year, 71% of North Carolina's low-income families experience at least one civil legal problem. But 86% of those legal needs go unmet. N.C. Equal Access to Just. Comm'n & N.C. Equal Just. Alliance, *In Pursuit of Justice: An Assessment of the Civil Legal Needs of North Carolina* 3 (2021).

5

25.    The areas of greatest legal need in North Carolina are (in descending order): summary ejectment, divorce, collection on account, domestic violence, foreclosure, custody, findings and order of foreclosure, and permanent civil no-contact order. *Id.* at 6.

26.    About 16.9% of North Carolina residents are eligible for assistance from the Legal Aid of North Carolina ("LANC"). The income cutoff for LANC is $18,225 for an individual, or $37,500 for a family of four. *Legal Aid of North Carolina, Inc. Program Profile*, *supra*.

27.    Because of budgetary and human resources constraints, LANC can serve only 1 in 10 households needing legal help. Legal Aid of North Carolina, *Annual Report 2018* 7 (2018).

28.    And LANC's services are limited to select subject-matter areas. LANC does not handle divorce, summary administration, or small estate administration. *Our Services*, Legal Aid of N.C., https://legalaidnc.org/our-services/.

29.    Because of the shortage of free legal services, low-income residents often lack meaningful access to North Carolina courts.

30.    The North Carolina access to justice gap also includes the "missing middle"—moderate-income individuals that: (1) are ineligible for legal aid, but (2) lack sufficient disposable income to afford a lawyer.

31.    About 26.5% of North Carolinians make up the missing middle. Mitchell-Mercer, *supra*, at 21.

32.    Many in the missing middle have the ability pay something for legal services, but they cannot afford the rates that attorneys charge.

33.    North Carolina ranks 49th out of 52 states (including Washington, D.C. and Puerto Rico) in access to attorneys for civil legal needs, per the National Center for Access to Justice. *Attorney Access*, Nat'l Ctr. for Access to Just., https://ncaj.org/state-rankings/justice-index/attorney-access.

34.    The access to justice gap is not limited to North Carolina. Nationwide, 74% of low-income households experience at least one civil legal problem in a year. Legal Servs. Corp., *The*

6

*Justice Gap: The Unmet Civil Legal Needs of Low-Income Americans* 32 (2022). Organizations funded by the Legal Services Corporation—a federally established nonprofit—turn away half of all requests for legal help. *Id.* at 9.

35.    Internationally, the United States ranks 115th out of 142 countries in affordability and accessibility of civil justice, per the World Justice Project's Rule of Law Index. Out of the "high income" countries, the United States ranks 46th out of 46 countries. *Rule of Law Index*, World Just. Project, https://worldjusticeproject.org/rule-of-law-index/country/2023/United%20States/Civil%20Justice/.

36.    In response to the justice gap, several states have enacted regulatory and legislative reforms, including limited licensing programs, regulatory sandboxes, liberalization of UPL, and alternative pathways to bar admission.

37.    These nationwide reforms are designed to combat the shortage in legal services and the resulting justice gap by allowing additional—preferably lower-cost—entrants into the legal market.

38.    Early studies on limited licensing programs show that the number of complaints concerning harm from limited licensees in these states are no greater than those against lawyers.

39.    In 2017, the North Carolina Commission on the Administration of Law and Justice drafted a report recommending that the state consider altering its UPL definition and adding a limited licensing program. These reforms would have created a limited right for nonlawyers to provide legal services that accounted for the "evolving needs and expectations of the public."

40.    Since 2017, North Carolina has not enacted a limited licensing program or altered its UPL definition. In 2016, and in response to the *LegalZoom.com v. North Carolina State Bar* lawsuit, the state narrowly exempted website providers offering interactive software for generating legal documents from its UPL definition. *See* N.C. Gen Stat. § 84-2.2.

7

**The North Carolina Justice for All Project**

41.     In late 2020, S.M. Kernodle-Hodges ("Kernodle") and Alicia Mitchell-Mercer founded the North Carolina Justice for All Project: a nonprofit organization dedicated to bridging the access to justice gap.

42.     JFAP's team consists of five certified paralegals across North Carolina. All five women have years of experience in the legal industry. All five women have served in leadership positions within the North Carolina Bar Association Paralegal Division. All five women have volunteered their legal services for free over their paralegal careers.

43.     JFAP's mission is to promote equality, efficiency, and fairness in the North Carolina legal system.

44.     Because of North Carolina's UPL statutes and regulations, JFAP has been unable to narrow the access to justice gap by offering their own free legal services.

45.     Instead, JFAP has spent the last three years advocating for nonlawyers to offer limited legal services in areas of high need, particularly family law, landlord-tenant law, and estate planning and probate services.

46.     In 2021, JFAP submitted a limited licensing proposal ("2021 proposal") to both the North Carolina Supreme Court and the North Carolina State Bar ("NCSB"). The 2021 proposal called for a second tier of legal service providers that could provide affordable legal help to low- and moderate-income North Carolinians.

47.     JFAP's 2021 proposal was modeled after Washington and Utah's limited licensing program. It called for a "legal technician" exception to North Carolina's UPL statutes. These legal technicians would be permitted to assist in select practice areas like family law and landlord-tenant law.

48.     JFAP's 2021 proposal compared this "legal technician" exception to exceptions used to combat shortages in medical services, like nurse practitioners and physician assistants.

8

**JA 25**

49.    JFAP's 2021 proposal added that 13.6% of North Carolinians are illiterate and cannot advocate for themselves.

50.    After presenting JFAP's 2021 proposal to the NCSB, JFAP co-founders Kernodle and Alicia were appointed to NCSB's Issues Subcommittee on Regulatory Change.

51.    In January 2022, the NCSB subcommittee published a report unanimously recommending that the NCSB Council develop and implement a limited lawyer licensing program that targets the areas of highest legal need identified in a 2021 North Carolina legal needs assessment. The report recommended that the NCSB Council explore liberalizing North Carolina's UPL statutes to permit nonlawyers to help draft certain documents and provide other limited legal services.

52.    In July 2022, the NCSB voted to create an Access to Justice Committee to recommend initiatives and programs that "ensure equal access to our system of justice for all those who, because of economic or social barriers, cannot afford or secure adequate legal counsel." 27 N.C. Admin. Code 1A.0701(a)(9) (quoting the Preamble to North Carolina's Rules of Professional Conduct, 27 N.C. Admin. Code 2.0.1(f))).

53.    JFAP proactively contacted the NCSB to see if they could contribute to the new committee. After months of silence, an NCSB representative told JFAP that they would not take part in the Access to Justice Committee.

54.    Over several committee meetings, NCSB representatives articulated that they would not pursue initiatives that require legislative approval. Because significant reforms would ultimately require amendments to North Carolina's UPL statutes and regulations, JFAP refocused its advocacy efforts towards the state legislature.

55.    In February 2023, following months of NCSB inaction, JFAP submitted a limited licensing proposal ("2023 proposal") to the North Carolina General Assembly. The 2023 proposal recommended: (1) liberalizing UPL for those providing free legal services, and (2) creating limited licenses for legal professionals in areas of high legal need.

9

**JA 26**

56.     To date, neither of JFAP's proposals have led to any regulatory reforms.

**Individual Plaintiffs Morag Black Polaski and Shawana Almendarez**

57.     Individual plaintiffs Morag Black Polaski and Shawana Almendarez are both charter members of JFAP. They are North Carolina Certified Paralegals with over twenty years of experience as paralegals.

58.     Both Morag and Shawana have served in leadership positions in the North Carolina Bar Association Paralegal Division. Morag was Treasurer. Shawana has served in these roles: Government and Public Sector Liaison, Internet & Regulations Liaison, Legal Services Committee Liaison, Treasurer, Secretary, and Chair.

59.     Morag labels her expertise in "people law." She has worked in multiple private law firms, mainly in personal injury, debt collection, Social Security disability claims, workers' compensation claims, real estate law, wills, probate, and family law.

60.     Over her more than twenty years as a paralegal, Morag has developed extensive familiarity with a wide variety of court-created forms and has filled those forms out countless times under the supervision of a lawyer.

61.     Shawana's expertise is in family law and state and local government administration.

62.     Shawana worked as a family law paralegal at a nonprofit law center for several years. There, she collaborated with North Carolina's 26th Judicial District to facilitate self-service clinics for absolute divorce. The self-service packets included forms created by the NCAOC.

63.     Shawana also worked as the Family Court Case Coordinator for NCAOC. There, she worked as a case manager and aimed to make the court more user-friendly—running the same self-service clinics and handing out information packets.

64.     Along with others at NCAOC, Shawana limited her work to providing legal *information*, and she actively avoided providing legal *advice*. As a result, she regularly had to refrain from answering legal questions she knew the answers to, and she regularly saw the frustration this caused for pro se litigants trying to understand how to properly fill in legal forms.

10

**JA 27**

**Plaintiffs' Goal to Provide Simple Legal Advice on Court-Created Forms**

65.    With JFAP's legislative efforts to create a limited licensing program and liberalize North Carolina's UPL statutes stalled, Plaintiffs seek to protect their First Amendment right to provide pure legal advice through constitutional litigation.

66.    Specifically, Plaintiffs want to provide simple legal advice on a variety of court-created forms in family law, landlord-tenant law, and estate planning and probate services.

67.    The North Carolina Judicial Branch (through the NCAOC) offers over one thousand statewide judicial forms and over one thousand local judicial forms on their website for attorneys and pro se litigants to fill out themselves. The website is www.nccourts.gov ("NCAOC website").

68.    Plaintiffs are particularly interested in providing legal advice on court-created forms in the following subject-matter areas:

    a.    Summary ejectment;

    b.    Absolute divorce;

    c.    Domestic violence, including domestic violence protective orders;

    d.    Civil no-contact orders, under North Carolina General Statute §§ 50C-1 *et seq.*, 50D-1 *et seq.*;

    e.    Child custody and visitation, including motions to modify custody;

    f.    Summary administration, testate or intestate; and

    g.    Small estate administration.

69.    These subject-matter areas align with several of the areas of highest legal need identified in the 2021 North Carolina legal needs assessment.

70.    The NCAOC website provides statewide forms for all these subject-matter areas. Each of these forms has a searchable form number. They can be found at www.nccourts.gov/documents/forms.

11

71.    Additionally, the NCAOC website provides packets, guidelines, or landing pages for all these subject-matter areas. These packets, guidelines, and webpages group up the relevant forms and briefly discuss how the forms relate to each other.

72.    And since 2020, the NCAOC website maintains a "Guide & File" system for attorneys and pro se litigants. This system guides lawyers and pro se litigants through a series of prompts related to select subject-matter areas. The system then generates the appropriate legal documents with the provided information. These documents can be printed and—in a few counties—electronically filed.

73.    The Guide & File system provides prompts in all these subject matter areas except civil no-contact orders.

74.    The NCAOC website's resources, including most packets and the Guide & File system, append disclaimers that state they are legal *information*, not legal *advice*.

75.    Additionally, the Guide & File system states: "**Use this interview at your own risk!** This interview is designed to help you. Because you do not have a lawyer, it is *your* job to make sure the forms and information you file to the Court are correct and complete."

76.    According to the North Carolina Equal Access to Justice Commission, as of 2021, there is an 80% drop off between the number of Guide & File users and the number of users that make it through to the end of the system's prompts (and thus generate a file).

77.    Plaintiffs have seen, worked with, and filled out at least some of these court-created forms over the course of their paralegal careers. But under North Carolina's UPL statutes and regulations, they have only been able to work on these forms under the supervision of a licensed attorney.

78.    Based on Plaintiffs' experience with these forms, many North Carolina residents have a legitimate, civil legal need, but due to the emotional turmoil of their situations and lack of familiarity with the procedures, they cannot fill out the forms timely or correctly.

12

**JA 29**

79. Based on Plaintiffs' experience with these forms, some of these forms have terms that ordinary laypeople would not understand without prior exposure, like "implied warranty of habitability" and "right of survivorship."

80. Based on Plaintiffs' experiences with these forms, most traditional, licensed attorneys do not offer or advertise a narrow legal service to provide legal advice on these court-created forms for pro se litigants.

81. Based on Plaintiffs' experience with these forms, many North Carolina residents either do not understand these forms or fill them out incorrectly. Consequently, many cannot obtain meaningful access to the courts or defend their legal rights.

82. Based on Plaintiffs' experience, with guidance from someone familiar with these forms, these forms can often be filled out in under an hour. At minimum, they are easily explainable to laypeople.

83. Based on Plaintiffs' experience with these forms, it only takes a matter of hours of exposure and training for paralegals and other nonlawyer providers to become comfortable with them.

84. Plaintiffs want to advise North Carolinians about these court-created forms at clinics. This advice would go beyond basic legal information. It would include guidance on what each form does, how the forms interact, what certain terms mean, what local court rules to know, what forms to file, and what information to include on the forms.

85. Plaintiffs also want to offer legal advice specific to these court-created forms online through an on-demand video library. These videos would explain how to prepare the court-created forms in greater detail than the NCAOC website's resources.

86. Plaintiffs' legal advice would be tailored to the litigant's factual circumstances and legal goals.

13

87.     In providing this legal advice, Plaintiffs would not hold themselves out as attorneys. As needed to prevent confusion, they would explain their legal certifications, experiences, and expertise.

88.     Some JFAP members have already—under the supervision of a licensed attorney and consistent with North Carolina law—trained law students and paralegals to advise North Carolina residents on these types of forms.

### Plaintiffs Want to Provide Both Free and Paid Advice

89.     Plaintiff JFAP would like to offer this advice at clinics open to the public. At these clinics, a JFAP member—such as Plaintiffs Morag or Shawana—would provide advice for free.

90.     Outside of these clinics, Morag and Shawana would also like to provide the same advice for a fee.

91.     The fees they would charge would track their experience and the complexity and time of the work. These fees would be lower than the hourly rates charged by licensed attorneys in the same geographical area.

92.     Plaintiffs believe that expanding the availability of paid legal advice is a necessary component of ensuring access to justice. They believe free advice, though helpful and necessary for low-income individuals, is not enough to narrow the access to justice gap alone.

93.     Payment for legal advice encourages others to provide legal advice, reducing the ongoing shortage of legal services available to both low- and moderate-income individuals.

94.     Expanding the availability of paid legal advice is vital to narrowing the access to justice gap for the missing middle because they are ineligible for North Carolina legal aid.

95.     The current options for the missing middle for seeking legal advice are: (1) hiring an attorney, or (2) receiving no help at all.

96.     Plaintiffs believe that Morag and Shawana should be able to receive payment for the work and expertise they offer.

14

97.    Like with their free legal advice through JFAP, Morag and Shawana would not hold themselves out as attorneys. They would explain their legal certifications, experiences, and expertise as necessary to prevent confusion.

### North Carolina's Total Ban on Free and Paid Legal Advice by Nonlawyers

98.    Plaintiffs are prohibited from providing simple advice—whether for free or for pay—because they are not lawyers, and providing legal advice about how to fill out court-created forms would thus be a criminal offense under North Carolina's UPL statutes.

99.    Licensed lawyers have a state-created monopoly on the provision of legal advice in North Carolina.

100.    North Carolina's UPL statutes apply to all advice on legal matters, paid and unpaid.

101.    North Carolina General Statute § 84-2.1 defines the phrase "practice law" as "performing *any* legal service for *any* other person." (emphasis added).

102.    Section 84-2.1 provides several examples that constitute UPL, including "assisting by advice, counsel, or otherwise in any legal work" and "advis[ing] or giv[ing] opinion upon the legal rights of any person."

103.    Section 84-2.1 specifies that it applies to both compensated and uncompensated legal services.

104.    Similarly, § 84-4 prohibits all unlicensed persons from "giv[ing] legal advice or counsel" or "prepar[ing] . . . any other legal document," regardless of compensation.

105.    The NCSB has published "Guidelines for Use of Paralegal in Rendering Legal Services" ("the Guidelines"). The Guidelines are attached as Exhibit A.

106.    Citing both §§ 84-2.1 and 84-4, the Guidelines read: "**A lawyer shall not permit a paralegal to engage in the practice of law. To this end, a lawyer may not delegate the following responsibilities . . . giving oral or written legal advice or a legal opinion to a client . . . .**" The Guidelines add that a paralegal may not give legal advice no matter their level of competence.

15

107.    The NCSB also publicizes a list of frequently asked questions on the applicability of North Carolina's UPL statutes ("UPL FAQs").  These UPL FAQs are attached as Exhibit B.

108.    The UPL FAQs state that a nonlawyer engages in UPL regardless of the relationship between the two parties or whether the nonlawyer charges for her advice.

109.    Separately, the NCSB lists some questions and answers on the "Reporting and Preventing the Unauthorized Practice of Law" tab of their website.

110.    Under this tab, the NCSB confirms that nonlawyers cannot fill out legal forms, "especially if the assistance involves helping you understand what needs to be filled in, advising you of the consequences of completing the form in a certain manner, or otherwise providing legal advice concerning the completion of the form. Additionally, advising a person that a particular legal form is appropriate for the person's legal needs is legal advice that may not be given by a nonlawyer."

111.    Violators of North Carolina's UPL statutes are guilty of a Class 1 misdemeanor and face a criminal penalty of up to 120 days in jail. *Id.* § 84-8. District Attorneys are required to prosecute violators of North Carolina's UPL statutes. *Id.* § 84-7.

112.    In addition to criminal prosecution by district attorneys, the NCSB is tasked with civil prosecution of North Carolina's UPL statutes. *Id.* § 84-37.

113.    Defendant Brown, as the NCSB's President and as Chair of the Executive Committee of the North Carolina State Bar, may authorize the Bar Counsel to initiate legal proceedings seeking both temporary and permanent injunctive relief to enjoin violators from providing legal advice. 27 N.C. Admin. Code 1D.0208(b), (e).

114.    North Carolina's UPL statutes exempt certain speakers from prosecution for practicing law without a license.

115.    Section 84-2.1 lists three classes of speakers:

   a. "The drafting or writing of memoranda of understanding or other mediation summaries by mediators at community mediation centers authorized by G.S. 7A-

16

38.5 or by mediators of employment-related matters for The University of North Carolina or a constituent institution, or for an agency, commission, or board of the State of North Carolina."

b. "The selection or completion of a preprinted form by a real estate broker licensed under Chapter 93A of the General Statutes, when the broker is acting as an agent in a real estate transaction and in accordance with rules adopted by the North Carolina Real Estate Commission, or the selection or completion of a preprinted residential lease agreement by any person or Web site provider."

c. "The completion of or assisting a consumer in the completion of various agreements, contracts, forms, and other documents related to the sale or lease of a motor vehicle as defined in G.S. 20-286(10), or of products or services ancillary or related to the sale or lease of a motor vehicle, by a motor vehicle dealer licensed under Article 12 of Chapter 20 of the General Statutes."

116. North Carolina's UPL statutes also exempt:

a. website providers "offer[ing] consumers access to interactive software that generates a legal document based on the consumer's answers to questions," *id.* § 84-2.2(a);

b. "banking corporation[s] . . . performing ministerial and clerical acts in the preparation and filing of [] tax returns . . . ," *id.* § 84-5;

c. law school clinics advising or serving clients for free, *id.* § 84-7.1(1); or

d. law students interning for a law school clinic or a government agency, *id.* § 84-7.1(1–2).

117. Separately, federal law permits certain nonlawyers to provide limited legal advice or representation in various federal courts and agency hearings. These exemptions include nonlawyers advising or representing: social security claimants before the Social Security Administration, veterans benefits claimants before the Department of Veterans Affairs, individuals

17

**JA 34**

before immigration courts and the Board of Immigration Appeals, individuals in patent cases before the United States Patent and Trademark Office, and individuals before the Federal Labor Relations Authority.

118. None of the exceptions in ¶¶ 114–17 apply to Plaintiffs as speakers or the advice they wish to provide.

119. More generally, North Carolina's UPL statutes do not apply to pro se litigants. North Carolina's UPL statutes only apply to a person who tries to represent others, or a person who tries to provide legal advice to others so they can ultimately represent themselves.

120. The NCSB's UPL FAQs clarify: "An individual may represent him or herself on any legal matter. A person commits the unauthorized practice of law only by performing acts constituting the practice of law for another person or entity."

121. Under North Carolina law, litigants can fill out the court-created forms on their own. They can use the Guide & File system or other interactive software to assist if it covers their unmet civil legal need. But they cannot seek advice from unlicensed legal professionals to ensure they fill out the forms correctly.

122. The NCAOC's Guide & File system has a "Disclaimers" page that further confirms that only lawyers may advise a pro se litigant regarding court-created forms. A copy of that disclaimers page is attached as Exhibit C.

123. As the NCAOC's Guide & File system summarizes on its "Disclaimers" page:

   a. "If you have **questions** about your case or need **legal advice**, talk to **a lawyer**."

   b. "**Only Lawyers Can Explain Your Legal Rights**."

   c. "This Interview **cannot** tell you if or what you should file."

   d. "For advice about your particular case, **talk to a lawyer**."

124. The language of North Carolina's UPL statutes and regulations, as well as North Carolina's guidance and interpretations of those laws, confirms that Plaintiffs are legally prohibited from giving legal advice on how to properly fill out court-created forms.

18

125.    In North Carolina, the only way for Plaintiffs to give simple legal advice on these court-created forms would be to attend three years of law school, pass the Multistate Professional Responsibility Exam, pay a bar application fee ranging from $850 to $1,650, sit for and pass the bar exam, meet certain character and fitness requirements, pay other licensing fees, and abide by North Carolina's continuing legal education requirements.

### INJURY TO PLAINTIFFS

126.    If Plaintiffs provide legal advice without first becoming fully licensed North Carolina attorneys, they face a credible threat of prosecution by Defendants.

127.    Because of Defendants' credible threat of prosecution, Plaintiffs have self-censored. In their legal careers and advocacy on behalf of JFAP, they have refrained from providing legal advice that they knew to be accurate and knew would help a person they were assisting.

128.    Because of Defendant's credible threat of prosecution, Plaintiffs have had to turn down requests for legal advice from friends and family.

129.    Because of Defendants' credible threat of prosecution, Plaintiffs have only provided legal advice under the supervisory authority of an attorney, or for Social Security claimants as permitted by federal law.

130.    Defendants' credible threat of prosecution has chilled and silenced Plaintiffs' pure legal speech.

131.    Because of Defendants' credible threat of prosecution, Plaintiffs are constantly concerned that a person with an unmet civil legal need will lose their legal rights, wanting their advice and assistance, without having had an opportunity to consult them.

132.    Because of Defendants' credible threat of prosecution, Plaintiff JFAP has been unable to further or fulfill its mission to promote equality, efficiency, and fairness in the North Carolina legal system.

19

### JA 36

133. Because of Defendants' credible threat of prosecution, Plaintiff JFAP has been and will remain unable to narrow the access to justice gap by offering its own free legal advice. Nor have Plaintiffs Morag and Shawana been able to offer the same at a lower cost.

134. Because of Defendants' credible threat of prosecution, Plaintiff JFAP has had to and will continue to have to divert their financial resources and time into educational and advocacy efforts, including writing multiple legislative proposals, attending national and statewide conferences, and serving on various associations and commissions, rather than assisting North Carolinians directly.

135. Because of Defendants' credible threat of prosecution, Plaintiffs Morag and Shawana have lost and will continue to lose the opportunity to provide useful legal advice to North Carolinians.

136. Because of Defendants' credible threat of prosecution, Plaintiffs Morag and Shawana have lost and will continue to lose the opportunity to earn money for providing useful legal advice to North Carolinians.

137. But for North Carolina's UPL statutes and regulations, Plaintiffs would not have to choose between not helping North Carolina residents who need them and risking criminal and civil enforcement.

138. But for North Carolina's UPL statutes and regulations, JFAP would commit significant resources to giving free legal advice, both at clinics open to the public and an on-demand video library.

139. But for North Carolina's UPL statutes and regulations, Plaintiffs Morag and Shawana would offer the same legal advice services through their own freelance business structures.

20

**JA 37**

## CAUSE OF ACTION

### COUNT I
### 42 U.S.C. § 1983 – First Amendment
### (Plaintiffs' Right to Provide Free Legal Advice)

140.    Paragraphs 1 through 139 are incorporated as though fully set forth herein.

141.    Plaintiffs challenge North Carolina's UPL laws solely as applied to legal advice regarding court-created forms.

142.    Plaintiffs' advice regarding court-created forms is pure speech, not a form of occupational conduct of which speech is only an incidental part.

143.    Plaintiffs are not challenging the application of North Carolina's UPL laws to the non-communicative aspects of legal work, such as the handling of client funds.

144.    Plaintiffs are not challenging the application of North Carolina's UPL laws to speech having an independent legal effect, such as acting as an agent with the authority to make legally binding admissions or create legally binding obligations for another party.

145.    Plaintiffs are not challenging the application of North Carolina's UPL laws to speech in courtrooms or other government-created forums—such as arguing on behalf of another in court or calling and examining witnesses—that have historically been subject to regulation.

146.    The First Amendment's Free Speech Clause fully protects Plaintiffs' oral and written legal advice regarding North Carolina's court-created forms.

147.    North Carolina's UPL statutes, as applied to Plaintiffs' communications with North Carolinians, are content-based prohibitions of pure speech.

148.    Defendants lack a substantial or compelling interest in preventing people like Morag and Shawana and organizations like JFAP from sharing important and useful knowledge about court-created forms.

149.    Requiring the individual Plaintiffs or JFAP's members to go to law school for three years and sit for the bar exam before they can lawfully advise others about simple, court-created forms is not a narrowly tailored means of advancing any sufficiently important or compelling

21

**JA 38**

government interest. Nor do those requirements satisfy any other level of First Amendment tailoring.

150. Any interest the state has could be adequately served by less-speech-restrictive alternatives.

151. Other states' regulatory schemes providing limited practice rights for paralegals, such as in Arizona and Utah, show the existence of plausible regulatory alternatives short of a total speech ban for nonlawyers.

152. Other countries' regulatory schemes allowing for the provision of legal advice by nonlawyers, such as in England and Wales, show the existence of plausible regulatory alternatives short of a total speech ban for nonlawyers.

153. Defendants cannot demonstrate that these plausible regulatory alternatives would not adequately serve any interest they may allege.

154. Defendants' enforcement of the challenged statutes, regulations, policies, and practices to suppress Plaintiffs' speech rights cannot withstand any level of First Amendment scrutiny.

**COUNT II**
**42 U.S.C. § 1983 – First Amendment**
**(Plaintiffs Morag and Shawana's Right to Provide Paid Legal Advice)**

155. Paragraphs 1 through 139 are incorporated as though fully set forth herein.

156. Besides providing free legal advice through JFAP's clinics, Plaintiffs Morag and Shawana would like to individually provide the same advice for compensation.

157. As recognized by the Supreme Court of the United States, "It is well settled that a speaker's [First Amendment] rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 801 (1988).

158. Plaintiffs challenge North Carolina's UPL laws solely as applied to legal advice regarding court-created forms.

22

**JA 39**

159. Plaintiffs' advice regarding court-created forms is pure speech, not a form of occupational conduct of which speech is only an incidental part.

160. Plaintiffs are not challenging the application of North Carolina's UPL laws to the non-communicative aspects of legal work, such as the handling of client funds.

161. Plaintiffs are not challenging the application of North Carolina's UPL laws to speech having an independent legal effect, such as acting as an agent with the authority to make legally binding admissions or create legally binding obligations for another party.

162. Plaintiffs are not challenging the application of North Carolina's UPL laws to speech in courtrooms or other government-created forums—such as arguing on behalf of another in court or calling and examining witnesses—that have historically been subject to regulation.

163. The First Amendment's Free Speech Clause fully protects Plaintiffs' oral and written legal advice related to North Carolina's court-created forms.

164. North Carolina's UPL statutes, as applied to Plaintiffs' communications with North Carolinians, are content-based prohibitions of pure speech.

165. Just as Defendants lack a substantial or compelling interest in silencing JFAP or its members from providing free legal advice regarding court-created forms, Defendants equally lack a substantial or compelling interest in silencing Plaintiffs Morag and Shawana from providing the same advice for a fee.

166. Requiring the individual Plaintiffs to go to law school for three years and sit for the bar exam before they can lawfully advise others for pay about simple, court-created forms is not a narrowly tailored means of advancing any sufficiently important or compelling government interest. Nor do those requirements satisfy any other level of First Amendment tailoring.

167. Any interest the state has could be adequately served by less-speech-restrictive alternatives.

23

168.    Other states' regulatory schemes providing limited practice rights for paralegals, such as in Arizona and Utah, show the existence of plausible regulatory alternatives short of a total speech ban for nonlawyers.

169.    Other countries' regulatory schemes allowing for the provision of legal advice for pay by nonlawyers, such as in England and Wales, show the existence of plausible regulatory alternatives short of a total speech ban for nonlawyers.

170.    Defendants cannot demonstrate that these plausible regulatory alternatives would not adequately serve any interest they may allege.

171.    Defendants' enforcement of the challenged statutes, regulations, policies, and practices to suppress Plaintiffs Morag and Shawana's speech rights cannot withstand any level of First Amendment scrutiny.

## REQUEST FOR RELIEF

Plaintiffs requests the following relief:

A.    A declaration that Defendants' enforcement of North Carolina's UPL statutes and regulations violates the First Amendment as applied to Plaintiffs, both for free and compensated legal advice regarding court-created forms;

B.    A permanent injunction enjoining future enforcement of North Carolina's UPL statutes and regulations as applied to Plaintiffs free and compensated legal advice regarding court-created forms;

C.    Attorney's fees and costs; and

D.    Any other relief that the Court deems appropriate.

24

**JA 41**

Respectfully submitted this 18th day of March, 2024.

/s/ Vince Eisinger
Vince Eisinger
North Carolina Bar No. 57646
CRANFILL SUMNER LLP
5420 Wade Park Blvd., Suite 300
Raleigh, NC 27607
Phone: (919) 863-8703
Fax: (919) 863-3459
Email: veisinger@cshlaw.com

/s/ Paul M. Sherman
Paul M. Sherman*
Virginia Bar No. 73410
Christian W. Lansinger*
Maryland Bar No. 2211290007
INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org
        clansinger@ij.org

*Local Civil Rule 83.1(d)*
*Attorney for Plaintiffs*

*\*Special Appearance pursuant to*
*Local Rule 83.1(e)*

*Attorneys for Plaintiffs*

25

**JA 42**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2024, a true and correct copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF system.

I hereby further certify that the foregoing document will be dispatched to a third-party process server for service on all named Defendants.

Dated: March 18, 2024

/s/ Paul M. Sherman
Paul M. Sherman*
*Special Appearance pursuant to Local Rule 83.1(e)*

*Attorney for Plaintiffs*

26

**JA 43**

# EXHIBIT A

North Carolina State Bar Guidelines for Use of
Paralegals in Rendering Legal Services

Case 7:24-cv-00004-BO-BM   Document 17-1   Filed 03/18/24   Page 1 of 6

# GUIDELINES FOR USE OF PARALEGALS IN RENDERING LEGAL SERVICES

The Guidelines for Use of Paralegals in Rendering Legal Services were approved on July 23, 2010.

## INTRODUCTION

Making legal services of good quality available to all segments of the public efficiently and at an affordable price is an important goal of the North Carolina State Bar. The Plan for Certification of Paralegals, approved by the North Carolina State Bar and adopted by the NC Supreme Court in 2004, advances this goal by recognizing the value of paralegals as a cost effective delivery of legal services, establishing proficiency standards for paralegal certification, and raising the profile of the paralegal profession. The State Bar worked diligently with lawyers and paralegals across the state to establish certification requirements, including a degree in paralegal studies and passing a rigorous examination, that ensure that the certification credential has real value. North Carolina's voluntary certification program helps lawyers and administrators to identify paralegals who meet or exceed the skills and knowledge required for certification.

The State Bar's paralegal certification program promotes proper utilization of paralegals and helps to ensure that legal services are professionally and ethically offered to the public. Paralegals, like lawyers, should be held to the highest ethical and professional standards. The State Bar regulates the activities of paralegals indirectly through each lawyer's professional duty to supervise employees and contractors to whom legal work is delegated. The Rules of Professional Conduct establish the standards for the supervision of nonlawyer assistants, including paralegals. The statutes on unauthorized practice of law in Chapter 84 of the North Carolina General Statutes, Rules 5.3 and 5.5 of the Rules of Professional Conduct, and the formal ethics opinions interpreting those rules determine the extent to which law-related tasks may properly be performed by paralegals.

The following guidelines do not change the Rules of Professional Conduct or the formal ethics opinions of the State Bar interpreting those rules. These guidelines are intended to facilitate the proper use of paralegals in a law firm by clarifying a lawyer's professional responsibilities when supervising a paralegal. The guidelines also assemble in one document the applicable standards (with appropriate comment) for the ready use of lawyers and their employees when determining the permissible bounds of the conduct and activities of paralegals assisting lawyers in the rendition of legal services. To the extent there may be any inconsistencies, the Rules of Professional Conduct, not these guidelines, govern the conduct of a lawyer.

## GUIDELINES

**1. A lawyer is responsible for the professional conduct of a paralegal performing services at the lawyer's direction. A lawyer must take reasonable measures to ensure that the paralegal's conduct is consistent with the lawyer's obligations under the Rules of Professional Conduct.**

Rule 5.3,* *Responsibilities Regarding Nonlawyer Assistants*, provides that the partners or managing lawyers in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the conduct of a paralegal employed by the firm is consistent with the professional obligations of lawyers. Rule 5.3(a). Regardless of whether the lawyer has managerial authority in a law firm, paragraph (b) of the same rule provides that a lawyer having direct supervisory authority over a paralegal shall make reasonable efforts to ensure that the paralegal's conduct is compatible with the professional obligations of the lawyer.

Lawyers responsible for the management of a firm must familiarize paralegals with all relevant provisions of the Rules of Professional Conduct. *See* guideline 4. As explained in comment [1] to Rule 5.3, "[t]he measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline." Particular care must be taken to ensure that paralegals understand and appreciate the obligation to maintain the confidentiality of information received during the representation of clients.

Although legal work is delegated to a paralegal, the lawyer remains responsible for the ethical and competent performance of the work: a lawyer can never delegate his or her professional responsibility for the legal services provided to a client. *See* guideline 3. A lawyer is normally in a better position to supervise and this ensures ethical compliance of a paralegal who is an employee of the lawyer. The Rules of Professional Conduct do not, however, require that nonlawyer assistants be employees of a lawyer's firm. Nevertheless, when a paralegal works as an independent contractor, the lawyer is still responsible for the paralegal's work product and ethical conduct. *See* RPC

**JA 45**

216. For this reason, special care must be taken by the lawyer to ensure that an independent or "freelance" paralegal is competent and ethical before delegating work to the paralegal. The lawyer must provide the appropriate supervision and instruction regardless of the employment relationship with the paralegal. *See* 99 FEO 6 and guideline 3.

Rule 5.3(c) makes a lawyer professionally responsible for any conduct of a paralegal that would be a violation of the Rules of Professional Conduct if engaged in by the lawyer, when (1) the lawyer ordered the conduct or, with knowledge of the specific conduct, ratified the conduct; or (2) the lawyer has managerial authority or direct supervisory authority over the paralegal and learned of the conduct at a time when its consequences could be avoided or mitigated but the lawyer failed to take reasonable action to avoid the consequences.

A lawyer is also prohibited from violating or attempting to violate the Rules of Professional Conduct through the acts of another person. Rule 8.4(a). For example, Rule 4.2 prohibits a lawyer from communicating about a matter with a person known to be represented by a lawyer in the matter, unless that person's lawyer consents. A lawyer may not use an agent, such as a paralegal, to make such a communication and should ensure that a paralegal understands the lawyer's duty.

**2. A lawyer shall not permit a paralegal to engage in the practice of law. To this end, a lawyer may not delegate the following responsibilities or activities to a paralegal: establishing a client-lawyer relationship and the terms of the relationship; giving oral or written legal advice or a legal opinion to a client; interpretation of legal documents for a client; or appearance in any court proceeding unless authorized by law.**

N.C. Gen. Stat. § 84-4 makes it unlawful for anyone but a licensed North Carolina lawyer to practice law. The term "practice law" is defined in N.C. Gen. Stat. § 84-2.1 as follows:

> The phrase "practice law" as used in this Chapter is defined to be performing any legal service for any other person, firm or corporation, with or without compensation, specifically including the preparation or aiding in the preparation of deeds, mortgages, wills, trust instruments, inventories, accounts or reports of guardians, trustees, administrators or executors, or preparing or aiding in the preparation of any petitions or orders in any probate or court proceeding; abstracting or passing upon titles, the preparation and filing of petitions for use in any court, including administrative tribunals and other judicial or quasi-judicial bodies, or assisting by advice, counsel, or otherwise in any legal work; and to advise or give opinion upon the legal rights of any person, firm or corporation: Provided, that the above reference to particular acts which are specifically included within the definition of the phrase "practice law" shall not be construed to limit the foregoing general definition of the term, but shall be construed to include the foregoing particular acts, as well as all other acts within the general definition. The phrase "practice law" does not encompass the writing of memoranda of understanding or other mediation summaries by mediators at community mediation centers authorized by G.S. 7A-38.5 or by mediators of personnel matters for The University of North Carolina or a constituent institution.

Rule 5.5(d) of the Rules of Professional Conduct provides: "A lawyer shall not assist another person in the unauthorized practice of law." The rationale for allowing only licensed lawyers to practice law is articulated in the comment [9] to Rule 5.5 as follows: "Limiting the practice of law to members of the bar protects the public against rendition of legal services by unqualified persons." As further observed in the comment, however, Rule 5.5, "does not prohibit a lawyer from employing the services of paraprofessionals and delegating functions to them, so long as the lawyer supervises the delegated work and retains responsibility for their work."

Regardless of the apparent competence displayed by a paralegal, the paralegal may not engage in the practice of law. A lawyer may, however, allow a paralegal to perform legally-related tasks, provided the lawyer and the paralegal comply with these guidelines. For example, a paralegal may communicate settlement terms to a claims adjuster for an insurance carrier as long as the paralegal does not exercise independent legal judgment regarding the value of the case. RPC 70. Similarly, 2002 FEO 9 provides that, in a residential real estate closing, a nonlawyer assistant supervised by a lawyer may identify to the clients the documents to be executed, direct the clients as to the correct place on each document to sign, and handle the disbursements of proceeds for the transaction, even though the supervising lawyer is not physically present. However, a lawyer may not rely upon title information from an abstract firm operated by a paralegal or other nonlawyer unless the lawyer supervised the nonlawyer who did the work. RPC 29; *See also* N.C. Gen. Stat, § 58-26-1.

If warranted by exigent circumstances, a lawyer may allow a paralegal to sign his or her name to court documents as long as: 1) it does not violate any law, court order, local rule, or rule of civil procedure, 2) the lawyer has provided the appropriate level of supervision, and 3) the signature clearly discloses that another has signed on the lawyer's behalf. 2006 FEO 13.

Although only a lawyer may act as a representative of or serve as an advocate for a client before most tribunals, there are limited statutory, administrative and judicial exceptions which allow a nonlawyer to appear in a representative capacity in certain tribunals. For example, some federal agencies authorize nonlawyers to represent parties in certain proceedings before the agency. A lawyer may hire a nonlawyer to perform such limited representation on behalf of a client. *See* 2005 FEO 2 (law firm may employ nonlawyer to represent Social Security disability claimants provided the status of the nonlawyer is disclosed to prospective clients and in any advertising for the service). Also, a lawyer may have a nonlawyer employee deliver a message to a court holding calendar call if the lawyer is unable to attend due to a scheduling conflict with another court or for another legitimate reason. 2000 FEO 10. However a lawyer may not permit a legal assistant to examine or represent a witness at a deposition. RPC 183.

**JA 46**

A lawyer is responsible for taking reasonable measures to ensure that clients, courts, and other lawyers are aware that a paralegal, whose services are utilized by the lawyer in performing legal services, is not licensed to practice law. *See* guideline 5. A lawyer shall require a paralegal to disclose that he or she is not a lawyer when necessary to avoid misrepresentation. Although a paralegal may communicate directly with a client on behalf of the lawyer, early disclosure of nonlawyer status is necessary to assure that there will be no misunderstanding as to the responsibilities and role of the paralegal. Disclosure may be made in any way that avoids confusion. Common sense suggests a routine disclosure at the outset of a conference or any type of communication. If a paralegal is designated as a client's contact in a law firm, disclosure of nonlawyer status should be made at the time of such designation.

Two advisory opinions from the Authorized Practice Committee are worth noting. The first is Authorized Practice Advisory Opinion 2002-1 which speaks to the role of laypersons in the consummation of residential real estate transactions. The second is Authorized Practice Advisory Opinion 2006-1 which speaks to appearances of nonlawyers at quasi-judicial hearings on zoning and land use. These opinions can be found in the NC State Bar website: www.ncbar.gov (https://www.ncbar.gov/).

**3. A supervising lawyer is responsible for work product and for providing appropriate and active supervision to a paralegal. A lawyer may delegate to a paralegal any task normally performed by the lawyer except as set forth in guideline 2.**

A lawyer may delegate legal and non-legal work to a paralegal subject to any limitations imposed by statute, court order or rule, administrative regulation, or the Rules of Professional Conduct. *See* guideline 2 and Rule 5.3.

A lawyer must take reasonable measures to ensure that the paralegal is competent to perform the work delegated to the paralegal. To do so, the lawyer must be competent to do the legal work that the lawyer delegates to the paralegal: the lawyer may not rely on the experience and knowledge of the paralegal. In addition, the lawyer must supervise all of the work of the paralegal. The appropriate level of supervision is dependent upon the paralegal's knowledge, skill and experience.

A paralegal should inform the responsible lawyer of all significant actions and services performed by the paralegal. Only appropriate supervision of the paralegal can ensure the quality of the work performed and that the paralegal is neither engaging in the unauthorized practice of law nor violating the lawyer's professional responsibilities.

A lawyer shall maintain an active, personal relationship with his or her clients. Maintaining such a relationship with the client, however, does not preclude a paralegal from meeting with or talking with the client, nor does it necessarily require regular and frequent meetings between the lawyer and client. However, whenever it appears that consultation between the lawyer and the client is necessary, the lawyer should not rely on a paralegal to communicate with a client; the lawyer should talk directly with the client and, when reasonable, remain available for consultation with the client.

A lawyer must give a paralegal appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to representation of the client. *See* guidelines 1 and 4.

It is permissible for a lawyer to employ an independent contractor or "freelance" paralegal provided certain conditions are met. A lawyer must take reasonable measures to determine that the freelance paralegal is competent to perform any activities delegated to the paralegal. *See*, RPC 216. In addition, as with an employee, a lawyer must also take reasonable measures to ensure that the freelance paralegal complies with the lawyer's ethical responsibilities. The lawyer must adequately supervise the freelance paralegal and inquire into the freelance paralegal's potential conflicts of interest. *See* guideline 9. Finally, a lawyer should disclose to the client the use of a freelance paralegal, the name of the freelance paralegal and how the freelance paralegal's services will be charged to the client, if the client inquires. RPC 216.

**4. A lawyer is responsible for taking reasonable measures to ensure that client confidences are Preserved and protected by a paralegal.**

Perhaps no professional duty of a lawyer is more important than the duty of confidentiality. Consistent with a lawyer's duty under Rule 5.3 to ensure that a paralegal acts in a manner that is consistent with the lawyer's professional responsibilities, a lawyer must take reasonable measures to ensure that a paralegal understands and fulfills the duty to preserve and protect client confidences from disclosure. The importance of this duty is emphasized in RPC 176 which addresses the responsibilities of a lawyer who employs a paralegal previously employed by a lawyer representing an opposing party. While recognizing that a paralegal is not subject to the imputed disqualification rules applicable to a lawyer, the opinion holds that the hiring lawyer must take care to ensure that the paralegal is screened from participation in the case because this requirement "is consistent with a lawyer's duty...to make reasonable efforts to ensure that the conduct of a nonlawyer over whom the lawyer has direct supervisory authority is compatible with the professional obligations of the lawyer including the obligation...to preserve the confidentiality of client information." RPC 74 allows a firm that employs a paralegal to represent an interest adverse to that of a party represented by the paralegal's prior employer provided the paralegal is screened from participation in the case. *See* Rule 1.0(l) and cmt. [9] to Rule 1.0 for screening procedures.

**5. A lawyer may include the name of a paralegal on firm letterhead or other forms of communication, including advertising, provided the paralegal's title is clearly indicated.**

**JA 47**

A lawyer's letterhead, like other communications about the lawyer or the lawyer's services, must not be false or misleading. Rule 7.1. Specifically, such communication may not misrepresent or omit a fact necessary to make a statement not materially misleading. To avoid the implication that a paralegal whose name appears on the letterhead of a law firm is licensed to practice law, the limited capacity of the paralegal must be clearly indicated. RPC 126.

Likewise, business cards bearing the name of the lawyer or law firm employing a paralegal may be used by the paralegal for identification. However, the paralegal's status must be evident from the title or other description used on the business card. *See* CPR 253.

A paralegal may also sign correspondence on a lawyer's or a law firm's letterhead, subject, however, to the same requirements. For example, a paralegal's signature must be accompanied by a title.

**6. A lawyer may charge for the work performed by a paralegal provided the fee is not clearly excessive.**

Rule 1.5(a) prohibits a lawyer from making an agreement for, charging, or collecting a clearly excessive fee or charging or collecting a clearly excessive amount for expenses. Numerous authorities, including the United States Supreme Court, have recognized that paralegal work may be billed at the prevailing market rate and included in a fee application to a court. *See, Missouri v. Jenkins*, 491 U.S. 274 (1989). Generally, a lawyer may bill and recover for a paralegal's work if the work would have traditionally been performed by the lawyer provided the fee charged or collected is not clearly excessive.

In determining a reasonable rate to charge for a paralegal's services, such factors as the paralegal's experience, training, knowledge, skill and ability, including whether the paralegal is certified by the North Carolina State Bar or a nationally recognized organization, should be taken into consideration. *See* Rule 1.5(a). As with the lawyer's fees, the basis or rate of the fee charged for a paralegal's services or time should be promptly communicated to all new clients, preferably in writing. *See* Rule 1.5, cmt. [2].

**7. A lawyer may compensate a paralegal based on the quality and quantity of the paralegal's work but a legal fee may not be shared with a paralegal. The paralegal's compensation may not be contingent upon the outcome of a particular case or paid in exchange for referring clients.**

Rule 5.4(a) specifically prohibits sharing legal fees with a nonlawyer except in certain limited situations. As noted in comment [1] to the rule, the rule expresses "[the] traditional limitations on sharing fees [which]...are to protect the lawyer's professional independence of judgment." In accordance with Rule 5.4, compensation of a paralegal may not be based upon a percentage of the fees received by the lawyer, nor should the paralegal receive any remuneration, directly or indirectly, for referring prospective clients to the lawyer. *See* Rule 7.2(b). For example, RPC 147 holds that a lawyer may pay a paralegal a bonus for productivity but the bonus may not be a percentage of the income that the firm derives from the legal matters upon which the paralegal worked. Similarly, a paralegal may not be promised compensation based upon the outcome of a particular case or cases. A lawyer may, however, compensate a paralegal based upon the quality and quantity of the paralegal's work and may include a paralegal in a retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement. Rule 5.4(a)(4).

A paralegal who handles a matter for which a nonlawyer may legally be awarded a fee, may be compensated based upon the income generated by such representation. 2005 Formal Ethics Opinion 6 explains:

> Nonlawyers are legally permitted to represent disability claimants before the Social Security Administration and to be awarded fees for such representation. When generated by a nonlawyer as authorized by law, such a fee cannot be designated a 'legal fee' subject to the limitations of Rule 5.4(a)....Moreover, the nonlawyer's participation in the fee does not impair a lawyer's independent professional judgment when the nonlawyer may, by law, represent the claimant without the supervision or participation of the lawyer.

**8. A lawyer may delegate management of a trust account to a paralegal or other nonlawyer employee but the lawyer remains professionally responsible for the safe keeping of the funds deposited in the account and for compliance with the record keeping and accountings required by the Rules of Professional Conduct.**

As with other law-related tasks, a lawyer may delegate the day-to-day management of a trust account to a paralegal or other nonlawyer employee. However, the lawyer's responsibility for client funds that are deposited into the trust account persists, and the lawyer may be held professionally responsible for the conduct of the nonlawyer. *See* Rule 5.3. The lawyer is responsible for maintaining the trust account in accordance with Rule 1.15, the trust accounting rule of the Rules of Professional Conduct. This includes compliance with the record keeping and accounting requirements in Rule 1.15-3. A paralegal who is managing a trust account must be properly trained to handle this responsibility. More importantly, the lawyer must provide continuous oversight to ensure not only that the records are maintained and accountings rendered but also to ensure that no client funds are inappropriately taken from the account. This requires constant vigilance even when the day-to-day management of the trust account is delegated to a nonlawyer. The duty of safekeeping of client property includes informing the State Bar when a lawyer discovers that a nonlawyer has taken funds from the trust account. Rule 1.15-2(o) and Rule 5.3, cmt. [3].

**9. A lawyer shall take reasonable measures to prevent conflicts of interest resulting from a paralegal's prior employment, other employment, or personal interests.**

JA 48

A lawyer owes his or her client loyalty. No interest or loyalty of a paralegal may be permitted to interfere with the lawyer's exercise of independent professional judgment. If the interests of a paralegal might materially limit or otherwise adversely affect the lawyer's representation of a prospective or current client, Rule 1.7 may require the lawyer to decline or discontinue the representation.

Lawyers should make sure that their paralegal understands a lawyer's professional and ethical responsibilities with respect to conflicts of interest. If a lawyer accepts a matter in which the paralegal has a conflict of interest that does not affect or limit the lawyer's representation of the client, the lawyer should exclude the paralegal from participation in the representation. RPC 74 and RPC 176. Although the imputed disqualification rule (Rule 1.10) does not apply to nonlawyers, a lawyer must take "extreme care to ensure" that the paralegal is totally screened from participation in the case. Id. In addition, the lawyer should inform the client that a nonlawyer employee has a conflict of interest which, were it the lawyer's conflict, might prevent further representation of the client in connection with the matter. The nature of the conflict should be disclosed and the client's informed consent, confirmed in writing, should be obtained. Rule 1.7 (b).

A lawyer is not disqualified from representing a client merely because a secretary or paralegal in his or her office may be called as a witness. RPC 19 and RPC 213. Rule 3.7, which governs the potential conflict if a lawyer is both an advocate and a witness, does not apply to nonlawyer employees of the lawyer. RPC 19. Furthermore, a paralegal may work for multiple employers, including working as a private investigator, as long as each lawyer takes steps to ensure that client confidences are not compromised. CPR 334.

**10. A lawyer who employs a paralegal should facilitate the paralegal's continuing self improvement by encouraging and supporting the paralegal's participation in professionalism, continuing education, and pro bono publico activities and encouraging certification by the North Carolina State Bar's Board of Paralegal Certification or other reputable program.**

When a paralegal is delegated responsibility for tasks which would otherwise be performed by a lawyer, their continuing competence is critical to responsible client representation. Just as it is important for a lawyer to take continuing education programs and to participate in professional associations in order to keep abreast of changes in the law, learn new practices and procedures, and network with individuals who are more knowledgeable about certain areas of law, it is important for a paralegal to do the same. Keeping a paralegal's skills honed and his or her enthusiasm for advocacy fresh by encouraging attendance at continuing education programs and professional certification by the State Bar or another reputable national organization will result in a paralegal who is a more valued member of the team and better able to serve the client. Similarly, a paralegal's participation in pro bono activities will instill respect for the fair administration of justice and also provide opportunities to learn new skills.

OTHER INFORMATION FOR AND ABOUT PARALEGALS

Definition

At the August 1997 American Bar Association ("ABA") Annual Meeting, the ABA's policy making body, the House of Delegates, adopted the current definition of "legal assistant/paralegal", as recommended by the Standing Committee on Legal Assistants (now the Standing Committee on Paralegals). The current definition reads as follows:

**A "legal assistant or paralegal" is a person, qualified by education, training or work experience who is employed or retained by a lawyer, law office, corporation, governmental agency or other entity and who performs specifically delegated substantive legal work for which a lawyer is responsible.**

The definition is instructive. Although no mandatory course of study or certifying exam exists to qualify one as a "legal assistant or a paralegal", and lawyers are not required to hire legal assistants with any specific educational prerequisites or certifications, information about paralegal education and certification programs may assist a lawyer in hiring and effectively utilizing legal assistants in accordance with the lawyer's ethical obligations and these guidelines.

# EXHIBIT B

North Carolina State Bar
Unauthorized Practice of Law FAQs

Case 7:24-cv-00004-BO-BM   Document 17-2   Filed 03/18/24   Page 1 of 5

JA 50

## Unauthorized Practice of Law

Review Guidelines for Attorneys Licensed in Other Jurisdictions but Seeking to Work in North Carolina

Q: What is the practice of law?

There is no precise definition of the practice of law in the statutes or caselaw. Two North Carolina statutes provide examples of the activities that constitute the practice of law. See NCGS §84-2.1 and §84-4. Note that NCGS §84-2.1 states that the list of particular acts set forth in the statute is not exclusive.

Q: Who may practice law in North Carolina?

Only active members of the North Carolina State Bar may engage in the practice of law in North Carolina. Any person other than an active member of the North Carolina State Bar who engages in the practice of law for another commits the unauthorized practice of law in violation of Chapter 84 of the North Carolina General Statutes, unless the acts are performed under the direction and active supervision of a licensed North Carolina attorney. It is a class 1 criminal misdemeanor to engage in the unauthorized practice of law.

Q: May a nonlawyer perform acts constituting the practice of law for him or herself?

Yes. An individual may represent him or herself on any legal matter. A person commits the unauthorized practice of law only by performing acts constituting the practice of law for another person or entity.

Q: May a nonlawyer do legal work for a relative, friend, or another person, if the non-lawyer does not charge any money or fees for such work?

No. It is a violation of North Carolina's unauthorized practice of law statutes for a nonlawyer to practice law regardless of the relationship with the individual for whom the services are provided or that no fees are charged.

Q: May a nonlawyer assist or represent another person in negotiations or settlement discussions on a legal claim, such as an automobile or personal injury matter?

No. Even if no lawsuit has been filed, assisting another person with settlement negotiations on a legal claim constitutes the unauthorized practice of law.

JA 51

1/2/24, 11:13 AM                                    FAQs | North Carolina State Bar

**Q: May a paralegal assist or represent another person or provide legal services directly to the public?** ▲

No. A paralegal or other nonlawyer may only perform work constituting the practice of law if it is under the supervision and at the direction of a licensed North Carolina attorney. Attorneys may hire or contractwith paralegals or other nonlawyers to perform such services provided that the nonlawyers are properly supervised. See Rule 5.3 of the Revised Rules of Professional Conduct.

**Q: May a corporation (including nonprofit corporations) provide legal representation to third parties?** ▲

Generally, no. NCGS §84-5 prohibits corporations from practicing law for others. However, the statute does not prohibit legal corporations, authorized to practice under Chapter 55 of the NC General Statutes, from practicing law.

**Q: May a nonlawyer do legal work for a corporation?** ▼

**Q: May a lawyer licensed in another state practice law in North Carolina?** ▼

**Q: May a lawyer licensed in another jurisdiction provide legal services in North Carolina?** ▼

**Q: When may a lawyer licensed in another jurisdiction appear before a North Carolina court or tribunal?** ▼

**Q: May a lawyer licensed in another jurisdiction send a demand letter or otherwise negotiate a settlement of a North Carolina dispute?** ▼

**Q: May a lawyer licensed in another state ghost write pleadings to be filed by a pro se party in a North Carolina filed action?** ▼

**Q: Does a North Carolina licensed lawyer engage in UPL if the lawyer negotiates a settlement of a client's out of state matter?** ▼

Case 7:24-cv-00004-BO-BM   Document 17-2   Filed 03/18/24   Page 3 of 5

JA 52

Q: If a lawyer licensed in another state represents a client in his home jurisdiction and that client owns real property in North Carolina, may the lawyer assist the client with sale of the North Carolina property by drafting the deed?

Q: May a lawyer licensed in another state work as in-house counsel for a North Carolina corporation located in North Carolina?

Q: Does a lawyer licensed in another state engage in UPL if the lawyer lives in North Carolina and intends to limit his practice to federal matters?

Q: Does a lawyer licensed in another state engage in UPL if the lawyer lives in North Carolina and continues to practice in his state of licensure from his location in North Carolina?

Q: May nonlawyers sell or distribute standard legal kits, forms, or books to the public?

Generally yes. Generalized legal statements and opinions, not tailored to any specific or particular situation, do not constitute the unauthorized practice of law. However, if a nonlawyer attempts to meet with a person, discuss the person's particular situation, or assist the person in filling out a form legal document, the non-lawyer is committing the unauthorized practice of law.

Q: How are the prohibitions on the unauthorized practice of law enforced?

The North Carolina State Bar has the authority by statute to investigate allegations of unauthorized practice of law as well as the District Attorney. The State Bar may seek injunctive relief. District attorneys may prosecute charges of unauthorized practice of law as a class 1 criminal misdemeanor.

Q: How does the State Bar process complaints relative to the unauthorized practice of law?

The Authorized Practice Committee of the North Carolina State Bar investigates complaints of unauthorized practice of law. The procedures for the committee are found at 27 NCAC 1D, Section .0200.

Q: How do I file an unauthorized practice of law complaint with the State Bar?

Case 7:24-cv-00004-BO-BM   Document 17-2   Filed 03/18/24   Page 4 of 5

**JA 53**

All complaints regarding the unauthorized practice of law in North Carolina must be in writing. There is no special form required to file a complaint. Complaints should be mailed to the North Carolina State Bar, ATTN: Authorized Practice Committee, PO Box 25908, Raleigh, NC 27611.

## Q: What do I include with an unauthorized practice of law complaint? ▲

Include a written summary of the circumstances constituting and surrounding the potential unauthorized practice of law. Also, include all documents or materials available that would establish a potential unauthorized practice of law violation. Make sure you include the name, address, and phone number of the person alleged to have committed the unauthorized practice of law and the names of any material witnesses to such acts, if available.

## Q: When is a decision on a complaint likely to be rendered? ▲

The Authorized Practice Committee meets once a quarter in January, April, July, and October. The committee considers all complaints filed during the preceding quarter for which the investigation has been completed. Whether an investigation is completed during the quarter in which it is filed depends upon many factors including:

(1) when the complaint was received;

(2) the complexity of the investigation; and

(3) the ability to locate the accused individual, material witnesses, and relevant evidence.

## Q: May I attend a meeting of the Authorized Practice Committee? ▲

Yes, all meetings of the committee are public.

## Q: Who should I contact at the State Bar to discuss matters relating to the unauthorized practice of law? ▲

You may contact B. Tessa Hale at the North Carolina State Bar at (919) 828-4620.

JA 54

JA 55

# EXHIBIT C

North Carolina eCourts Guide & File Disclaimers Page

Case 7:24-cv-00004-BO-BM   Document 17-3   Filed 03/18/24   Page 1 of 2

**JA 55**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Southern Division
7:24-CV-4-BO-BM

| | | |
|---|---|---|
| MORAG BLACK POLASKI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **DEFENDANTS' JOINT** |
| v. | ) | **MOTION TO DISMISS** |
| | ) | |
| ERNIE LEE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Defendants Ernie Lee, Benjamin R. David, Nancy Lorrin Freeman, Ashlie Shanley, and Spencer B. Merriweather III, in their official capacities as District Attorneys of their respective prosecutorial districts (the "District Attorneys"), and A. Todd Brown, in his official capacity on behalf of the North Carolina State Bar (the "State Bar"), respectfully request that the Court dismiss Plaintiffs' first amended complaint pursuant to Rule 12(b)(6), with prejudice. In support of this motion, Defendants show the Court the following:

1. Plaintiffs initiated this lawsuit by filing the complaint against one defendant, the Attorney General of North Carolina, on 4 January 2024. (Dkt. 1.) The Attorney General moved to dismiss on 26 February 2024. (Dkt. 13.)

2. On 18 March 2024, Plaintiffs filed their first amended complaint, which essentially operated as a substitution of defendants. (Dkt. 16.) Plaintiffs no longer asserted claims against the Attorney General, and instead asserted their claims against the District Attorneys and the State Bar. The official-capacity claims against Mr. Brown, who currently serves as President of the North Carolina State Bar, are in effect claims against the State Bar. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

**JA 57**

3.     The filing of the amended complaint mooted the Attorney General's motion to dismiss the claims originally asserted against that office. (*See* Text Order of 24 Apr. 2024.)

4.     Plaintiffs include two paralegals and an unincorporated nonprofit association of which they are purportedly members.

5.     In the amended complaint, as in the original complaint, Plaintiffs assert two claims under 42 U.S.C. § 1983 and the First Amendment's freedom-of-speech clause. Plaintiffs argue that they have a First Amendment right to engage in the practice of law by offering legal advice to third parties. Plaintiffs' legal advice would include how to fill out court-created forms for litigation matters in North Carolina's state courts. Plaintiffs' clients would receive this legal advice for free in some cases, and would pay Plaintiffs for it in others. Plaintiffs' clients would then file those forms and appear *pro se* before the courts.

6.     Based on this First Amendment theory, Plaintiffs seek a declaratory judgment and permanent injunction barring enforcement of the North Carolina statutes that collectively prohibit the practice of law by nonlawyers such as Plaintiffs. These statutes, found in Chapter 84 of the North Carolina General Statutes, are referred to in this motion and the supporting brief as the "UPL Statutes." Plaintiffs contend that the UPL Statutes must be evaluated under strict scrutiny.

7.     In North Carolina, the General Assembly defines the practice of law. The District Attorneys and the State Bar have been charged by the General Assembly with criminal and civil enforcement of the UPL Statutes.

8.     Controlling authority requires dismissal of the amended complaint under Rule 12(b)(6). The Fourth Circuit has affirmed the UPL Statutes – and particularly the prohibition on nonlawyers practicing law – in a case based on the same First Amendment theory advanced by Plaintiffs. *See Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019), *cert. denied*, 140 S.Ct. 666 (2019) ("*CAI*"). The Fourth Circuit held that

2

**JA 58**

these arguments should be evaluated under intermediate scrutiny, which the UPL Statutes satisfy. In so holding, the Fourth Circuit, like the district court before it, rejected arguments that a plan to offer legal advice through speech (so-called "pure speech" according to Plaintiffs, like *CAI* argued before them) requires strict scrutiny. As in *CAI*, the UPL Statutes regulate conduct, and "any impact the UPL Statutes have on speech is incidental to the overarching purpose of regulating who may practice law." *Id.* at 207.

9.     Under intermediate scrutiny, the UPL Statutes must advance a substantial state interest, and must be sufficiently drawn to protect that interest. *Id.* at 209. The Fourth Circuit's analysis in *CAI* controls on both points. In turn, *CAI* establishes that Plaintiffs cannot state a claim that the UPL Statutes' prohibition on the practice of law by nonlawyers violates the First Amendment.

10.     This motion is supported by a concurrently filed brief.

**WHEREFORE**, the District Attorneys and State Bar jointly and respectfully request that the Court dismiss the amended complaint in full and with prejudice.

This the 20th day of May, 2024.

/s/ Stephen M. Russell, Jr.
Alan W. Duncan
N.C. State Bar No. 8736
Stephen M. Russell, Jr.
N.C. State Bar No. 35552
MULLINS DUNCAN HARRELL
    & RUSSELL PLLC
300 N. Greene St., Suite 2000
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
aduncan@turningpointlit.com
srussell@turningpointlit.com

*Attorneys for Defendant A. Todd Brown,*
*in his official capacity*

3

**JA 59**

/s/ Elizabeth Curran O'Brien
Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. State Bar No. 28885
Chris D. Agosto Carreiro
Special Deputy Attorney General
N.C. State Bar No. 45356
NORTH CAROLINA DEPARTMENT
   OF JUSTICE
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: 919-716-0091
Facsimile: 919-716-6755
eobrien@ncdoj.gov
ccarreiro@ncdoj.gov

*Attorneys for Defendants Ernie Lee,
Benjamin R. David, Nancy Lorrin
Freeman, Ashlie Shanley, and Spencer B.
Merriweather III, in their official
capacities*

4

**JA 60**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notice of filing to all counsel of record.

This the 20th day of May, 2024.

/s/ Stephen M. Russell, Jr.
Stephen M. Russell, Jr.

**JA 61**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

MORAG BLACK POLASKI, SHAWANA    )
ALMENDAREZ, and NORTH CAROLINA  )
JUSTICE FOR ALL PROJECT,        )            Docket No.
                                )        7:24-CV-00004-BO-BM
            *Plaintiff,*         )
                                )
  v.                            )
                                )
JOSH STEIN, ERNIE LEE,          )
BENJAMIN R. DAVID, NANCY LORRIN )
FREEMAN, ASHLIE SHANLEY,        )
SPENCER B. MERRIWEATHER III,    )
and A. TODD BROWN,              )
                                )
            *Defendants.*        )

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

FRIDAY, NOVEMBER 1, 2024
TRANSCRIPT OF MOTION TO DISMISS HEARING
BEFORE THE HONORABLE TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the Plaintiffs:

    Paul Sherman, Esquire
    Christian W. Lansinger, Esquire
    Institute for Justice
    901 North Glebe Road
    Arlington, Virginia 22203
    (703) 682-9320 │ psherman@ij.org
                   │ clasinger@ij.org

    Vince R. Eisinger, Esquire
    Cranfill Sumner, LLP
    5420 Wade Park Boulevard, Suite 300
    Raleigh, North Carolina 27607
    (919) 863-8703 │ veisinger@cshlaw.com

JENNIFER C. CARROLL, RMR, CRR, CRC
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

2

APPEARANCES CONTINUED

On Behalf of the Defendants:

    Stephen McDaniel Russell, Jr., Esquire
    Alan W. Duncan, Esquire
    Mullins Duncan Harrell & Russell PLLC
    300 North Greene Street, Suite 200
    Greensboro, North Carolina 27401
    (336) 645-3320 | srussell@mullinsduncan.com
                | aduncan@turningpointlit.com

    Chris D. Agosto Carreiro, Esquire
    N.C. Department of Justice
    114 West Edenton Street
    Raleigh, North Carolina 27601
    (919) 716-6874 | ccarreiro@ncdoj.gov

**JA 63**

Friday, November 1, 2024, at 10:33 a.m.

**P R O C E E D I N G S**

THE COURT:  Good morning.  We're here in *Polaski versus Stein.*  And representing the defendant -- is it Mr. Russell?

MR. RUSSELL:  Yes, Your Honor.

THE COURT:  Are you the lead counsel?

MR. RUSSELL:  Yes, Your Honor.

THE COURT:  All right.  I'll hear from you regarding your motion.

MR. RUSSELL:  Thank you, Your Honor.

Our named defendant is A. Todd Brown, the president of the State Bar, but it is an official-capacity claim and we're here on defendant's motion to dismiss under Rule 12(b)(6).  And this is a joint motion filed by our client, the State Bar, along with the district attorney defendants that have been named in the case.

The -- this amended complaint does not state a plausible claim for relief when considering all of the allegations in the applicable law, including the Fourth Circuit's commonsense intermediate scrutiny test that is written about in two notable recent decisions that I'll discuss.

The plaintiffs here include two paralegals,

a Ms. Polaski and Ms. Almendarez, and an unincorporated nonprofit association that they're a part of, the Justice For All Project.  And their claims run under the First Amendment's freedom of speech clause.  And, in essence, their claim is that the First Amendment bars the requirement that only lawyers may practice law in North Carolina -- statutory requirement -- as applied to them and what they have proposed to do, which is to offer legal advice to clients as it relates to North Carolina court form pleadings in a series of seven or eight different subject matters.

The -- and how it appears that would play out is the plaintiffs would meet with their clients and essentially assist in ghostwriting the forms based on information about that client's circumstances that would be discussed with the plaintiffs, then allow the client to go into court in a pro se capacity.

THE COURT:  The paralegal wouldn't sign the documents?

MR. RUSSELL:  That's correct, Your Honor. What they're proposing is they would not be appearing in any way before the Court; they would just be working behind the scenes on preparing the documents for the -- for the party.

THE COURT:  Well, can people do that now?

MR. RUSSELL: No. If a -- if a nonlawyer engages in providing legal advice, which is applying the law to a particular client's facts and circumstances or assist in preparing a legal document in that manner, that would be the unauthorized practice of law.

THE COURT: Well, does it matter if you receive a fee or a stipend or some remuneration?

MR. RUSSELL: That does not matter. And the statute actually makes clear that whether or not it's for a fee does not come into play. The practice of law is based on the -- the acts that are performed, the nature of what happens in the relationship, and not whether it's for a fee or not.

THE COURT: Well, don't you think lawyers sometimes tell people, "I don't think you can afford me but here's what you can do," and go ahead and do it? I mean, like writing a will. Somebody comes in to see you and says, "I've got some property and I'm going to need a will and I want my wife to have a will and -- but how much will it cost me?" "Well, we'll charge you $400 an hour." "Ooh. What's that going to be?" "Well, maybe $2500, $3,000 to do your will. But, you can write out on a piece of paper what you want to do with your legal property and sign it in your own name and that's a valid will in North Carolina." And then let them go on their

way.

I mean, would that -- I'm sure that happens. Would that be the unauthorized practice of law?

MR. RUSSELL: That would not because that's being done by a lawyer.

THE COURT: Yeah.

MR. RUSSELL: And so that's the first distinction, is that would not be the practice of law because it's not a nonlawyer engaging in giving -- and to the extent that's giving legal advice --

THE COURT: But do you think there's a representation problem there that -- confidentiality and things like that?

MR. RUSSELL: I think a lawyer's confidentiality and other obligations apply even to their interactions with a prospective client. In that context, you would say I believe that's a prospective client and a relationship is not formed from a going-forward standpoint, but the lawyers's duties all apply there. And in the event -- in the normal course, let's say a paralegal is meeting with a prospective client in the context of the North Carolina law firm right now, the lawyer that's overseeing that would also be responsible for ensuring the paralegal is complying and make sure the lawyer therefore complies with all of

his or her duties under the Rules of Professional Conduct.

THE COURT: Okay.

MR. RUSSELL: And so here we are talking about legal advice. And the plaintiffs allege -- and I think this is a correct statement of what constitutes legal advice, it would be advice tailored to the litigant's factual circumstances and legal goals. And that's distinct from what we sometimes call "legal information," which is more of a generic presentation or set of information about what the law provides that's not tailored to someone's unique facts.

So as with most First Amendment cases, the immediate question is what standard of scrutiny applies here. According to plaintiffs, it's strict scrutiny; and according to the defendants, it's intermediate scrutiny under these recent Fourth Circuit cases. And the starting point of that analysis, I believe, was the *NIFLA* case from the Supreme Court in 2018. *NIFLA* struck down a California statute that mandated that medical facilities provide certain information to their clients. So, a forced-speech case.

But in the course of that case, the Supreme Court made the point that states could regulate conduct in a manner that incidentally impacts speech, and those

regulations are subject to lower scrutiny. And the Fourth Circuit has filled in the law from there.

And so the two key cases --

THE COURT: Where -- just fundamentally, where does the state get its authority to regulate professions, like medical, law? I don't know -- Certified Public Accountant. I guess somebody needs to certify them, so that may be a part of it. And then there are probably a lot of junior occupations that aren't professional per se. Like, they can't regulate religion, right? The state can't grant you a minister's license, but they do allow you to marry people. And I don't know what kind of oversight they have on that. But just fundamentally, where does the state draw its authority to regulate commerce or people's activities?

MR. RUSSELL: And there have been a long line of cases, including North Carolina state courts that have gone right to that tension. There's an old case, for instance, where the state tried to regulate photography and the North Carolina Supreme Court said, obviously, that's a bridge too far.

THE COURT: Okay.

MR. RUSSELL: But the courts -- in particular, the Fourth Circuit and Supreme Court -- have recognized, going back quite a long ways, the state's

special interest in regulating the practice of law.

In the *CAI* case, the Fourth Circuit wrote that North Carolina's interest in regulating the legal profession to protect clients is at least substantial. And the Supreme Court case of *Goldfarb* recognized the states have a compelling interest in the practice of professions within their boundaries. Part of their power to protect public health --

THE COURT: They can't regulate me. Judge Phillips on the Fourth Circuit resolved that 50 years ago. And the state constantly -- when a new federal judge comes, they want you to re-up your license, and they can't do that. *McCuller versus Maryland*, that the federal -- but they can regulate me if I quit and completely resign and go back into law.

MR. RUSSELL: Yeah. I would say, if nothing else, that's just a direct supremacy clause question there. And it harkens to the *Sperry v. State of Florida* case that's cited in our papers. But it's an interesting one because there's a federal law that allowed nonlawyers to engage in a practice before the patent board. And the State of Florida sought to prohibit that and said that constitutes unauthorized practice in the state of Florida, if you're writing or preparing arguments or making arguments in that sort of

capacity.  And the Supreme Court rejected that on supremacy clause grounds.

But this is what it wrote:  "Nor do we doubt that Florida has a substantial interest in regulating the practice of law within the state.  And in the absence of the federal legislation, it could validly prohibit nonlawyers from engaging in the circumscribed form of practice."

And you look at other older cases, the Supreme Court recognizes that the broad power includes establishing standards for licensing practitioners and regulating the practice of professions.  In the context of lawyering in particular, in *Goldfarb*, the Supreme Court noted that the interest of states in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice and have historically been officers of the court.

THE COURT:  I had a case maybe 20, 25 years ago, a suit brought by a lawyer from a different state.  Say, Missouri.  And he had practiced there for a period of time.  Then he maybe went to California and practiced for a period of time.  Then maybe he went somewhere else and practiced or there's some interruption.  And then he came to North Carolina and he wanted to waive in, and

the state wouldn't let him.  And I granted his -- his motion on a privileges-and-immunities ground.  And the Fourth Circuit reversed it, said no.  I don't remember why they said no, but they said you couldn't do that.

MR. RUSSELL:  Yeah.  And I have not studied that particular case, Your Honor.  But I think that does fit in more broadly with the theme that we recognize in *Goldfarb*, *Ohralik*, the *Wadmond*, *Konigsberg*, and *Schware* cases that are all about state bars' authority to set the qualifications and the requirements to practice law within a state.

THE COURT:  Well, the state has a significant interest in protecting its citizens from reckless professionals, whether they're accountants or doctors or lawyers or whoever else might be subject to that.  People who -- do you have to be licensed to be an electrician?  You do, don't you?

MR. RUSSELL:  I believe you do.  Yes.  I believe that there are -- there are ways for the nonlicensed, or journeymen type of electricians to practice under the supervision of the licensed electrician, which would be something of a rough analog to how a paralegal functions in our justice system here.

So the two Fourth Circuit cases that I believe are the ones that control the decision before

12

the Court today are the *Capital Associated Industries* case from 2019 and the *360 Virtual Drone Services* case from just this summer. It just coincidentally was issued by the Fourth Circuit on the day our motion to dismiss was filed. And so this is, I would presume, very much one of the first cases that has an opportunity to apply the law as it is set out in *360*.

Start with the *CAI* case, though, which was a case challenging these UPL statutes on First Amendment grounds. Dealt with the same set of arguments. It was about you take -- you start with the prohibition on nonlawyer practice and then there's the question of corporate practice and there's certain corporate forms that are allowed to engage in the practice of law and some that are not. And *CAI* was looking at that particular question. And then more broadly at the question of what does the First Amendment allow in terms of the regulation or prohibition of nonlawyer practice.

THE COURT: Have other states allowed paralegals to perform legal practice requirements?

MR. RUSSELL: In the complaint and in their papers, the plaintiffs make reference to some different regulatory schemes that are in effect in other states. This is an area that I would say that the state regulators in general -- the state legislators -- have

been engaged in a lot of looking at where can changes be made. Of course, in North Carolina, it's ultimately up to the General Assembly. That's who defines what's the practice of law and who can practice it. It's not a State Bar question. It's not a district attorney question.

But I believe --

THE COURT: The legislature sets the bounds for practice of law.

MR. RUSSELL: That's exactly right.

THE COURT: Okay.

MR. RUSSELL: Yes.

THE COURT: So recently -- and this may be irrelevant to it, but this Court has the Camp Lejeune water cases of which there, for your information, are 550,000. And if you had a television set maybe a year or 18 months ago, you couldn't avoid seeing an advertisement constantly for this. And was that the unauthorized practice of law?

MR. RUSSELL: No. I believe that the --

THE COURT: The solicitations.

MR. RUSSELL: I mean, solicitation raises an important point. It goes to the *Ohralik* case from the Supreme Court, that the state bars do have the authority to regulate attorney solicitation.

Now, I presume, in the absence of there having been an investigation, that whatever advertisements were playing in North Carolina in connection with Camp Lejeune claims were consistent with our law and the ethics opinions that have been promulgated in North Carolina.

But, you know, I'll take it back for *Ohralik* and solicitation. I think this actually raises an important point. In the plaintiff's argument, they suggest that because you have to look at what the paralegal said to determine whether or not it is legal advice and therefore would be within the scope of practicing law, this must necessarily be a content-based restriction of speech. It's regulating speech as speech and therefore it must be subject to strict scrutiny.

But the fact in *Ohralik* and in other cases, we can look at whether lawyers's speeches constituted a solicitation is very telling. I mean, that recognizes what I think is intuitive and what the Supreme Court in the *City of Austin* case made clear, among others, that just because you have to look at what was said does not mean that you must then apply strict scrutiny. But there are ample content-neutral ways to look at what was said to determine whether or not it falls within the scope of the statutory --

THE COURT:  Take it back to the Camp Lejeune cases.  The TV ads were making gross representations about what they could do and what you were entitled to and things of that sort, without any regulation as far as I can tell.  So where does that fit into the unauthorized practice of law?

MR. RUSSELL:  Well, I think that the -- there would be two questions there.  If an out-of-state attorney was engaging in something in the -- within the bounds of North Carolina --

THE COURT:  Assume that they are out of state and they're broadcasting into North Carolina.

MR. RUSSELL:  So, obviously, they can certainly, I think, cross the threshold to where they're engaged in unauthorized practice depending on how they're entering into the state in that regard.  The other question is just what are the solicitation rules and what are the ethics opinions that govern solicitation of clients in North Carolina.

THE COURT:  Well, if you looked at the whole spectrum of what they said, you would come to the conclusion that there were no rules.  Because they almost said, "We'll send you a check if you send us your name."

MR. RUSSELL:  And that's the area where, for

instance, the State Bar is the state agency that's been charged by the General Assembly to regulate these issues, has unauthorized practice committees, has an entire disciplinary function --

THE COURT: Yeah, but I don't think they acted to regulate anybody at all. Because the -- only the cost was remedy. The cost of being on the air.

MR. RUSSELL: Well, I can't speak to exactly what's happening within the confidential disciplinary process as it would relate to any of those issues. But that is precisely the kind of thing that we have a State Bar for. Because when the lawyers engage in that, the State Bar has that disciplinary jurisdiction that they can look at it and determine whether it meets our ethical standards here. That's a problem with the paralegal practice that's being proposed. Because paralegals are not themselves subject to the State Bar's regulatory jurisdiction. Just like if they're not signing the pleading and not coming before the Court on behalf of the client, then presumably they're not subject to the Court's jurisdiction. They're not making any kind of appearance. And they couldn't under the law.

And so that gets to one of the, I think, consumer protection considerations that underlie why we

say nonlawyers cannot practice law. Because when they do that, they're not exposed to the checks that exist in the system, whether from the bench, from the State Bar, from the criminal justice system, or others. Or from fiduciary duties, from client confidentiality obligations, from a legal malpractice claim. Those are all the kinds of concerns that exist in nonlawyer practice. And you saw many of those echoed in the *CAI* case, as the Court was looking at this potential set of harms from that unauthorized corporate practice of law.

THE COURT: Correct my information: There's no requirement that a licensed lawyer have insurance coverage, is there?

MR. RUSSELL: I do not believe that there's a malpractice insurance requirement.

THE COURT: But generally speaking, it would be suicidal to practice without some protection.

MR. RUSSELL: That would seem to be a big mistake.

THE COURT: And there's no corresponding asset like that for paralegals, is there?

MR. RUSSELL: Not to my knowledge. No. There's not.

THE COURT: Nobody's underwriting a paralegal; it would be -- always be within the scope of

18

the practicing lawyer.

MR. RUSSELL:  That's right.  That's traditionally how our system's always worked, is the paralegal is under the supervision of the lawyer and the obligations ultimately lie on the lawyer.

I think that speaks also to the broader point that -- obviously, the Fourth Circuit's recognized that the states have leeway to change their law as it relates to the practice of law.  And certainly the General Assembly, it's looked at this issue before. It's decided not to make a change.  It could at some point.  You would expect it then to also change all of those other regulatory surroundings if they were to say that paralegals can practice law or give legal advice. You would expect in their wisdom that the General Assembly then fills in some of those other gaps that just don't exist right now.  You would have to stand up that structure around it to ensure that you had those matching consumer protections that exists right now under the lawyer regulations.

THE COURT:  I was admitted to practice in North Carolina in September of 1973.  So that's 51 years ago.  I was admitted in the District of Columbia three years before.  But when -- what was I going to say?  Oh, I know.  In 19 -- so I went into practice in Elizabeth

19

City.  And there was a book from the State Bar, and one of my partners gave it to me.  And it set the fees for real estate closings and the amount of the loan was -- and it was considered unethical not to charge within that fee range.  Are you familiar with any of that?

MR. RUSSELL:  That is essentially the same issue that was before the Supreme Court in the *Goldfarb* case, which was from Virginia.  And in that case, there were Sherman Act claims about --

THE COURT:  Yeah, it was antitrust.

MR. RUSSELL:  Yes.

THE COURT:  That you had -- it was -- you were violating your ethical code if you didn't charge within the established rate.

MR. RUSSELL:  Yes.  And so the Supreme Court dealt with that issue in the *Goldfarb* case while at the same time recognizing that it was not intending to impinge on the state's broad authority to license lawyers.

So I want to come back to this notion because this does go to what level of scrutiny applies. These notion that you see in the papers of pure speech or that you have to look at the speech to determine whether it falls within the regulation.  And in the *360* case, that exact same argument was presented to the

Fourth Circuit. And it addressed it directly. The Court wrote: "Further, to plaintiff's suggestion finding the line between speech and conduct is not as simple as asking whether the prohibition is literally one against verbal or written speech on the one hand or one against conduct -- i.e., nonverbal action -- on the other."

In the *CAI* case, again, the same argument was raised, and the Court dealt with it in footnote four at the Fourth Circuit. *CAI* describes the UPL statutes as content-based and identity-based restrictions on speech. Because the statutes regulate conduct, we need not engage with those descriptors.

Likewise, in the Supreme Court *City of Austin* case from 2023 -- so a recent Supreme Court case -- and this was a sign code case about on- or off-premises sign restrictions. The plaintiffs there made the argument this must be strict scrutiny because you have to read the sign to know whether it's an on-premises or off-premises sign. The Court rejected that as too extreme an interpretation of its presence, but the Court's First Amendment precedence and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral. And the Court gave

21

the example of solicitation restrictions as an instance when, of course, we review what is said to determine whether it falls within the requirements, and that's not subject to strict scrutiny.

So just like that regulation in the *City of Austin*, the UPL statutes only require examining the speech in service of drawing the neutral line that is agnostic to the substance of the legal advice given. The law does not say that a nonlawyer paralegal can give legal advice about one topic but cannot give legal advice about another topic. It is a flat prohibition. There's no further review that's needed.

The plaintiff's counterargument, in very large part, relies on the *Holder v. Humanitarian Law Project* case from the Supreme Court. And what I would say to the Court about that is it was a very law at issue. That case was a blanket prohibition on providing material support to terrorist groups. There was no licensing issue at all in that case. And therefore, it is really far afield from what we look at in *CAI* and *360*, for instance. And the same arguments that are advanced here were advanced in the *CAI* and the *360* case about the impact of *Holder*. Both of those cases, they argued, you've got to look at our speech therefore it must be strict scrutiny. And the Fourth Circuit

rejected that argument in maybe the most direct way you can, by just not even acknowledging it. I mean, the Fourth Circuit did not address *Holder* at all in its decisions in *CAI* and *360*. It plays no part in the analysis here. And instead, the Fourth Circuit has told us, quite plainly, what to look for as it relates to the UPL statute specifically and then the guideposts that were in the *360* case more generally.

I would also commend to the Court the *Brokamp v. James* case from the Second Circuit. It's at 66 F. 4th 374. It was from 2023. That was a case about counselor licensing. And the Second Circuit at the Rule 12 stage dismissed the claim applying intermediate scrutiny. In footnote 19 of the *Brokamp* case, the Court went through several other cases like you see cited here, including *NIFLA* and *Holder,* and made the point that those don't control the analysis on these licensing questions.

So we'll turn to the Fourth Circuit authority instead of those overly simplistic arguments for strict scrutiny. And the Fourth Circuit has given us two ways to approach the level-of-scrutiny question. The first and most direct is to just look at the *CAI* case, because it was examining the exact same statutes under the First Amendment. Same licensure system, same

kind of First Amendment challenge, and it even had a very similar case history with that group trying to go to the General Assembly to obtain a legislative change to North Carolina law.  The General Assembly refusing, and so the group then turning to the federal courts.  In that case, they went to the Middle District.  Very similar to what's asserted here.

And that opinion from the Fourth Circuit was very much focused on CAI's desire to speak.  It was their call center and writing legal documents.  And the Fourth Circuit's analysis is all true here.  It wrote that the UPL statutes fit within NIFLA's exception for professional regulations that incidentally affect speech.  The ban is part of a generally applicable licensing regime that restricts the practice of law to bar members and entities owned by bar members.  Any impact that the UPL statues have on speech is incidental to the overarching purpose of regulating who may practice law.  They don't target the communicative aspects of practicing law, such as the advice lawyers may give to clients.  Instead, they focus more broadly on the question of who may conduct themselves as a lawyer.  And this is the key point:  Licensing laws inevitably have some effect on the speech of those who are not or cannot be licensed.  But that affect is

24

merely incidental to the primary objective of regulating the conduct of the profession.  So that's the Fourth Circuit from 2019.  And I would argue that controls.

THE COURT:  Okay.

MR. RUSSELL:  And that can do it.  But in *CAI -- or in 360*, we have this very new case that is looking at *CAI* and some of the other Fourth Circuit precedence and imposes these three guideposts to answer the question of is there regulation of speech as speech.

The first one is one we've essentially talked about today, whether the regulation is in a field that carries legal help, economic, or public safety related consequences.  And law is one of the ones the Court acknowledged, citing *CAI* as an example.

And the Fourth Circuit contrasted that with the *Billups v. City of Charleston* case, also from the last few years.  That case was about regulating tour guides.  And the Fourth Circuit recognized that tour guides do not carry health and safety and legal consequences in the way that lawyers and engineers and doctors do.

So the UPL statutes pass that first guidepost.  This is squarely about the legal consequences of these acts on people's lives.  And look at the areas of the law that are proposed to be part of

25

this practice:  child custody, estate administration, no contact orders.  These are things that have some of the deepest consequences for the litigants involved in those matters.

The second guidepost is whether the regulation is aimed at speech taking place in a traditionally public sphere.  And again, *Billups* is the example of the case that fails that guidepost because *Billups* was about providing tours on the streets of Charleston, and that's where First Amendment rights are at their apex.

And here, we have the opposite.  And we've also talked about this again today, too.  This proposed practice is not before the Court.  It's not in the courtroom.  It's in a way that appears to be shielded from all of the public scrutiny that otherwise would attach or the scrutiny from the regulators.

THE COURT:  When did licensing occur?  What time period of history?  I mean, because there weren't any law schools 200 years ago.  And you read law or were under the auspices or guidance of somebody who was practicing law.  I don't know how they had the right to practice law, but -- you know, we think of Thomas Jefferson and Samuel Johnson in North Carolina, and people like that.  And so at some point someone must

have exercised restrictions on the practice of law. Who did that?

MR. RUSSELL: I don't know the point in time that that licensing system came into place in North Carolina. What I do know is --

THE COURT: I sat in -- years ago in the Fourth Circuit with Judge Kellam from Virginia, who was the last federal judge to have not gone to law school. And you didn't have to go to law school to be a lawyer; you could be certified by -- I don't know who, but by somebody, and get your law license.

MR. RUSSELL: From the -- from the *CAI* case, I recall that there was a good bit of attention paid to the *Seibel* case, which was a North Carolina Supreme Court case from the 1920s. That's not cited in the papers here. But -- and there were older cases looking at the monopoly clause angled that was asserted in *CAI* that's not asserted here. Going back to the 1800s that recognized from the North Carolina Supreme Court standpoint the profession of the practice of law. But I don't have the exact answer of when the licensing system came --

THE COURT: I think before there was a bar association or a state bar, I think probably the North Carolina Supreme Court was the authorizing body. That

to become a lawyer, you were admitted by the Supreme Court.  Is that right?

MR. RUSSELL:  I believe that is correct, Your Honor.

The --

THE COURT:  No.  I'm just curious as to how elastic the control is.  You know, it came from somewhere, and it's presently exercised here and by your clients.  And, you know, can that change?  I mean, it hasn't changed right now.  But it's not something that's written in stone.

MR. RUSSELL:  I don't think it is.  And I think that goes right to the nature of the intermediate scrutiny test.  And the Fourth Circuit has addressed that point in both of these cases -- in both the *CAI* and *360*.  In both of those cases, like we see here, there was this assertion that there could be less-restrictive means or look at what this other state is doing with its regulatory system.  And in both -- in both cases, the Fourth Circuit has said that we leave it to the legislators of these states to make those determinations.  They have the authority --

THE COURT:  I mean, how much of the future practice of law is going to be done just online?  We won't be in the courtroom; we'll be online.  And you

don't know who you're talking to online.  You don't necessarily have a video.  You can just be, "Hello.  My name is Joe.  You know, can I do this?  Yes or no.  How much do I owe you?"

MR. RUSSELL:  Yeah, I think that -- we see -- I know in the counseling context, there's these apps that people use now to engage in, essentially, a quick turnaround counseling service.  I would say I personally hope that in the practice of law, we can hold the line and not get to that impersonal place.  Because I think from the lawyer's standpoint, it's very hard to know whether you really are accomplishing your duties --

THE COURT:  It's happening.  In this room yesterday at 11:00, I had a hearing in which the Government lawyer was in New Jersey in his living room Zooming in and the other lawyer was I don't know where. And I made the comment, I'm the only one who is in court, you know, and why is this right?

MR. RUSSELL:  I think those are -- those are interesting questions in terms of the authority of a court to control the practice of law before it.  Which is a place that I suspect the Fourth Circuit would say the General Assembly's authority does end at some point. But that's not the question that's before us today.

What's before us today is something that

going back to all of those cases from much earlier in the last century, the Supreme Court has recognized the state authority to implement these licensing and regulatory requirements --

THE COURT: The U.S. Supreme Court has recognized that.

MR. RUSSELL: Yes. I mean, that's *Goldfarb*. That's *Ohralik*. That's the *Schware* case, the *Konigsberg* case. These are cited in our papers. But they go back to all sorts of requirements that the Supreme Court has recognized, including even the ethics interview process, that somebody is of good character. I mean, so that's the -- probably the most subjective requirement you could have to practice law, that the Supreme Court has squarely recognized that that is an appropriate regulatory function and appropriate threshold for practicing law.

THE COURT: Okay.

MR. RUSSELL: I want to come to the last guidepost. The third one is whether the regulation appears to regulate some kind of unpopular or dissenting speech. And this is one where the *Otto v. City of Boca Raton* case is interesting, an Eleventh Circuit case. And that is about a local effort to prohibit counselors from engaging in what we sometimes call "conversion

therapy." And the counselor that wanted to be able to provide that kind of therapy brought suit. And the Court recognized that that's where you're getting into the Government picking and choosing what speech it likes, if it says, "You, counselor, can give this sort of therapy but not that sort of therapy."

That's not what we're talking about here. There's no contention that we're dealing with unpopular or dissenting speech here. So *CAI* -- or, excuse me, the UPL statutes pass the third guidepost as well.

After the Fourth Circuit went through those three guideposts in *360*, it directly applied it to the UPL statutes looking at *CAI*. For example, *CAI* involved a classic regulation of conduct with an incidental burden of speech. The law prohibits certain entities from offering legal services or advice, speech that has economic and legal consequences, and had no readily apparent implications for unpopular or dissenting speech.

So within just the last few months the Fourth Circuit has said this is a classic regulation of conduct with an incidental burden on speech.

I mentioned the *Brokamp* case earlier, and I would commend that to the Court as well, undertaking a very similar analysis and holding that the state could

31

require licensure.

So the end result of that is that intermediate scrutiny is the test here. And I think the next question is, is that a test that can be applied at the Rule 12 stage in this case? And I would submit to you that it can. We now have the benefit of two analyses from the Fourth Circuit on these questions in *CAI* and in *360*. We have the Fourth Circuit's experiences, guidance. We have the controlling framework. And in *CAI*, we have a controlling case. In *360*, the Fourth Circuit wrote that this is a commonsense approach that's needed. Reviewing *CAI*, it said that in resolving the legality of the UPL statute at issue in *CAI*, we relied on common sense, not specific evidence, to conclude that the defendant had met this burden under intermediate scrutiny. And that echoes this Court's statement about the Rule 12 test, that the facts alleged must allow a court drawing on judicial experience and common sense to infer more than the mere possibility of misconduct. The *Brokamp* case from the Second Circuit was a Rule 12 case. And beginning at page 397 of that decision, the Court walked through its Rule 12 analysis, applying intermediate scrutiny.

And the last one on that question, I would commend to the Court, is the *Wag More Dogs* case from the

Fourth Circuit.  680 F. 3d 359.  A sign ordinance case but the Court applied intermediate scrutiny and affirmed dismissal at Rule 12.  Footnote three, in particular, covers that analysis.  And the Fourth Circuit summarized it this way:  "The defendant need not reinvent the wheel by coming forward with voluminous evidence justifying a regulation of the type that has been upheld several times over."  I would submit we're on all squares there.

THE COURT:  Okay.

MR. RUSSELL:  So then we have to apply the intermediate scrutiny test.  And I'll do this quickly.  The first one is the substantial state interest, and we've already talked about that.  That's *CAI*, *Goldfarb, Ohralik*, long recognized.

The second is whether the regulation is sufficiently drawn to protect the interest, which is a reasonable fit test.  It's not a high burden.  In *CAI*, we saw a reasonable fit because the statute prohibited the nonattorney-owned corporation from practicing law but allowed professional corporations and nonprofit law groups.  In *360*, the Court said that the statute was a reasonable fit because the drone enthusiasts could still fly his drone, take pictures, and even mark property lines; he just could not affix the measurement data that constituted surveying.  But he was still allowed to do

substantially all of what was in his expertise and that he was enthusiastic about.

Exact same thing here under the complaint. It is alleged that these paralegals have a very diverse set of experience, and I'm sure that's true. They admit that, under the current law, they can engage in the provision of legal services under attorney supervision. At paragraph 60, they allege that Ms. Morag has filled those forms out countless times under the supervision of a lawyer. And the complaint recites their work in firms, nonprofits, the court system, clinics. That speaks directly to this reasonable fit question. Just like in *CAI*, we have broad opportunities to work, to engage with the legal system. The what's prohibited is doing -- is offering legal advice or other practice of law without attorney supervision. Paralegals can always give out legal information. And that means the statute is sufficiently drawn.

The final point: There also is an assertion in the complaint about a desire to do on-demand videos and seminar presentations. Those would not constitute legal advice. A video or seminar, that's a generic presentation. That's not about a particular person's facts and circumstances. And so under the recognized tests, that would not be prohibited by the statutes and

the claim there would have to fail on those terms.

Thank you, Your Honor.

THE COURT: Yeah. Thank you.

Let's see. Mr. Sherman, are you going to be the lead?

MR. SHERMAN: Yes, Your Honor.

THE COURT: Good. I'll hear from you.

MR. SHERMAN: Thank you, Your Honor. May it please the Court. We're here on a motion to dismiss. The plaintiffs in this case want to have conversations with North Carolinians in which they will give those North Carolinians information and advice about how to fill out court-created legal forms that the state itself expects nonlawyers to fill in without the assistance of a lawyer. And the question is whether those conversations are speech within the protection of the First Amendment. And they clearly are. This should be clear under the Supreme Court's precedent in *Holder v. Humanitarian Law Project*, which itself dealt with individualized legal advice and holds that even when a law is generally aimed at a type of conduct, when the application of that law is triggered by speech with a particular conduct -- content, that application has to be analyzed under the First Amendment. If that was true in *Holder v. Humanitarian Law Project*, I think it has to

be true here.

Now, my friend on the other side suggests that this commonsense conclusion does not hold because of the Fourth Circuit's rulings in *Capital Associated Industries* and in *360 Drone Services*. Those cases are distinguishable, however, and the primary takeaway from the *360 Drones* decision is not that all speech, even individualized speech about law, is the conduct of practicing law. But, rather, what the Court held there is that the line between speech and conduct is, quote, quite blurry, and it provided a nonexhaustive list of factors the Court should consider in deciding whether we're on the speech side of the line or the conduct side of the line.

I would suggest that when all you're dealing with is literally conversations, the baseline assumption is that you have to be on the speech side of things.

THE COURT: But those conversations are material. They are -- they have to serve a purpose. It's not -- I'm not talking to you about the weather or about the World Series or something else. You're talking about business, and that's why it's regulated.

MR. SHERMAN: That goes to the strength of the Government's interest, Your Honor. Under First Amendment scrutiny, I don't think that goes to whether

it is speech or conduct. And I think we can look directly to the Supreme Court's decision in *NIFLA,* which --

THE COURT: But the paralegal holds themself out as having special qualifications. I mean, undoubtedly husbands talk to their wives about legal matters about their -- you know, I'm going to buy a house or I'm not going to buy a house, I'm going to write a will or I'm not going to write a will, we're going to take out a loan or we're not going to take out a loan. I mean, those are all business-type things that people talk to each other about, but you don't need a license for that.

MR. SHERMAN: That's correct, Your Honor, you don't need a license for that.

Now, I think the most factually analogous case to this case anywhere in the country is the Southern District of New York's decision in *Upsolve v. James,* which dealt with a similar situation where you had nonlawyers who wanted to give limited legal advice about court-created forms. In that case, there were forms about how to respond --

THE COURT: Well, does it matter that you take a fee for this? This isn't -- I'm not volunteering this information. I'm not in the barbershop and

somebody's cutting my hair and somebody says, "What do you think about this?"  "Well, here's what I think about it."  And then we just leave each other.  I mean, people are charging a fee for this; otherwise, they wouldn't be here.

MR. SHERMAN:  Well, so, Your Honor, two thoughts on that.  Number one, the complaint in this case alleges two claims.  The North Carolina Justice For All Project wants to give uncompensated advice.  It does not want to charge a fee for the advice that it will give to people.  Claim two is a claim --

THE COURT:  Well, why would they do it if they -- I mean, how do they earn a living?

MR. SHERMAN:  It's an unincorporated nonprofit association, Your Honor.  The reason it exists is to help bridge the access-to-justice gap.  Because there are people in North Carolina who have unmet legal needs and who can't afford a lawyer, and the members of the North Carolina Justice For All Project have information and advice they can give that can help these people.

THE COURT:  Well, but you can't sue them for malpractice if they give you bad advice.

MR. SHERMAN:  I think the state could definitely create a cause of action for malpractice

against nonlawyers who give legal advice. And that would be consistent with the history of the regulation of malpractice and the history of the regulation of the practice of law.

THE COURT: How about confidentiality? When -- if you talk to a lawyer and give them private information, they have a duty to preserve that and not disclose it.

MR. SHERMAN: And I think the state could create a legal duty of that type here.

THE COURT: But it hasn't yet.

MR. SHERMAN: Well, all of those suggests that there are less-restrictive alternatives that are available to the state. And the mere fact that the state hasn't created those less-restrictive alternatives yet doesn't mean that in the meantime it can prohibit people from speaking to one another if they have valuable information to share. This is exactly what the Court held in *Upsolve v. James* in the Southern District of New York when it held that in a case that was limited to pure advice, they were on -- on the speech side of the speech conduct line.

And I would like to go to *NIFLA versus Becerra*, the case that my friend on the other side cited. So in *NIFLA*, the Supreme Court rejected the

so-called "professional speech doctrine" under which courts had historically decided these issues. So under the professional speech doctrine, the approach the Court, including the Fourth Circuit, had taken was that any speech that was sufficiently professional was automatically conduct and did not fall within the scope of the First Amendment. The Supreme Court rejected that and said there are only two exceptions to the ordinary rules of First Amendment law when it comes to, quote-unquote, professional or occupational speech. One of them is the courts -- I'm sorry, states do have more leeway to regulate speech that is incidental to professional conduct. And the example that the Supreme Court gave, I think, is extremely telling. Because the example it gave was *Planned Parenthood of Southeastern Pennsylvania versus Casey*.

In that case, what the Court held was that if a physician wants to perform an abortion, the physician can be required to get informed consent from the patient even though informed consent requires speaking to the patient. But that requirement was triggered by a noncommunicative act, by the noncommunicative act of performing a surgical procedure. It's very different than the situation we have here where the only type of acts at issue are the

communicative acts between the plaintiffs in this case and people who could benefit from their information.

That also serves to distinguish this case from *Capital Associated Industries*. The firm in *Capital Associated Industries* essentially wanted to have a law firm that was owned by nonlawyers and it did not want to limit its services to pure advice. It said specifically that it wanted to be able to represent people in front of agencies like the EEOC and that it wanted to be able to respond to subpoenas on behalf of clients. That appeared on page 8 of their appellate brief before the Fourth Circuit.

Faced with a company that essentially wanted to operate a full-service law firm doing everything but litigation and right of appearance in court, I don't think it's that surprising that the Fourth Circuit held that that general challenge to UPL laws couldn't survive.

But the Southern District of New York distinguished *CAI* and other challenges to UPL laws on precisely the grounds that it wasn't limited to pure advice of the sort that we have in this case.

And I don't think the Fourth Circuit's decision in *360 Drones* should change this analysis. Because, again, the Court in *360 Drone* says that there's

this blurry line between speech and conduct, and there's a nonexhaustive list of factors.  So it's not a three-factor test, and if you satisfy those factors, you're on the conduct side of the line.  You have to look essentially to the totality of the circumstances.  And the totality of the circumstances here, where you merely have people providing information and advice, are exactly the circumstances that led the Southern District of New York, again, to conclude that they were on the speech side of the line.

If I can speak briefly about something Your Honor brought up about the history of licensing.  I think that also generally supports this conclusion.  So the Supreme Court has held repeatedly that even restrictions on speech can escape First Amendment scrutiny if they are of the sort that have existed in parallel with the First Amendment from the time the First Amendment was enacted.  And that's certainly true for things like malpractice restrictions which did exist at the time of the founding.  But at the time of the founding, there was no general prohibition on who could give legal advice.  Instead, there were far more narrowly tailored restrictions on who could have right of appearance in front of court, who could represent people and act as their agent.  And lawyer licensing, as

42

we think of it today, is entirely a product of the 20th century.  It didn't exist in meaningful form in the colonial period.

For all of these reasons, I think that we are clearly on the speech side of things and that strict scrutiny should be the applicable standard of review. But even if my friend were correct and we're in the role of intermediate scrutiny, which is the absolute lowest arguable standard of review here, the Government still bears a burden, and I don't think it's a burden that can be covered by mere appeals to common sense at this stage.  Because unlike in *CAI*, where you had sophisticated business companies who had the alternative of hiring lawyers if they want to; here, you're dealing with people who, as alleged in the complaint, simply do not have access to other sources of legal information to help them.  The alternative for these people is not that they hire a North Carolina-barred lawyer, but that they go to Google or they go to Chat GBT or they ask anonymous person on the internet.  And it does not strike me as at all commonsensical that these people will be in a better position relying on those sources than relying on experienced paralegals like the individual plaintiffs and the members of the North Carolina Justice For All Project.

So I think here at the motion-to-dismiss stage, there is more than enough in the allegations for us to survive and go forward, and the Government can try to prove its case under the First Amendment.

THE COURT: Do you think that there's any authority under either the Ninth or Tenth Amendment, or are those completely irrelevant to this?

I'm just concerned about the speech. You know, that what you're talking about is speech because it doesn't seem to ring true to me. And I'm looking in the Constitution at the privileges-and-immunities clause, but that's -- that carries from one place to another, not necessarily an inherent power. But the other two places you can look, unless you have a different idea, is in the Ninth and Tenth Amendment.

MR. SHERMAN: So we haven't raised claims under the Ninth and Tenth Amendment. I think the reason why this case concerns speech is because plaintiffs have pleaded their claim narrowly to apply only to legal advice. Only to speech. They don't want to represent clients. They don't want to initiate litigation. They don't want to appear in court. All they want to do is take information that they have and that can be useful to people and convey that information to them. Everyone agrees that if they wrote a book containing this kind of

44

advice, that book would be fully protected by the First Amendment. The question is, is there a First Amendment principle that says that when you speak that advice to someone it loses its First Amendment protection. I don't think there is, even under *Capital Associated Industries* and *360 Drones*. Again, when you're dealing with --

THE COURT: Why don't you just call it advertising?

MR. SHERMAN: So the Supreme Court has a test for commercial speech. That test typically turns on whether the speech does no more than propose a commercial transaction. Here, this is more the -- to the extent that my clients want to sell their speech, their speech is the subject of the transaction. It's sort of the difference between advertising a book and then the actual content of the book. But all that suggests is that their speech is actually more protected. Because under the Supreme Court's commercial speech doctrine, speech typically gets a lower intermediate standard of review. When the Government regulates noncommercial speech based on its subject matter -- this is *Reed versus Town of Gilbert.* Those content-based restrictions are subject to strict scrutiny. And nothing in the *City of Austin* case

alluded to by my friend on the other side changes that. *City of Austin* dealt purely with content-neutral, location-based distinctions for signage. But even in the wake of that case, the Court has reaffirmed --

THE COURT: Is all of this going to be done online? Is that -- you're going to access possible contacts online, not -- not in person, they're not coming into an office to sit down and, you know, say hello and talk to you?

MR. SHERMAN: No. The allegations of the complaint suggest that they want to hold the -- that JFAP wants to hold clinics where people can come in and they can give them the forms and help them fill them out correctly so that they can vindicate their legal rights. But the only thing they want to do is provide people with this information and advice. And that is speech within the scope of the First Amendment.

THE COURT: Yeah, but how are they going to do that? I mean, are they going to be physically sitting next to them in the same room or are they going to be looking at a screen with just language?

MR. SHERMAN: They want to be holding live conversations. It's possible that they could hold those conversations via Zoom. I don't think that makes a difference to the First Amendment analysis. But

conversations, no matter what the subject matter, are presumptively within the scope of the First Amendment. What the Government essentially is arguing is that, well, these are really important conversations and so they shouldn't be subject to ordinary First Amendment rules.  That's not how First Amendment analysis works.

THE COURT:  Well, has anybody been charged with the unauthorized practice of law?

MR. SHERMAN:  For holding the kinds of conversations --

THE COURT:  Yeah, your people.  Are the people that you represent, have they -- anybody been charged with discipline for unauthorized practice of law?

MR. SHERMAN:  Well, they haven't, Your Honor, because they haven't had those conversations yet. As alleged in the complaint, they specifically do not have these conversations because doing so would be the illegal unauthorized practice of law.  And the state doesn't dispute that they --

THE COURT:  Maybe you should have taken a less-disciplined position.  The people that are broadcasting the Camp Lejeune water cases, they don't care about the unauthorized practice of law.  Have you ever seen any of those ads?

MR. SHERMAN:  I have seen them.

THE COURT:  So we've all seen them.

MR. SHERMAN:  Uh-huh.

THE COURT:  Right.  And they come from who knows where.  I mean, it's not a lawyer down the street.

MR. SHERMAN:  So, you know, I don't know the answer to where those ads come from, but I think it does point to something important that goes to the significance of evidence in any kind of First Amendment case.  My friend on the other side points, for example, to the *Ohralik* case, which was about attorney solicitation.  But when the Court was faced with a different factual scenario in *Edenfield versus Fane*, which dealt with accountant solicitation, it held that it had to have a factual record so that it could determine whether there was a strong enough reason to prohibit direct solicitation by accountants.

The takeaway, I think, is that facts and context are extraordinarily important in First Amendment cases, and the facts as alleged in this case are different than any case that the Fourth Circuit has ever faced, and they are most similar to the *Upsolve v. James* litigation from the Southern District of New York in which not only did the plaintiffs survive a motion to dismiss, they got a preliminary injunction granted

48

because the Court determined that they were likely to prevail on the merits of their First Amendment claim. If those litigants can get a motion for preliminary injunction, these litigants have more than enough to survive a motion to dismiss.

THE COURT: All right. Thank you. I've heard all I'm going to hear on this. I've given you an hour to argue it. Thank you for your preparation, and I'll review the motion and the arguments and give you a written opinion.

(The proceedings concluded at 11:32 a.m.)

* * * * *


**C E R T I F I C A T E**


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

This the 4th day of December, 2024.

_____
Jennifer C. Carroll, RMR, CRR
Official Court Reporter

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

No.7:24-cv-00004-BO-BM

|  |  |
|---|---|
| MORAG BLACK POLASKI; SHAWANA ALMENDAREZ; and NORTH CAROLINA JUSTICE FOR ALL PROJECT, <br><br> *Plaintiffs*, <br><br> v. <br><br> ERNIE LEE, in his official capacity as District Attorney for the 5th Prosecutorial District of the State of North Carolina; BENJAMIN R. DAVID, in his official capacity as District Attorney for the 6th Prosecutorial District of the State of North Carolina; NANCY LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; ASHLIE SHANLEY, in her official capacity as District Attorney for the 25th Prosecutorial District of the State of North Carolina; SPENCER B. MERRIWEATHER III, in his official capacity as District Attorney for the 26th Prosecutorial District of the State of North Carolina; and A. TODD BROWN, in his official capacity as President of the North Carolina State Bar and Chair of the Executive Committee of the North Carolina State Bar, <br><br> *Defendants*. |  |

## PLAINTIFFS' NOTICE OF APPEAL
_____

Please take notice that Plaintiffs Morag Black Polaski, Shawana Almendarez, and the North Carolina Justice for All Project appeal to the United States Court of Appeals for the Fourth Circuit from the December 16, 2024, Judgment of this Court following this Court's Order of December 16, 2024 (Docket No. 40), granting Defendants' Motion to Dismiss (Docket No. 13).

Respectfully submitted this 10th day of January 2025.

/s/ Vince Eisinger
Vince Eisinger
North Carolina Bar No. 57646
CRANFILL SUMNER LLP
5420 Wade Park Blvd., Suite 300
Raleigh, NC 27607
Phone: (919) 863-8703
Fax: (919) 863-3459
Email: veisinger@cshlaw.com

*Local Civil Rule 83.1(d)*
*Attorney for Plaintiffs*

/s/ Paul M. Sherman
Paul M. Sherman*
Virginia Bar No. 73410
Christian W. Lansinger*
Maryland Bar No. 2211290007
INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org
        clansinger@ij.org

*\*Special Appearance pursuant to*
*Local Rule 83.1(e)*
*Attorneys for Plaintiffs*

2

JA 111

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which provided electronic service upon all attorneys of record.

/s/ Paul M. Sherman
Paul M. Sherman

*Attorney for Plaintiffs*

3