No. 25-1038

In the United States Court of Appeals
for the Fourth Circuit

MORAG BLACK POLASKI; SHAWANA ALMENDAREZ; NORTH CAROLINA JUSTICE FOR ALL PROJECT,

*Plaintiffs-Appellants*,

v.

ERNIE LEE, in his official capacity as District Attorney for the 5th Prosecutorial District of the State of North Carolina; JASON W. SMITH, in his official capacity as District Attorney for the 6th Prosecutorial District of the State of North Carolina; NANCY LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; ASHLIE SHANLEY, in her official capacity as District Attorney for the 25th Prosecutorial District of the State of North Carolina; SPENCER B. MERRIWEATHER, III, in his official capacity as District Attorney for the 26th Prosecutorial District of the State of North Carolina; KATHERINE ANN FRYE, in her official capacity as President of the North Carolina State Bar and Chair of the Executive Committee of the North Carolina State Bar,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of North Carolina

# BRIEF OF DEFENDANTS-APPELLEES

JEFF JACKSON
Attorney General

James W. Doggett
Deputy Solicitor General
Elizabeth Curran O'Brien
Tamika L. Henderson
Special Deputy Attorneys General

N.C. DEPARTMENT OF JUSTICE
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

*Counsel for the District Attorney Defendants-Appellees, in their official capacities*

Alan W. Duncan
Stephen M. Russell, Jr.

MULLINS DUNCAN HARRELL & RUSSELL PLLC
300 North Greene St., Suite 2000
Greensboro, NC 27401
(336) 645-3320

*Counsel for Defendant-Appellee Frye, in her official capacity*

## CORPORATE DISCLOSURE STATEMENT

I certify, pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, that appellees are not in any part publicly held corporations, publicly held entities, or trade associations, and that no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation.

Dated: September 10, 2026

/s/ Stephen M. Russell, Jr.
Stephen M. Russell, Jr.

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iv

ISSUE PRESENTED .......... 1

INTRODUCTION .......... 1

STATEMENT OF THE CASE .......... 5

A. Parties and claims .......... 5

B. The UPL Statutes determine who may practice law .......... 8

C. A law license carries burdens that protect clients in North Carolina who receive legal advice .......... 12

D. The district court's dismissal of Plaintiffs' claims .......... 15

SUMMARY OF THE ARGUMENT .......... 19

ARGUMENT .......... 22

Standard of Review .......... 22

Discussion of Law .......... 23

I. The intermediate-scrutiny test this Court applied to the UPL Statutes in *CAI* applies here .......... 23

A. This Court defined the applicable intermediate-scrutiny test in *CAI* .......... 23

B. This Court reaffirmed the intermediate-scrutiny test for professional licensure requirements in *360 Virtual* .......... 26

C. *CAI*'s intermediate-scrutiny test applies to Plaintiff's challenge to the UPL Statutes ........ 29

D. This Court's professional licensure precedents can be read harmoniously with *Chiles* ........ 32

1. *Chiles* and *CAI* can be read harmoniously ........ 33

2. *Chiles*'s discussion of *Holder v. Humanitarian Law Project* did not abrogate this Court's precedents ........ 37

3. *Chiles* does not require a different approach to content neutrality in professional licensure cases ........ 41

4. The factors this Court discussed when distinguishing conduct and speech regulations in *360 Virtual* are consistent with *Chiles* ........ 44

5. The out-of-circuit cases cited by Plaintiffs do not support their argument that *Chiles* abrogated this Court's precedents ........ 46

II. The district court correctly applied the intermediate-scrutiny test to the UPL Statutes ........ 49

A. North Carolina has at least a substantial interest in barring nonlawyers from practicing law ........ 51

B. The UPL Statutes are sufficiently drawn ........ 54

III. JFAP is not entitled to reversal under a freedom-of-association theory ........ 57

CONCLUSION ........ 61

ORAL ARGUMENT STATEMENT ........ 61

CERTIFICATE OF COMPLIANCE ........ 64

CONTENTS OF ADDENDUM ........................................................ Add. 1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*360 Virtual Drone Servs., LLC v. Ritter*,
102 F.4th 263 (4th Cir. 2024) ........................................ *passim*

*360 Virtual Drone Servs. LLC v. Ritter*,
2026 U.S. LEXIS 1801 (Apr. 20, 2026) ........................................ 18

*360 Virtual Drone Servs. LLC v. Ritter*,
2026 U.S. LEXIS 2505 (June 15, 2026) ........................................ 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................ 22, 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................ 23

*Billups v. City of Charleston*,
961 F.3d 673 (4th Cir. 2020) ........................................ 27

*Brokamp v. District of Columbia*,
2026 U.S. Dist. LEXIS 140312 (D.D.C. June 24, 2026) ................. 47

*Brokamp v. James*,
66 F.4th 374 (2d Cir. 2023) ........................................ 43, 53

*Canales-Rivera v. Barr*,
948 F.3d 649 (4th Cir. 2020) ........................................ 51

*Capital Assoc. Indus. v. Stein*,
589 U.S. 1121 (2019) ........................................ 26

*Capital Assoc. Indus. v. Stein*,
922 F.3d 198 (4th Cir. 2019) .................................................. *passim*

*Carrera v. E.M.D. Sales, Inc.*,
75 F.4th 345 (4th Cir. 2023) .................................................. 32, 35

*Castillo v. Sec'y, Fla. Dep't of Health*,
26 F.4th 1214 (11th Cir. 2022) .............................................. 37, 44

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......................................................... *passim*

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*,
596 U.S. 61 (2022) ............................................................... 42, 43

*Crownholm v. Moore*,
2024 U.S. App. LEXIS 9121 (9th Cir. Apr. 16, 2024) .................... 44

*Dent v. West Virginia*,
129 U.S. 114 (1889) ............................................................... 53

*Gardner v. Conway*,
48 N.W.2d 788 (Minn. 1951) .................................................. 53

*Goldfarb v. Va. State Bar*,
421 U.S. 773 (1975) ............................................................... 51

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .................................................................. 37, 39

*In re Primus*,
436 U.S. 412 (1978) ............................................................... 58

*Jacoby & Meyers, LLP v. Presiding Justices*,
852 F.3d 178 (2d Cir. 2017) .................................................. 59, 60

*Konigsberg v. State Bar of Cal.*,
366 U.S. 36 (1961) .......... 52

*Konigsberg v. State Bar of Cal.*,
353 U.S. 252 (1957) .......... 52

*Law Students Civil Rights Research Council, Inc. v. Wadmond*,
401 U.S. 154 (1971) .......... 52

*Lawline v Am. Bar Ass'n*,
956 F.2d 1378 (7th Cir. 1992) .......... 60

*Laws. for Fair Reciprocal Admission v. United States*,
141 F.4th 1056 (9th Cir. 2025) .......... 44

*Leis v. Flynt*,
439 U.S. 438 (1979) .......... 52

*Mox v. Olson*,
807 F. Supp. 3d 926 (D. Minn. 2025) .......... 53

*NAACP v. Button*,
371 U.S. 415 (1963) .......... 58

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018) .......... *passim*

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978) .......... 52

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) .......... 46

*Philips v. Pitt Cty. Mem'l Hosp.*,
572 F.3d 176 (4th Cir. 2009) .......... 22

*Porter v. Bd. of Trs. of N.C. State Univ.*,
72 F.4th 573 (4th Cir. 2023) .......... 22

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 44

*Richwine v. Matuszak*,
148 F.4th 942 (7th Cir. 2025) .......... 48

*Schware v. Bd. of Bar Exam'rs of N.M.*,
353 U.S. 232 (1957) .......... 52

*Seawell v. Carolina Motor Club, Inc.*,
184 S.E. 540 (N.C. 1936) .......... 8

*Short v. Hartman*,
87 F.4th 593 (4th Cir. 2023) .......... 32, 33, 35, 37, 38, 46, 47, 48

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 35

*Sperry v. Florida*,
373 U.S. 379 (1963) .......... 12, 52

*State v. Pledger*,
127 S.E.2d 337 (N.C. 1962) .......... 8

*Stuart v. Camnitz*,
774 F.3d 238 (4th Cir. 2014) .......... 53

*Upsolve, Inc. v. James*,
155 F.4th 133 (2d Cir. 2025) .......... 43, 48

*Upsolve, Inc. v. James*,
827 F. Supp. 3d 482 (S.D.N.Y. 2026) .................................... 56, 60

*Wag More Dogs, LLC v. Cozort*,
680 F.3d 359 (4th Cir. 2012) ....................................................... 50

**Statutes**

N.C.G.S. § 84-2.1 ........................................................... 8, 9, 23, 43

N.C.G.S. § 84-2.2 ................................................................................ 9

N.C.G.S. § 84-4 ................................................................ 8, 9, 10, 23

N.C.G.S. § 84-5 ........................................................................... 10, 23

N.C.G.S. § 84-5.1 .............................................................................. 10

N.C.G.S. § 84-7 ................................................................................... 6

N.C.G.S. § 84-7.1 .............................................................................. 10

N.C.G.S. § 84-15 ................................................................................. 6

N.C.G.S. § 84-21 ................................................................................. 7

N.C.G.S. § 84-23 ................................................................................. 6

N.C.G.S. § 84-24 ................................................................................. 9

N.C.G.S. § 84-28 ................................................................................. 7

N.C.G.S. § 84-37 ................................................................................. 6

**Regulations**


27 N.C. Admin. Code § 01G.0101 ........ 11

27 N.C. Admin. Code § 03.0402 ........ 10

27 N.C. Admin. Code § 03.0501 ........ 10

27 N.C. Admin. Code § 03.0502 ........ 10

27 N.C. Admin. Code § 03.0503 ........ 10

27 N.C. Admin. Code § 03.0601 ........ 10

27 N.C. Admin. Code § 03.0702 ........ 10

N.C. R. Prof'l Conduct, Rule 1.1 ........ 13

N.C. R. Prof'l Conduct, Rule 1.5 ........ 14

N.C. R. Prof'l Conduct, Rule 1.6 ........ 13

N.C. R. Prof'l Conduct, Rule 1.7 ........ 14

N.C. R. Prof'l Conduct, Rule 1.8 ........ 14

N.C. R. Prof'l Conduct, Rule 1.9 ........ 14

N.C. R. Prof'l Conduct, Rule 1.10 ........ 14

N.C. R. Prof'l Conduct, Rule 1.11 ........ 14

N.C. R. Prof'l Conduct, Rule 1.12 ........ 14

N.C. R. Prof'l Conduct, Rule 1.13 ........ 14

N.C. R. Prof'l Conduct, Rule 1.19 ........ 14

N.C. R. Prof'l Conduct, Rule 5.3 .......... 9

N.C. R. Prof'l Conduct, Rule 7.1 .......... 14

N.C. R. Prof'l Conduct, Rule 7.2 .......... 14

N.C. R. Prof'l Conduct, Rule 7.3 .......... 14

**Other**

2005 N.C. Formal Ethics Op. 2 (Apr. 15, 2005) .......... 12

N.C. RPC Op. 216 (July 18, 1997) .......... 11

## ISSUE PRESENTED

1. Did the district court correctly dismiss Plaintiffs' First Amendment challenge to North Carolina's statutes that prohibit the unauthorized practice of law?

## INTRODUCTION

The Supreme Court has long recognized that states have broad authority to regulate the practice of professions within their borders. Exercising this authority, states may lawfully require individuals to meet education and other qualifications before receiving a license to practice the profession. Entry requirements of this kind do not abridge the constitutional rights of the unlicensed.

In more recent years, important questions about professional regulation have come before the Supreme Court and this Court. At the Supreme Court, states' efforts to compel or restrict the speech of licensed professionals have been heavily scrutinized. When California attempted to require crisis pregnancy centers to post notices about the availability of abortion services, the Court held that the compelled speech requirement failed intermediate scrutiny. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 773-75 (2018) ("*NIFLA*"). In the course of deciding *NIFLA*, the Supreme Court rejected the "professional

speech doctrine," under which this Court and others applied minimal scrutiny to regulations of professionals' speech. *Id.* at 771-73.

Earlier this year, the Supreme Court struck down a professional speech regulation that prohibited licensed therapists in Colorado from offering so-called "conversion therapy" to their minor patients. *See Chiles v. Salazar*, 146 S. Ct. 1010 (2026). Applying *NIFLA* and other precedents, the Court held that the Colorado law censored professionals' speech on the basis of viewpoint, which required strict scrutiny. *Chiles* recognized, however, that Colorado's content-based speech restriction was distinct from licensing laws that set the qualifications an individual must obtain before entering a profession.

In the wake of *NIFLA*, this Court has decided several cases about state authority to require a professional license. First, this Court considered *NIFLA*'s application to North Carolina's lawyer licensure requirement – the same licensure system that is at issue in this case. *See Capital Assoc. Indus. v. Stein*, 922 F.3d 198 (4th Cir. 2019) ("*CAI*"). In *CAI*, a trade association that was not controlled by lawyers sought to give legal advice to its members through a call center, and to help its members draft legal documents. Because North Carolina's lawyer licensure

statutes only allow entities controlled by lawyers to practice law, the trade association's plan constituted the unauthorized practice of law. The trade association sued, alleging that the lawyer licensure statutes abridged its freedom of speech.

This Court held that a First Amendment challenge to the lawyer licensure requirement should be evaluated under a loosened form of intermediate scrutiny, because the entry regulation focused on who may conduct themselves as a lawyer instead of targeting the specific messages conveyed in legal advice. Under the intermediate-scrutiny test, the lawyer licensure requirement did not violate the First Amendment because the state had a substantial interest in regulating the legal profession to protect the public, and the entry regulation was sufficiently drawn to protect that interest.

Later, this Court held that *CAI*'s intermediate-scrutiny test also applied to North Carolina's surveyor licensure requirement. *See 360 Virtual Drone Servs., LLC v. Ritter*, 102 F.4th 263 (4th Cir. 2024). Like the lawyer licensure requirement, the surveyor law did not violate the free-speech rights of the unlicensed.

In the instant case, two paralegals who are not licensed lawyers and a nonprofit they founded challenge North Carolina's lawyer licensure requirement under the First Amendment. Like the trade association in *CAI*, they want to give legal advice to others, for free or for a fee, which would constitute the unauthorized practice of law by nonlawyers and a nonlawyer-controlled entity. Below, the district court correctly applied *CAI*'s intermediate-scrutiny test and dismissed Plaintiffs-Appellants' claims.

On appeal, Plaintiffs argue that the district court erred in applying *CAI*, because new Supreme Court precedent has supposedly displaced this Court's professional licensure precedents. They say the district court erred by applying *CAI*'s intermediate-scrutiny test to this new challenge to North Carolina's lawyer licensure statutes, when it should have applied strict scrutiny or a heightened form of intermediate scrutiny.

As explained below, Plaintiffs are incorrect. This Court's professional licensure precedents have not been abrogated. Licensure requirements for lawyers that apply regardless of the specific nature of legal advice conveyed are regulations of conduct that are allowed under the First Amendment. The district court correctly held that North

Carolina's lawyer licensure requirement satisfies *CAI*'s intermediate-scrutiny standard.

Because Plaintiffs otherwise only offer arguments under inapplicable levels of scrutiny, this Court's binding precedent from *CAI* resolves this appeal. Defendants respectfully request that the Court affirm the judgment dismissing Plaintiffs-Appellants' claims.

## STATEMENT OF THE CASE

### A. Parties and claims.

Plaintiffs-Appellants Morag Black Polaski and Shawana Almendarez work as paralegals. They have met the requirements of the North Carolina Certified Paralegal program, a voluntary certification. JA20 ¶¶ 10-11. They are also "charter members" of Plaintiff-Appellant North Carolina Justice for All Project ("JFAP"), an unincorporated nonprofit association. JA21 ¶ 12; JA 27 ¶ 57.

Plaintiffs initially sued North Carolina's Attorney General. They alleged that the First Amendment's freedom-of-speech clause entitles paralegals to practice law by giving legal advice to *pro se* litigants about how to complete state court pleading forms, without regard for North Carolina's statutory requirement that persons practicing law must

obtain licensure. JA30 ¶¶ 84, 86. According to Plaintiffs, the North Carolina General Statutes defining the practice of law and prohibiting the practice of law by nonlawyers (the "UPL Statutes," described further below) are unconstitutional as applied to Plaintiffs' desire to give legal advice to clients.

After the Attorney General moved to dismiss, Plaintiffs filed an amended complaint on March 18, 2024. JA18. The amended complaint was, in effect, a substitution of parties. It dismissed the Attorney General and asserted claims against the current Defendants-Appellees, who include five district attorneys (the "District Attorneys"), and the president of the North Carolina State Bar (the "State Bar"), all in their official capacities.

North Carolina's district attorneys are charged with prosecuting the unauthorized practice of law. N.C.G.S. § 84-7. The State Bar is an agency of the State of North Carolina and is charged with regulating the practice of law. N.C.G.S. §§ 84-15, 84-23(a). Its duties include investigating and enforcing the UPL Statutes through civil proceedings. N.C.G.S. § 84-37. The State Bar also has disciplinary jurisdiction over "[a]ny attorney admitted to practice law in this State," including the

authority to investigate and prosecute allegations of lawyer misconduct. N.C.G.S. § 84-28(a). It also proposes rules and regulations for consideration and approval by the North Carolina Supreme Court, such as the Rules of Professional Conduct. N.C.G.S. § 84-21(b).

Plaintiffs seek to overturn North Carolina's licensure requirement, so that they can give "legal advice," which "would be tailored to the litigant's factual circumstances and legal goals," including "what forms to file" and "what information to include on the forms." JA30 ¶¶ 84, 86. At least, that is what Plaintiffs are "particularly interested" in doing. JA28 ¶ 68. Plaintiffs' clients would be *pro se* litigants in the state court system. JA19 ¶ 2. The individual Plaintiffs would charge fees to their clients. JA31 ¶¶ 90-96. Along with JFAP they would also offer some services to clients for free. JA31 ¶ 89. After acting as shadow counsel, Plaintiffs would send their clients, with ghostwritten court forms and appearing *pro se*, into the state courts to initiate litigation or, perhaps, to respond to litigation initiated against them. Plaintiffs would not be accountable to the courts in which their clients appear or to the State Bar's disciplinary jurisdiction.

### B. The UPL Statutes determine who may practice law.

Under longstanding North Carolina law, only licensed attorneys are authorized to practice law. N.C.G.S. § 84-4. The purpose of the UPL Statutes' licensure requirement "is for the better security of the people against incompetency and dishonesty in an area of activity affecting general welfare." *State v. Pledger*, 127 S.E.2d 337, 339 (N.C. 1962). *See also Seawell v. Carolina Motor Club, Inc.*, 184 S.E. 540, 544 (N.C. 1936) (licensure is "a personal right of the individual [attorney], obtained by diligent study and good conduct").

The restrictions on unauthorized practice are not a matter of the State Bar's preferences or the District Attorneys' prosecutorial discretion. In North Carolina, the General Assembly has reserved for itself the authority to define the conduct that constitutes the practice of law in this state, and who may lawfully engage in that conduct. JA26 ¶ 54 (acknowledging that "significant reforms would ultimately require amendments to North Carolina's UPL statutes and regulations").

The practice of law is defined in the General Statutes. *See* N.C.G.S. § 84-2.1(a). It includes preparing legal instruments such as deeds, preparing documents to be filed in court proceedings, "assisting by

advice, counsel, or otherwise in any legal work," and "advis[ing] or giv[ing] opinion upon the legal rights of any person, firm, or corporation." *Id.* These are activities that only a licensed attorney may perform for a client, either directly or through supervised nonlawyer assistants such as paralegals. *See* N.C.G.S. § 84-4; N.C. R. Prof'l Conduct r. 5.3 (governing attorney responsibilities regarding nonlawyer assistants); *id.* cmt. 2 (noting that "paraprofessionals … act for the lawyer in rendition of the lawyer's professional services," and that "[t]he measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline"). The General Statutes also include some exceptions to the definition of the practice of law, such as preparing mediation summaries and certain real estate transaction documents, N.C.G.S. § 84-2.1(b), and the operation of interactive software that can generate legal documents for the user (e.g., LegalZoom), N.C.G.S. § 84-2.2.

In order to obtain a law license, an applicant must satisfy requirements intended to "promote the welfare of the State and the profession." N.C.G.S. § 84-24. These include graduation from law school,

27 N.C. Admin. Code § 03.0702, establishing good moral character and general fitness, 27 N.C. Admin. Code § 03.0601, passing the bar exam and the Multistate Professional Responsibility Exam, 27 N.C. Admin. Code § 03.0501(5) and (6), and completing the application, 27 N.C. Admin. Code § 03.0402.[1] Plaintiffs expressly challenge these entry requirements. JA36 ¶ 125; JA38-39 ¶ 149; JA40 ¶ 166.

The prohibition on unauthorized practice applies to individuals and entities. N.C.G.S. § 84-4. Corporations and associations, in general, are not authorized to practice law, through nonattorneys or attorney-employees. N.C.G.S. §§ 84-4, 84-5. *See also CAI*, 922 F.3d at 202, 209. Exceptions to this prohibition include professional corporations organized under Chapter 55B of the General Statutes, public interest law firms, in-house counsel, legal clinics, and limited instances when a corporation acts in a fiduciary capacity. *See* N.C.G.S. §§ 84-4, 84-5(a), 84-5(b), 84-5.1, 84-7.1.

There is no statutory definition of a "paralegal," nor a required license. Although only attorneys may practice law, the state

[1] Other rules apply to comity applicants and relocated servicemembers and spouses. *See* 27 N.C. Admin. Code §§ 03.0502, 03.0503.

"recogniz[es] the value of paralegals as a cost effective delivery of legal services." JA45. For example, the voluntary paralegal certification program identifies paralegals who "are qualified by education and training and have demonstrated knowledge, skill, and proficiency to perform substantive legal work under the direction and supervision of a licensed lawyer," or who "may be otherwise authorized by applicable state or federal law to provide legal services directly to the public." 27 N.C. Admin. Code § 01G.0101. However, there is no difference between the work that can be performed by certified and non-certified paralegals.

Paralegals provide services to the public and contribute to the administration of justice in many ways. They work for private practitioners and law firms; as independent contractors; for the government, including the court system; for nonprofit law centers; and for legal aid organizations and clinics, all under the supervision of lawyers. JA27 ¶¶ 59-63.[2] They can "volunteer[] their legal services for free," with appropriate lawyer supervision, as Plaintiffs have done. JA25

---

[2] *See also* Using the Services of an Independent Title Abstractor, N.C. RPC Op. 216 (July 18, 1997) (ruling that a lawyer may use the services of a nonlawyer independent contractor, such as a paralegal), *available at* *https://www.ncbar.gov/for-lawyers/ethics-and-governing-rules/ethics-opinions/opinions/rpc-216/*.

¶ 42. In these settings, paralegals like Plaintiffs can assist clients with filling out court forms. JA27 ¶ 60 (noting that one Plaintiff "has filled those forms out countless times under the supervision of a lawyer"); JA29 ¶ 77. Paralegals may also practice in federal forums that have unique rules regarding the scope of practice. JA34-35 ¶ 117.[3]

### C. A law license carries burdens that protect clients in North Carolina who receive legal advice.

Plaintiffs' First Amendment theory is based on an asserted right to engage in one aspect of the practice of law – giving legal advice – while avoiding the responsibilities and restrictions that go along with every form of the practice of law. Yet these burdens ensure that clients in North Carolina receive reliable legal advice on which they are able to base important decisions.

---

[3] *See* Employment of Nonlawyer to Represent Social Security Claimants, 2005 N.C. Formal Ethics Op. 2 (Apr. 15, 2005) (confirming that law firm can employ nonlawyer to represent claimant before the Social Security Administration), *available at* *https://www.ncbar.gov/for-lawyers/ethics-and-governing-rules/ethics-opinions/opinions/2005-formal-ethics-opinion-2/*. Under the Supremacy Clause, a federal rule allowing nonlawyer practice in a federal forum will trump a state restriction. *See Sperry v. Florida*, 373 U.S. 379, 383-84 (1963). The instant case, however, is an effort to invoke federal authority to force a change in the rules governing state practice.

Clients can rely on legal advice because attorneys owe fiduciary duties to clients. Clients can confidentially provide information about their legal matters to an attorney, and confidentially receive legal advice, because of the attorney/client privilege. The Rules of Professional Conduct include an even broader confidentiality requirement. *See* N.C. R. Prof'l Conduct r. 1.6. The attorney work product doctrine allows lawyers to confidentially develop legal advice and other solutions needed by their clients. Plaintiffs do not propose a new paralegal/client fiduciary duty, a paralegal/client privilege, a paralegal work product doctrine, or any requirement for paralegals to keep their clients' communications and information confidential. One result, among others, is that a client's communications to an unsupervised paralegal would be discoverable in litigation.

To ensure attorneys meet their fiduciary duties to their clients, they must follow additional Rules of Professional Conduct. For example, the duty of competence allows a client to reasonably trust that their attorney is sufficiently knowledgeable about the subject matter of the legal advice. *See* N.C. R. Prof'l Conduct r. 1.1. As the district court recognized, Plaintiffs "seek to provide advice in circumstances which can have wide-

reaching effects, such as child custody matters." JA8. Divorce, estate administration, ejectment, and domestic violence proceedings also present difficult issues affecting clients, families, and third parties. JA28 ¶ 68. Yet Plaintiffs propose no analogous duty of paralegal competence.

The Rules of Professional Conduct also define the attorney's duty of loyalty, and how to avoid conflicts of interest. *See* N.C. R. Prof'l Conduct r. 1.7, 1.8, 1.9, 1.10, 1.11, 1.12, 1.13. Plaintiffs propose no analogous duty or conflict-of-interest rules. There are a host of other requirements for attorneys that protect clients and the public, such as limitations on solicitation of clients and misleading advertising, exploitative financial arrangements, and improper personal relationships. *See id.* r. 1.5, 1.8, 1.19, 7.1, 7.2, 7.3. Plaintiffs propose no analogous protections.

Clients of lawyers have recourse when misconduct occurs. The malpractice and breach of fiduciary duty tort claims are examples that would not apply to paralegals. Attorneys, as officers of the court, are subject to the court's jurisdiction, through its inherent authority and procedural mechanisms like Rule 11. Paralegals who do not sign filings or appear in court would avoid this judicial oversight. The State Bar operates a disciplinary system for receiving grievances, investigating,

and prosecuting violations of the Rules of Professional Conduct. Plaintiffs' proposal would eliminate the way that the State Bar can indirectly address paralegal misconduct, by disciplining lawyers who allow improper paralegal conduct to occur. JA45 ("The State Bar regulates the activities of paralegals indirectly through each lawyer's professional duty to supervise employees and contractors to whom legal work is delegated."). Plaintiffs do not propose analogous forms of recourse for clients or oversight of paralegals who practice law.

**D. The district court's dismissal of Plaintiffs' claims.**

Defendants moved to dismiss the amended complaint on May 20, 2024. JA57. After a hearing, the district court granted the motion and dismissed Plaintiffs' claims. JA1. It held that North Carolina's lawyer licensure requirement should be evaluated under the loosened intermediate-scrutiny standard that this Court applied in prior First Amendment challenges to professional licensing rules, specifically in *CAI* (which involved the same lawyer licensure requirements at issue here) and *360 Virtual* (which involved land surveyor licensing). JA6-7. This intermediate-scrutiny test requires the state to show that (1) its laws seek to achieve "a 'substantial state interest'" and that (2) its laws are

"'sufficiently drawn' to protect that interest." *CAI*, 922 F.3d at 209 (quoting *NIFLA*, 585 U.S. at 773).

Applying this test, the district court held that Plaintiffs failed to state a First Amendment violation. First, it recognized that the state's interest in prohibiting nonlawyers from giving legal advice is at least substantial. JA8. Second, it held that there is a reasonable fit between the licensure requirement and the state's interest in regulating the legal profession to protect its citizens. JA8-9. Among other things, the district court noted that the UPL Statutes only prohibit nonlawyers like Plaintiffs from engaging in unsupervised activities that constitute the practice of law, including giving legal advice, consistent with the state's interest. JA8. The UPL Statutes do not bar paralegals from giving legal information. J8. They also do not bar paralegals from helping to complete court forms with appropriate attorney supervision. JA8. In this way, the UPL Statutes have "struck a balance between limiting the practice of law and provision of legal advice to licensed attorneys and recognizing that paralegals are well-equipped to assist in the delivery of legal services." JA8-9. The district court rejected Plaintiffs' effort to

invoke other states' and countries' licensure laws, which are not relevant when applying the appropriate level of First Amendment scrutiny. JA9.

This case's history has paralleled the appellate proceedings in *360 Virtual*, the case about land surveyor licensing. Defendants here moved to dismiss Plaintiffs' amended complaint on the same day that this Court decided *360 Virtual* and upheld the surveyor licensing law. By the time that Plaintiffs here filed their notice of appeal, the *360 Virtual* plaintiffs had filed a petition for a writ of certiorari asking the Supreme Court to review whether this Court's test for First Amendment challenges to professional licensure laws was consistent with the Supreme Court's precedents.

On January 30, 2025, Plaintiffs moved for a stay of the instant appeal until the disposition of the *360 Virtual* plaintiffs' certiorari petition. (Dkt. 24.) This Court granted the motion and entered a stay. (Dkt. 26.) The stay remained in place for 14 months.

After this Court stayed this appeal, the Supreme Court held the *360 Virtual* petition until it decided another case: *Chiles v. Salazar*, 146 S. Ct. 1010 (2026). *Chiles* involved a First Amendment challenge to a very different kind of professional regulation, which prohibited licensed

therapists in Colorado from offering talk therapy to help minors change their sexual orientation or gender identity – that is, so-called "conversion therapy." The Supreme Court held that this Colorado statute failed strict scrutiny because it barred talk therapy on certain subjects but not others, thereby "censor[ing] speech based on viewpoint." *Chiles*, 146 S. Ct. at 1029.

Several weeks after *Chiles* was decided, the Supreme Court denied the *360 Virtual* plaintiffs' certiorari petition. *360 Virtual Drone Servs. LLC v. Ritter*, 2026 U.S. LEXIS 1801 (Apr. 20, 2026). Undeterred, the *360 Virtual* plaintiffs filed a petition for rehearing, asking the Supreme Court to vacate this Court's decision because of the supposed impact of *Chiles* on this Court's professional licensure precedents. *See 360 Virtual*, No. 24-279 (U.S.), Plaintiffs-Appellants' Pet. for Reh'g (May 15, 2026). The rehearing petition included many of the same arguments about the supposed infirmity of this Court's precedents that Plaintiffs here make in their opening brief. *Id.* The Supreme Court declined the plaintiff's request to vacate the *360 Virtual* decision. *360 Virtual Drone Servs. LLC v. Ritter*, 2026 U.S. LEXIS 2505 (June 15, 2026).

Following the resolution of *360 Virtual*, this Court lifted its stay of these proceedings. This appeal then commenced in earnest.

## SUMMARY OF THE ARGUMENT

In *CAI* and *360 Virtual*, this Court considered whether professional licensure requirements in the fields of law and surveying, respectively regulated conduct or regulated speech-as-speech. In *CAI*, this Court considered the same UPL Statutes that are issue here, and held that they regulated conduct because they did not target the communicative aspects of practicing law, such as by directing the legal advice that lawyers may give to clients. Therefore, the lawyer licensure requirements were regulations of professional conduct that incidentally impacted speech. As this Court further explained in *360 Virtual*, this approach applies to entry regulations in fields that carry legal, health, economic, or public-safety consequences, when the regulation is not aimed at speech taking place in the public sphere and does not target some kind of unpopular or dissenting speech. When a professional licensure requirement satisfies these factors, this Court applies an intermediate-scrutiny test.

The intermediate-scrutiny test that this Court applied to the UPL Statutes in *CAI* requires a substantial state interest and a solution that

is sufficiently drawn to protect that interest. A regulation is sufficiently drawn when there is a reasonable fit between the regulation and the state's interest. The test does not require the state to show that the regulation uses the least restrictive means to protect the state's interest.

In *CAI*, this Court held that the UPL Statutes satisfied the intermediate-scrutiny test. Because this Court's professional licensure precedents remain good law, *CAI*'s intermediate-scrutiny test also applies to Plaintiffs' challenge to the same UPL Statutes.

Seeking to avoid this result, Plaintiffs argue that this Court's professional licensure precedents have been abrogated by the subsequent decision in *Chiles* that struck down Colorado's ban on conversion therapy. This Court only recognizes that its precedents have been implicitly abrogated when those precedents are impossible to reconcile with a subsequent Supreme Court decision. Under this test, this Court's professional licensure precedents remain good law.

In particular, *Chiles* did not displace this Court's professional licensure precedents because the Supreme Court did not limit the states' long-recognized authority to require professional licensure before engaging in regulated speech. Furthermore, this Court's professional

licensure precedents and *Chiles* can be read harmoniously because, under both, a professional regulation that targeted a particular viewpoint would be subjected to heightened scrutiny.

Plaintiffs do not challenge the manner in which the district court applied *CAI*'s test. Instead, they argue that strict scrutiny or a heightened form of intermediate scrutiny should apply. Because those standards do not apply to the UPL Statutes under *CAI*, Plaintiffs' arguments are beside the point.

The district court correctly applied the intermediate-scrutiny test to Plaintiffs' challenge to the UPL Statutes. There is a long history of decisions confirming that the state has at least a substantial interest in establishing lawyer licensure requirements for the protection of clients and the public. In turn, the UPL Statutes are sufficiently drawn. Paralegals like Plaintiffs have broad work and speech opportunities, so long as they are under lawyer supervision when they give legal advice. The UPL Statutes only prohibit the most concerning scenario, when nonlawyers give legal advice to clients without lawyer supervision.

On appeal, Plaintiff JFAP also raises a freedom-of-association theory that it did not assert in the amended complaint or proceedings

below. The claim has thus been waived. Even if it is considered on its merits, the claim is not plausible. The freedom of association has been held to encompass lawyers' association with clients for the purpose of bringing civil rights litigation, but it has not been extended to nonlawyer representation, or when the association raises ethical concerns, or to litigation involving private disputes like the matters in which Plaintiffs want to advise *pro se* litigants.

The district court correctly applied this Court's precedents and dismissed Plaintiffs' claims. The judgment should be affirmed.

## ARGUMENT

### Standard of Review

This Court reviews a district court's dismissal under Rule 12(b)(6) *de novo*. *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 581 (4th Cir. 2023). In reviewing a dismissal, the Court accepts the complaint's "well-pleaded factual allegations" as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). But the Court "need not accept the plaintiff's legal conclusions drawn from the facts, nor need it accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (internal citation omitted).

To survive dismissal, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## Discussion of Law

### I. The intermediate-scrutiny test this Court applied to the UPL Statutes in *CAI* applies here.

Plaintiffs seek to enjoin enforcement of North Carolina's prohibitions on nonlawyers and nonlawyer-controlled entities giving legal advice. *See* N.C.G.S. §§ 84-2.1(a), 84-4, 84-5. These are the same lawyer licensure restrictions that were at issue in *CAI*. The district court correctly held that the intermediate-scrutiny test that this Court applied to the UPL Statutes in *CAI* applies to the UPL Statutes in this case too. JA6-7.

#### A. This Court defined the applicable intermediate-scrutiny test in *CAI*.

In *CAI*, a trade association brought a First Amendment challenge to North Carolina's UPL Statutes, which barred the association from giving legal advice to its members via a call center and from helping its members draft legal documents. *CAI*, 922 F.3d at 202.

While the association's appeal was pending, the Supreme Court decided *NIFLA* and abrogated this Court's "professional speech doctrine." *Id.* at 207. As a result, in *CAI*, this Court considered anew the standards that govern First Amendment claims concerning professional speech.

This Court looked to *NIFLA* for guidance on the standard to apply. It explained that *NIFLA* recognized that "states have broader authority to regulate the speech of professionals than that of nonprofessionals" in certain situations. *Id.* One of these situations, this Court observed, was when states regulate "professional conduct" that "incidentally involves speech." *Id.* (quoting *NIFLA*, 585 U.S. at 768).

After carefully considering the UPL Statutes, this Court held that North Carolina's licensing rules for lawyers fit "within *NIFLA*'s exception for professional regulations that incidentally affect speech." *Id.* It explained that "the practice of law has communicative and non-communicative aspects," but held that the licensing rules did not "target the communicative aspects of practicing law, such as the advice lawyers may give to clients." *Id.* at 208. In other words, the UPL Statutes did not prohibit any lawyer (or supervised nonlawyer) from giving legal advice to any client on any subject matter.

Instead of targeting legal advice, the UPL Statutes "focus more broadly on the question of who may conduct themselves as a lawyer." *Id.* Because they establish requirements for entry into the profession, "[l]icensing laws inevitably have some effect on the speech of those who are not (or cannot be) licensed." *Id.* As this Court observed, however, "that effect is merely incidental to the primary objective of regulating the conduct of the profession." *Id.* For that reason, this Court held that the UPL Statutes only incidentally affect speech.

After holding "that the UPL statutes regulate conduct," this Court then addressed the level of scrutiny that governed the trade association's First Amendment claim. *Id.* This Court rejected the association's argument that strict scrutiny should apply, because when "the Supreme Court has reviewed restrictions on conduct that incidentally burden speech, it has not applied strict scrutiny." *Id.* Instead, this Court held that a form of "intermediate scrutiny is the appropriate standard for reviewing conduct regulations that incidentally impact speech," like the UPL Statutes. *Id.* at 209.

This Court then explained that under intermediate scrutiny, professional licensure laws will be upheld if they advance a "substantial

state interest" and use means that are "'sufficiently drawn' to protect that interest." *Id.* (quoting *NIFLA*, 585 U.S. at 773). The latter requirement, this Court further held, requires only a reasonable fit between the challenged regulation and the state's interest, not "narrow tailoring" or the use of "the least restrictive means." *Id.* at 208, 210.

Applying this test, this Court held that North Carolina's interest in regulating the practice of law was "at least substantial." *Id.* at 209. It also held that the UPL Statutes were sufficiently drawn to protect that interest. *Id.* at 210. This Court therefore rejected the trade association's First Amendment challenge to North Carolina's lawyer licensure requirement.

The Supreme Court subsequently declined to review this Court's decision. *See Capital Assoc. Indus. v. Stein*, 589 U.S. 1121 (2019) (denying petition for writ of certiorari).

### B. This Court reaffirmed the intermediate-scrutiny test for professional licensure requirements in *360 Virtual*.

Five years after *CAI*, this Court heard another case involving a professional licensure requirement that did not target licensees' speech but rather regulated conduct and incidentally affected the speech of the unlicensed. In *360 Virtual*, this Court considered a First Amendment

challenge to North Carolina's professional licensure system for surveyors.

In the years between *CAI* and *360 Virtual*, this Court had decided another First Amendment lawsuit concerning a licensure law. *See Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020). In *Billups*, this Court held that Charleston's licensing regime for city tour guides violated the First Amendment. Unlike the lawyer licensing rules at issue in *CAI*, Charleston's tour-guide licensing rules were "directed at speech, not conduct," and thus had to satisfy a more stringent form of intermediate scrutiny that required narrow tailoring. *360 Virtual*, 102 F.4th at 273-74, 276-77.

Thus, to decide *360 Virtual*, this Court had to resolve whether North Carolina's licensure rules for surveyors regulated conduct, as in *CAI*, or regulated speech, as in *Billups*. To answer that question, and to harmonize *CAI* with *Billups*, this Court identified a series of nonexclusive factors that bear on whether a challenged statute "is a regulation of 'speech as speech,' or a regulation of professional conduct subject to 'less protection.'" *Id.* at 272 (quoting *NIFLA*, 585 U.S. at 768, 770).

First, this Court held that "courts are more likely to view a licensing regime limiting who may engage in certain professional conduct as conduct-focused for purposes of the First Amendment analysis where the conduct carries legal, health, economic, or public-safety-related consequences, such as in the realms of law, medicine, accounting, and engineering." *Id.* at 274. Reaffirming *CAI*, it held that North Carolina's UPL Statutes are a conduct-focused regulation under this factor, which need not satisfy heightened intermediate scrutiny. *Id.*

Second, this Court held that an entry regulation more likely targets speech as speech, warranting heightened intermediate scrutiny, when the law "is aimed at speech taking place in a traditionally public sphere." *Id.* As an example of a regulation that must satisfy heightened scrutiny under this factor, this Court identified Charleston's licensing regime for city tour guides who, unlike lawyers, work on "public sidewalks and streets." *Id.* at 274-75.

Third, this Court held that an entry regulation more likely targets speech as speech, and therefore must satisfy heightened scrutiny, when it "appears to regulate some kind of unpopular or dissenting speech." *Id.* at 275. In support, this Court noted that in *CAI*, it upheld North

Carolina's lawyer licensure rules because they did not "target the communicative aspects of practicing law, such as the advice lawyers may give to clients." *Id.* at 273 (quoting *CAI*, 922 F.3d at 208).

Applying these factors, this Court held that North Carolina's licensure requirement for surveyors regulated "professional conduct [that] only incidentally burdens speech," not speech itself. *Id.* at 278. The licensure requirement restricted who could practice surveying, a profession with economic and legal consequences. *Id.* But the licensure requirement did not "direct[] surveyors' speech once licensed." *Id.* This Court thus did not apply the heightened intermediate scrutiny of *Billups*, but rather *CAI*'s loosened intermediate scrutiny, and held that North Carolina's licensure requirement for surveyors satisfied that scrutiny. *Id.* at 279-80.

### C. *CAI*'s intermediate-scrutiny test applies to Plaintiff's challenge to the UPL Statutes.

Here, this Court's professional licensure precedents show that North Carolina's UPL Statutes, in order to satisfy the First Amendment, need only survive the loosened form of intermediate scrutiny that this Court applied in *CAI*.

In *CAI*, as just shown, this Court considered a First Amendment challenge to North Carolina's "UPL statutes," held that they would not offend the First Amendment if they satisfied a loosened form of "intermediate scrutiny" that did not require "narrow tailoring," and upheld their validity. *CAI*, 922 F.3d at 208. Because this case involves the same licensing regime, *CAI* requires that the same intermediate scrutiny standard must apply here.

*360 Virtual* confirms that result. In that case, this Court repeatedly cited and reaffirmed *CAI*. It held that North Carolina's UPL Statutes were a "classic" example of a "regulation of conduct with an incidental burden on speech," because the UPL Statutes do not "target the communicative aspects of practicing law." *360 Virtual*, 102 F.4th at 275 (citing *CAI*, 922 F.3d at 208). *360 Virtual* also reaffirmed that the loosened intermediate-scrutiny standard applied in *CAI* governs challenges to licensure laws that regulate "professional conduct and only incidentally burden speech," as the UPL Statutes do. *Id.* at 278. *360 Virtual* thus confirms that the UPL Statutes need only satisfy *CAI*'s loosened intermediate scrutiny to overcome Plaintiffs' challenge.

In their brief, Plaintiffs do not appear to seriously dispute that if *CAI* remains good law, then *CAI*'s intermediate-scrutiny standard applies here. (*See* Br. 16-46.) In passing, however, they perhaps mean to suggest that *CAI* is factually distinguishable from this case. (*See generally* Br. 21-27.) They note that Plaintiffs merely seek to engage in the purely "communicative aspects" of legal practice, by providing "individualized advice to willing listeners" and helping their clients complete court-created forms. (Br. 5-6, 26.) Plaintiffs do not, they say, "seek to appear in court, hold funds, bind clients, or sign filings as counsel." (Br. 26.)

These factual allegations, however, provide no basis for distinguishing *CAI*. The trade association similarly "disclaim[ed] any interest in representing its members in Court." *CAI*, 922 F.3d at 202. Instead, it sought to provide "legal advice," to prepare "legal documents," and to "answer questions about [the] law." *Id.* Those are the same activities that Plaintiffs seek to perform here.

Plaintiffs thus do not point to any meaningful difference between the facts alleged here and the facts in *CAI*. The district court's conclusion on this point applies with equal force on appeal. Below, that court

explained that it had been "presented with no argument which convinces it that [this Court's] treatment of the UPL statute at issue in *CAI* is somehow distinguishable from the UPL statutes at issue here." JA6.

Thus, if *CAI* remains good law, North Carolina's UPL Statutes need only satisfy *CAI*'s intermediate-scrutiny standard to survive Plaintiffs' First Amendment challenge.

### D. This Court's professional licensure precedents can be read harmoniously with *Chiles*.

Because Plaintiffs cannot prevail if this Court's professional licensure precedents remain good law, they argue instead that the Supreme Court's recent decision in *Chiles* implicitly abrogated that precedent. (Br. 16-25.) In effect, according to Plaintiffs, North Carolina's lawyer licensure requirement must now be considered under a higher level of scrutiny than the district court applied. Plaintiffs fail to show, however, that any such implicit abrogation has occurred.

This Court "do[es] not lightly presume that the law of [this] circuit has been overturned or rendered no longer tenable." *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) (quoting *Carrera v. E.M.D. Sales, Inc.*, 75 F.4th 345, 352 (4th Cir. 2023), *rev'd on other grounds*, 604 U.S. 45 (2025)). The test for whether a Supreme Court decision has overruled or

abrogated this Court's precedent is "a high bar." *Id.* If there is a harmonious reading of this Court's precedent and a subsequent Supreme Court decision, this Court "must" adopt that reading. *Id.* This Court only recognizes an implicit overruling or abrogation when its precedent is "impossible to reconcile" with the subsequent Supreme Court decision. *Id.* (internal citation omitted).

Applying this test, the decision last term in *Chiles* is not impossible to reconcile with this Court's prior precedents about North Carolina's UPL Statutes. To the contrary, this Court's repeated holding that the lawyer licensure rules regulate conduct, and not speech, easily harmonizes with *Chil*es.

### 1. *Chiles* and *CAI* can be read harmoniously.

*Chiles* held that a Colorado professional regulation governed "speech," and not "conduct," because it applied in a manner that "censor[ed] speech based on viewpoint." *Chiles*, 146 S. Ct. at 1023-24, 1029. Specifically, the Colorado law prohibited licensed therapists from providing "conversion therapy" to try to change minors' sexual or gender identity, while allowing therapists to provide counseling to minors about other subjects (such as gender transition). *Id.* at 1018. Colorado's law

therefore "train[ed] directly" on speech and permitted the expression of "some viewpoints but not others." *Id.* at 1026. *See also id.* at 1030 (Kagan, J., concurring) ("[T]he law draws a line based on the speaker's opinion or perspective, and thus enables speech on only one side – the State's preferred side – of an ideologically charged issue." (internal quotations omitted)). For that reason, the Supreme Court held that Colorado's law regulated "speech as speech" based on viewpoint and thus had to satisfy strict scrutiny. *Id.* at 1026.

In so concluding, however, the *Chiles* Court was careful to limit the reach of its holding. It specifically distinguished Colorado's ban on conversion therapy from "licensing laws," which "have traditionally addressed what qualifications an individual must possess before practicing a particular profession." *Id.* at 1028. The Court explained that, unlike Colorado's professional regulation that engaged in viewpoint discrimination, traditional licensing rules generally do not attempt "to dictate a professional's point of view." *Id.*

The *Chiles* Court also emphasized that it was not overruling its prior holdings in *NIFLA* and other cases that "laws regulating speech based on its content" can "apply to professionals" without triggering strict

scrutiny, such as laws that "regulate conduct in a way that only 'incidentally burden[s] speech.'" *Id.* at 1025 (quoting *NIFLA*, 585 U.S. at 769). The Court explained that under its speech-incident-to-conduct precedents, "'an ordinance against outdoor fires,'" for example, "would not require a court to apply strict scrutiny even if it prohibited burning a flag in protest, because the law forbids conduct without regard to the message it may convey." *Id.* at 1026 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)).

These holdings in *Chiles* are hardly "impossible to reconcile" with this Court's holding in *CAI*, later reaffirmed in *360 Virtual*, that North Carolina's licensing rules for lawyers regulate conduct, not speech. *Short*, 87 F.4th at 605 (quoting *Carrera*, 75 F.4th at 352). Instead, this Court's precedents can easily be read harmoniously with *Chiles*. *Id.*

In *CAI*, as noted, this Court held that North Carolina's licensing rules for lawyers fit "within *NIFLA*'s exception for professional regulations that incidentally affect speech." *CAI*, 922 F.3d at 207. *CAI*'s recognition of this exception is consistent with *Chiles*, which reiterated *NIFLA*'s holding that laws regulating "conduct in ways that incidentally

sweep in speech" need not satisfy strict scrutiny. *Chiles*, 146 S. Ct. at 1022.

*CAI*'s application of this principle to the UPL Statutes is also consistent with *Chiles*. In *CAI*, this Court held that the lawyer licensing rules regulate conduct because they address "who may conduct themselves as a lawyer." *CAI*, 922 F.3d at 208. And it further held that even though "the practice of law has communicative and non-communicative aspects," the licensing rules only incidentally affect speech because they do not "target the communicative aspects of practicing law, such as the advice lawyers may give to clients." *Id.*

This holding cleanly aligns with *Chiles*, which recognized that regulations of conduct do not directly regulate speech when they forbid "conduct without regard to the message it may convey." *Chiles*, 146 S. Ct. at 1026. The UPL Statutes are similar, in that they prohibit the provision of non-licensed legal services despite their "communicative aspects," without regard to the specific "advice lawyers may give to clients." *CAI*, 922 F.3d at 208. Indeed, paralegals can offer <u>any</u> legal advice under the UPL Statutes, without regard to the specific message conveyed through that advice, so long as they do so under the supervision

of a licensed attorney or obtain a law license themselves. *CAI*'s holding that North Carolina's lawyer licensure rules regulate conduct is therefore consistent with *Chiles*'s recognition that conduct-focused laws do not directly regulate speech when they apply "without regard to the message" conveyed. *Chiles*, 146 S. Ct. at 1026.

Thus, this Court's holding that North Carolina's lawyer licensure rules regulate conduct, not speech, is easily reconciled with *Chiles*. *Short*, 87 F.4th at 605; *see also Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1219-25 (11th Cir. 2022) (similarly concluding that *NIFLA* did not abrogate prior circuit precedent that licensing rules regulated conduct, not speech). In their brief, however, Plaintiffs advance a variety of arguments to try to show that *Chiles* nonetheless implicitly abrogated this Court's professional licensure precedents. These arguments fail to persuade.

**2. *Chiles*'s discussion of *Holder v. Humanitarian Law Project* did not abrogate this Court's precedents.**

Plaintiffs' principal contention is their claim that *Chiles* held that the Supreme Court's prior decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), "supplies the applicable test for distinguishing

regulations of speech from regulations of conduct." (Br. 17; *see also id.* 16-23.) *Holder*, Plaintiffs say, establishes that whenever professionals engage in "pure speech," such as by offering "individualized advice" about "legal rights or legal form[s]," any regulations of that pure speech must be viewed as regulations of speech, not conduct. (Br. 18-19, 22.) And that holding, Plaintiffs maintain, is inconsistent with *CAI*, because *CAI* treated unlicensed legal advice as speech that was incidentally affected by a regulation of conduct. (Br. 23.)

Plaintiffs' argument on this point falls short for multiple reasons. For one thing, this Court only sets aside its prior precedent when it comes into conflict with "a <u>subsequent</u> Supreme Court decision." *Short*, 87 F.4th at 605 (emphasis added). The Supreme Court's 2010 decision in *Holder*, of course, is not a decision subsequent to *CAI* or *360 Virtual*. In fact, in both *CAI* and *360 Virtual*, the plaintiffs urged this Court to apply strict scrutiny under *Holder* to their claims. (*See 360 Virtual*, No. 23-1472 (4th Cir.), Dkt. 18 at 38-39 (plaintiffs-appellants' brief); *CAI*, No. 17-2218 (4th Cir.), Dkt. 19 at 39-40 (plaintiff-appellant's brief).) In both cases, this Court declined to do so.

In any event, neither *Holder* nor *Chiles*'s application of *Holder* is inconsistent with this Court's precedents. In *Holder*, this Court did not (as Plaintiffs wrongly claim) hold that all restrictions on "pure speech" by professionals must be viewed as regulations of speech, not conduct. (Br. 18-19, 22.) Rather, the Supreme Court considered the validity of a federal statute that prohibited the provision of material support to foreign terrorist groups. *Holder*, 561 U.S. at 8-9. The plaintiffs claimed a threat of prosecution based solely on the subject matter of their communications, which conveyed "specialized knowledge," like training on the use of international law. *Id.* at 27. The Court held that the material-support statute not only regulated conduct, but also regulated speech, because it only prohibited the provision of legal advice on those subjects that could constitute material support for terrorism. *Id.* Thus, *Holder* held that the material-support statute required higher scrutiny than a regulation of conduct, because in trying to regulate conduct, its applicability turned on the specific nature of the legal advice being expressed. *Id.* at 28.

In *Chiles*, the Court applied *Holder* to show that Colorado's ban on conversion therapy necessarily could not qualify as a mere regulation of

conduct because, as in *Holder*, the law's applicability turned on the nature of the message being expressed. *Chiles*, 146 S. Ct. at 1022-24. Effectively, *Chiles* was a straightforward case because Colorado's ban went "a step further" than laws like those at issue in *Holder*, in that Colorado's law not only regulated based on subject matter of the professional's speech, but further "prescribe[d] what views . . . may and may not [be] express[ed]." *Id.* at 1024.

Here, however, North Carolina's licensing rules for lawyers are materially different from the laws at issue in *Holder* and *Chiles*. The UPL Statutes do not impose any restrictions on the subjects or viewpoints that Plaintiffs can address through legal advice. They only require that legal advice is offered by or under the supervision of a licensed attorney. Instead of directing the content of speech, the UPL Statutes "focus more broadly on the question of who may conduct themselves as a lawyer." *CAI*, 922 F.3d at 208. Neither *Holder* nor *Chiles* involved a similar question of the state's authority to require licensure before engaging in the speech at issue. Therefore, these cases provide no support for

discarding *CAI*'s holding that the licensure rules in the UPL Statutes regulate conduct, not speech. *Id.* at 207-08.[4]

#### 3. *Chiles* does not require a different approach to content neutrality in professional licensure cases.

Next, Plaintiffs argue that this Court's precedents have been abrogated by *Chiles* because those precedents do not engage in the "ordinary content-based scrutiny" applicable to regulations of speech. (Br. 24.) Both *CAI* and *360 Virtual*, it is true, held that when "a statute regulates conduct," as the UPL Statutes do here, less scrutiny is needed and courts "need not engage with descriptors like content-based." *360 Virtual*, 102 F.4th at 275 (quoting *CAI*, 922 F.3d at 209 n.4) (cleaned up).

That holding, however, is consistent with *Chiles*. The Supreme Court noted that "some laws regulating speech <u>based on its content</u>" do

[4] Plaintiffs also argue that *Chiles* displaced this Court's precedents because, like *NIFLA*, it shows that professional speech is entitled to the same protections as other kinds of speech. (Br. 32-33.) But this Court's precedents before *Chiles* already recognized that professional speech has the same protections as other kinds of speech. *See 360 Virtual*, 102 F.4th at 273; *CAI*, 922 F.3d at 207. In holding that professional licensure rules regulate conduct, not speech, this Court's precedents do not deny protection to professional speech. Instead, they simply recognize that professional licensure rules that apply "without regard to the message" being conveyed raise different issues than the speech-targeting laws at issue in cases like *Chiles* and *NIFLA*. *Chiles*, 146 S. Ct. at 1026.

not "trigger heightened scrutiny," such as laws that "regulate conduct in a way that only 'incidentally burden[s] speech.'" *Chiles*, 146 S. Ct. at 1025 (quoting *NIFLA*, 585 U.S. at 769). This Court's professional licensure precedents already answer the question of whether the UPL Statutes regulate conduct in a way that incidentally burdens speech. Therefore, this Court did not need to engage in a further content-neutrality analysis of the UPL Statutes or the surveyor licensing law. But even if the question of content neutrality is considered, the UPL Statutes are plainly content neutral.

In their brief, Plaintiffs contend that the UPL Statutes are content-based because the licensure requirement only applies to "legal advice." (Br. 32.) Plaintiffs therefore claim that whether they "may speak depends on what [Plaintiffs] say," making the UPL Statutes content-based. (Br. 32; *see also id.* 30-32.)

Plaintiffs are mistaken on this point. In *City of Austin v. Reagan National Advertising of Austin, LLC*, the Supreme Court held that "restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." 596 U.S. 61, 72 (2022). If a law "requires an examination of speech only in service of drawing neutral . . .

lines," then the law effectively regulates the "time, place, or manner" of speech and is content-neutral, "absent a content-based purpose or justification." *Id.* at 69, 71.

North Carolina's licensing rules are content-neutral under this test. The UPL Statutes require "an examination of speech," to determine if a person is offering "legal advice" that is restricted to licensees. *Id.* at 69; N.C.G.S. § 84-2.1(a). But the UPL Statutes only do so to regulate the manner of that speech. Paralegals like Plaintiffs can offer any legal advice under the UPL Statutes, no matter its specific content, so long as they do so under the supervision of a licensed attorney or they obtain a law license. North Carolina therefore draws neutral lines to regulate the manner in which Plaintiffs may offer legal advice, irrespective of the specific content of the legal advice. *Reagan*, 596 U.S. at 71. *See also Brokamp v. James*, 66 F.4th 374, 395-97 (2d Cir. 2023) (rejecting similar argument that therapist licensure law was content-based merely because it called for some examination of the communication's content to determine whether it fell within the scope of the profession).[5]

[5] In addition to the Second Circuit's decision in *Brokamp*, other courts have held that professional entry regulations are content neutral. *See Upsolve, Inc. v. James*, 155 F.4th 133, 143 (2d Cir. 2025) (holding that

#### 4. The factors this Court discussed when distinguishing conduct and speech regulations in *360 Virtual* are consistent with *Chiles*.

Plaintiffs also argue that *Chiles* is inconsistent with *360 Virtual*, because *Chiles* did not apply the non-exhaustive factors that this Court applied in *360 Virtual* to determine whether Colorado's ban on conversion therapy regulated conduct or speech. (Br. 23-24.) Plaintiffs point out that, unlike *360 Virtual*, *Chiles* did not consider whether the talk therapy offered by the plaintiff in *Chiles* "would have legal and economic consequences" or "would occur in private." (Br. 23.)

This argument, once again, misses the mark for several reasons. As an initial matter, *360 Virtual* is only relevant here insofar as it

---

New York's UPL statutes are content-neutral as applied to nonlawyers who sought to give legal advice about court forms), *cert. denied*, 146 S. Ct. 1854 (Mar. 30, 2026); *Laws. for Fair Reciprocal Admission v. United States*, 141 F.4th 1056, 1069 (9th Cir. 2025) (holding that bar admission requirements "are neutral not only as to content of the message expressed but also as to viewpoint and speaker," and therefore "do not 'target speech based on its communicative content.'" (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)); *Crownholm v. Moore*, 2024 U.S. App. LEXIS 9121, at *6-7 (9th Cir. Apr. 16, 2024) (holding that California's surveyor licensing requirement is content-neutral), *cert. denied*, 2026 U.S. LEXIS 1838 (Apr. 20, 2026), *reh'g denied*, 2026 U.S. LEXIS 2489 (June 15, 2026); *Castillo*, 26 F.4th at 1225-26 (holding that licensure requirement for nutrition counseling was a professional regulation with an incidental effect on speech).

reaffirmed *CAI*'s holding that North Carolina's licensure rules for lawyers are "a classic regulation of conduct with an incidental burden on speech." 102 F.4th at 275. As shown, that holding in *CAI* is consistent with *Chiles*.

Nonetheless, *360 Virtual* is also consistent with *Chiles*. The non-exhaustive factors discussed in *360 Virtual* do not reflect any divergence from the Supreme Court's precedents. Rather, the *360 Virtual* factors demonstrate that this Court applies especially careful scrutiny to licensing rules – such as Charleston's rules for city tour guides – that apply in "traditionally public sphere[s]" like streets, but that do not have significant "legal, health, economic, or public-safety-related consequences." *360 Virtual*, 102 F.4th at 274. This Court's decision to apply stronger scrutiny in those circumstances, which *Chiles* itself does not necessarily require, is not inconsistent with *Chiles*.

Furthermore, *Chiles*'s principal holding, that ostensible regulations of conduct actually regulate speech when they target speech based on "viewpoint," is actually anticipated by *360 Virtual*. *Chiles*, 146 S. Ct. at 1024. In *360 Virtual*, this Court held that professional regulations are really "aimed at speech as speech" when they appear "to regulate some

kind of unpopular or dissenting speech." *360 Virtual*, 102 F.4th at 274-75. To support this holding, it noted the risk that "[g]overnment regulation of professional speech can be used 'to suppress unpopular ideas or information.'" *Id.* at 275 (quoting *NIFLA*, 585 U.S. at 771). This Court also cited an earlier decision from another circuit that, like *Chiles*, applied strict scrutiny and enjoined enforcement of bans on conversion therapy. *See id.* (citing *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020)).

*360 Virtual* is therefore not "impossible to reconcile" with *Chiles*. *Short*, 87 F.4th at 605. That conclusion is confirmed by the Supreme Court's decision earlier this year not to vacate *360 Virtual* in the face of arguments that this Court's precedent conflicted with the intervening decision in *Chiles*.

#### 5. The out-of-circuit cases cited by Plaintiffs do not support their argument that *Chiles* abrogated this Court's precedents.

Finally, Plaintiffs argue that three cases from other jurisdictions show that *Chiles* has abrogated the precedent of this Court. (Br. 27-30.) This argument stumbles out of the gate, however, because precedent from other circuits cannot free this Court from its obligation to follow

previous panel precedent. *See Short*, 87 F.4th at 605. Only "a subsequent Supreme Court decision" or an en banc decision may do so. *Id.* And as already shown, *Chiles* did not implicitly abrogate this Court's prior precedents in this area.

Even looking past that problem, the out-of-circuit cases are less helpful for Plaintiffs than they claim. In the only post-*Chiles* case that Plaintiffs rely on, a district court held that a licensure regime for teletherapy regulated conduct. *See Brokamp v. District of Columbia*, 2026 U.S. Dist. LEXIS 140312 (D.D.C. June 24, 2026) (holding that a therapist licensed in Virginia did not need to obtain a separate license in Washington, D.C. before engaging in talk therapy there). In doing so, however, the district court expressly relied on *360 Virtual* to clarify that it was not addressing other types of licensing regimes in its decision. *See id.* at *18-19. *See also id.* at *17 n.4 (distinguishing the talk therapy licensure at issue in that case as being "far afield" from "bar admission requirements for attorneys").

In another of Plaintiffs' cases, the Seventh Circuit expressly recognized that different circuits have approached these issues differently, with some circuits holding that licensure regimes regulate

conduct and others holding that they regulate speech directly. *See Richwine v. Matuszak*, 148 F.4th 942, 953-54 (7th Cir. 2025) (collecting cases).[6] *See also Upsolve*, 155 F.4th at 143-44 (reversing preliminary injunction and holding that strict scrutiny did not apply to New York's UPL statutes that prohibited nonlawyers from giving legal advice to *pro se* litigants.) This kind of routine percolation about the meaning of the Supreme Court's precedents among the different circuits provides no basis for this Court to conclude that its own prior precedent has been overruled or abrogated. *Short*, 87 F.4th at 605.

In sum, Plaintiffs fail to show that *Chiles* implicitly abrogated this Court's professional licensure precedents. For that reason, this Court's prior holding that North Carolina's licensure rules for lawyers regulate conduct, not speech, is binding precedent that applies here.

---

[6] The Seventh Circuit did not resolve the level of scrutiny for Illinois' funeral services licensure law, because the law swept so broadly that it even failed intermediate scrutiny. *Richwine*, 155 F.4th at 954. For example, the law "burden[ed] almost the entirety of [the death doula's] professional speech," such as prohibiting her from helping families pick the music to play at a funeral. *Id.* at 955, 957. By contrast, Plaintiffs have had long and varied careers as paralegals under the UPL Statutes. JA27 ¶¶ 57-63.

## II. The district court correctly applied the intermediate-scrutiny test to the UPL Statutes.

Because this Court's professional licensure precedents apply here, North Carolina's licensure rules comply with the First Amendment if they satisfy the loosened intermediate-scrutiny standard that this Court applied in *CAI*.

Plaintiffs implicitly concede this point. They argue that the district court erred in applying *CAI*'s test, but only because they believe that *Chiles* requires the UPL Statutes to receive heightened scrutiny as a "content-based restriction on speech." (Br. 25.) As just shown, however, it is not such a restriction. For that reason, *CAI*'s intermediate-scrutiny standard applies here.

Under *CAI*'s standard, laws will be upheld if (1) they advance a "substantial state interest" and (2) use means that, while perhaps not "narrow[ly] tailor[ed]," are still "sufficiently drawn" to achieve that interest. *CAI*, 922 F.3d at 208-09; *see also 360 Virtual*, 102 F.4th at 277 (similar). This requires "a reasonable fit between the challenged regulation and the state's interest – not that the regulation is the least restrictive means for achieving its goal." *360 Virtual*, 102 F.4th at 277 (cleaned up).

To satisfy this standard, the state need not "point to specific record evidence to support" the constitutionality of a challenged licensure requirement, which can rather be demonstrated by "common sense." *Id.* at 277, 279. *See also CAI*, 922 F.3d at 209-10; *Wag More Dogs, LLC v. Cozort*, 680 F.3d 359, 365 n.3 (4th Cir. 2012) (affirming dismissal of complaint under intermediate scrutiny because a party "need not reinvent the wheel by coming forward with voluminous evidence justifying a regulation of the type that has been upheld several times over"). This burden "is not exceedingly high." *360 Virtual*, 102 F.4th at 277.

This Court has already held that "North Carolina's interest in regulating the legal profession to protect clients is at least substantial." *CAI*, 922 F.3d at 209. In the same case, this Court also held that North Carolina's licensure rules are "sufficiently drawn to protect that interest." *Id.*

Both of these prior holdings apply here. Indeed, Plaintiffs do not argue that North Carolina's lawyer licensure rules are infirm under *CAI*'s standard. (*See* Br. 16-46.) For that reason, Plaintiffs have abandoned any argument that the lawyer licensure rules fail to satisfy

*CAI*'s intermediate-scrutiny standard as applied to them. *See Canales-Rivera v. Barr*, 948 F.3d 649, 656 n.3 (4th Cir. 2020).

Nonetheless, if this Court chooses to revisit these issues, the UPL Statutes clearly satisfy this standard.

### A. North Carolina has at least a substantial interest in barring nonlawyers from practicing law.

At the first step of the intermediate-scrutiny test, North Carolina plainly has a substantial interest in barring nonlawyers from practicing law. *See CAI*, 922 F.3d at 209.

The Supreme Court has "recognize[d] that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975). In particular, "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" *Id.*

Many other decisions recognize the states' broad authority to regulate professions like the practice of law, including entry into the profession. *See Leis v. Flynt*, 439 U.S. 438, 442 (1979) ("Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions."); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) ("[T]he State bears a special responsibility for maintaining standards among members of the licensed professions."); *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154, 159 (1971) (holding that states are constitutionally permitted to establish character and fitness requirements for admission to the bar); *Sperry*, 373 U.S. at 383 (recognizing that states have "a substantial interest in regulating the practice of law" and can "validly prohibit nonlawyers from engaging" in the practice of law); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 40-41 (1961) (holding that states may require bar applicants to establish good moral character); *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 273 (1957) ("recogniz[ing] the importance of leaving States free to select their own bars"); *Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 239 (1957) ("A state can require high standards of qualification, such as good

moral character or proficiency in its law, before it admits an applicant to the bar," so long as the qualifications "have a rational connection with the applicant's fitness or capacity to practice law."); *Dent v. West Virginia*, 129 U.S. 114, 122 (1889) (recognizing state authority to require medical licensure); *Brokamp*, 66 F.4th at 399 (noting that "licensure based on specified standards of education, experience, and testing" as been "long recognized by the Supreme Court directly and materially to alleviate concerns about ignorant, incompetent, and/or deceptive" conduct by professionals); *Stuart v. Camnitz*, 774 F.3d 238, 247 (4th Cir. 2014) (noting that "[t]he state may establish licensing qualifications," and that the "power to prescribe rules and regulations for professions … has an extensive history"); *Mox v. Olson*, 807 F. Supp. 3d 926, 947 (D. Minn. 2025) ("No doubt a state may require lawyers and doctors to be licensed and, as part of that, require members of each profession to meet prerequisites."); *Gardner v. Conway*, 48 N.W.2d 788, 795 (Minn. 1951) ("The protection of the public, as the purpose of confining law practice to a licensed bar, ancient as it is of origin, is of vital importance today").

### B. The UPL Statutes are sufficiently drawn.

At the second step of the intermediate-scrutiny test, North Carolina's licensure requirement is "sufficiently drawn" to protect the state's interest in addressing the harms caused by the non-licensed practice of law. *CAI*, 922 F.3d at 209. Under *CAI*, this step requires "only a reasonable fit between the challenged regulation and the state's interest – not the least restrictive means." *Id.* at 209-10 (internal citation omitted).

Here, a reasonable fit exists. The UPL Statutes prohibit the practice of law by an unsupervised nonlawyer who lacks the training, ethical and fiduciary duties, professional requirements, and court- and bar-oversight of lawyers, and who does not operate within the scope of the attorney-client privilege and work product doctrine. But North Carolina allows nonlawyers like Plaintiffs to give legal advice under the supervision of lawyers, and to participate in the delivery of legal services, including through speech alone.

First, the UPL Statutes do not prohibit paralegals from engaging in speech that constitutes legal information. JA53 (nonlawyers may sell or distribute "[g]eneralized legal statements and opinions, not tailored to

any specific or particular situation, [which] do not constitute the unauthorized practice of law"). For example, Plaintiffs want to offer on-demand videos, which generally are not prohibited because they would not be tailored to a specific client's facts. JA30 ¶ 85; JA53.

Second, North Carolina law allows individuals to work as paralegals in a wide variety of settings, as Plaintiffs have done throughout their careers. Plaintiffs "may still engage in the activities that fall within their area of experience and expertise" as paralegals, in any area of the law. *360 Virtual*, 102 F.4th at 280 (holding that the surveyor law was sufficiently drawn when the drone enthusiast could carry on most of his activities of interest so long as his images did not include measurable mapping data). Similarly, as applied in *CAI*, the UPL Statutes prohibited the most concerning structure (an organization controlled by nonlawyers that employed lawyers) but allowed other structures, such as privately-owned and public interest law firms. *See CAI*, 922 F.3d at 209.

Third, the UPL Statutes "protect[] the professional integrity" of lawyers. *360 Virtual*, 102 F.4th at 280. A license to practice law "is not easy to obtain, and there is a public interest in ensuring there is an

incentive for individuals to go through that rigorous process and become trained as" lawyers. *Id.* (discussing surveyor licensing). Like surveyors, lawyers protect their clients from potentially harmful economic and legal consequences, which could flow from making misrepresentations to a court, from asserting a baseless claim, or from failing to assert an important claim or defense. *Id. See also Upsolve, Inc. v. James*, 827 F. Supp. 3d 482, 494 (S.D.N.Y. 2026) (dismissing nonlawyers' First Amendment challenge to New York's prohibition on giving legal advice to *pro se* litigants, and holding that "[m]any of the risks that the licensure of attorneys guards against are at or near their apices in this context," including the risk of "incompetent advice that prejudices a client's legal rights," giving advice "despite a clear conflict of interest," or advice that causes "a client to make statements that mislead the court"). Furthermore, Plaintiffs are not prohibited by the UPL Statutes from obtaining the necessary qualifications to apply for a law license.

Fourth, the broad scope of lawful paralegal practice should be viewed in conjunction with the broad resources available to the *pro se* litigants in North Carolina whom Plaintiffs see as prospective clients. As Plaintiffs acknowledge, the state court system publishes forms that *pro*

*se* litigants can complete, which "are not complicated," along with instructions. JA19 ¶ 2; JA28 ¶¶ 67-70. It also publishes extensive "packets, guidelines, or landing pages" that provide guidance to litigants using the forms. JA29 ¶ 71. And it has developed a "Guide & File" system that litigants can use to "generate[] the appropriate legal documents." JA 29 ¶¶ 72-73.

In sum, applying common sense and prior holdings to the record, the UPL Statutes are sufficiently drawn to satisfy intermediate scrutiny, as this Court held in *CAI*. The UPL Statutes do not violate the First Amendment by excluding nonlawyers from the unsupervised practice of law while allowing paralegals to "assist in the delivery of legal services" and to "shar[e] and distribut[e] legal information." JA8-9. The district court correctly dismissed the amended complaint.

## III. JFAP is not entitled to reversal under a freedom-of-association theory.

Finally, Plaintiffs argue that JFAP, an unincorporated nonprofit association, has separately stated a plausible claim based on a violation of its assembly rights. (Br. 46-48.)

Relying on two Supreme Court cases, JFAP argues that the First Amendment's Assembly Clause guarantees it an associational right to

provide "pro bono legal assistance," in order to secure "meaningful access to courts." (Br. 46 (citing *NAACP v. Button*, 371 U.S. 415 (1963), and *In re Primus*, 436 U.S. 412 (1978)).) In the two cases that JFAP relies on, the Supreme Court recognized an associational right for lawyers associated with the NAACP and ACLU to solicit or represent clients in civil rights litigation. *See Primus*, 436 U.S. at 429-32; *Button*, 371 U.S. at 442-44.

Here, JFAP maintains that it would like to provide free legal advice, and that this Court's decision in *CAI*, which rejected a similar associational-rights claim, is distinguishable. (Br. 47.) As JFAP notes, this Court rejected the associational-rights claim asserted in *CAI*, because, among other reasons, the plaintiff sought to provide legal services for "commercial ends," not pro bono services. (Br. 47 (citing *CAI*, 922 F.3d at 206).)

JFAP's associational-rights claim fails because it is not properly before this Court. For starters, Plaintiffs advanced no associational-rights claim. Count I of their amended complaint, which is the only claim brought by JFAP, invokes the First Amendment's Speech Clause only. JA38 ¶ 146. But even if the amended complaint could be construed to

assert an associational-rights claim, the claim was not preserved. Below, JFAP did not assert any such claim, either in its briefing in response to Defendants' motion to dismiss or at the hearing on that motion, and the district court never ruled on such a claim either. (*See* No. 7:24-CV-4 (E.D.N.C.), Dkt. 33; JA1-10; JA95-109.)

If an associational-rights claim were properly before this Court, it would fail anyway. The freedom of association applies to legal services only when they "offer a means to serve <u>other</u> First Amendment ends," such as the civil-rights work that the NAACP and ACLU engage in. *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 188 (2d Cir. 2017) (emphasis added). Here, JFAP would like to provide pro bono services to help its clients "resolve <u>private</u> differences," instead of undertaking litigation aimed at "expanding and guarding civil rights." *CAI*, 922 F.3d at 206 (emphasis added). JFAP specifically wants to work on private matters like summary ejectment, divorce, custody, and estate administration. JA28 ¶ 68. This kind of work provides no basis for a valid associational-rights claim.

JFAP's non-preserved associational-rights claim also fails because JFAP seeks to offer legal services through nonlawyers. This Court and

others have rejected associational claims like the one JFAP asserts here when nonlawyers would be involved in the practice of law. *See CAI*, 922 F.3d at 206 (holding there is no associational right for nonlawyer-controlled trade association to give legal advice to members); *Jacoby & Meyers*, 852 F.3d at 187-89 (upholding prohibition on nonlawyer ownership of law firms); *Lawline v Am. Bar Ass'n*, 956 F.2d 1378, 1381, 1387 (7th Cir. 1992) (holding that "unincorporated association of lawyers, paralegals and laypersons" did not have an associational right to provide legal advice over the telephone or "to assist [individuals] in representing themselves in routine legal matters"); *Upsolve*, 827 F. Supp. 3d at 497-98 (dismissing freedom-of-association claim brought by nonlawyers and entity who sought to give legal advice about court forms to *pro se* litigants).

An associational-rights claim would also fail for a final reason. As this Court noted in *CAI*, the Supreme Court has not extended associational rights in circumstances that would raise "ethical concerns." *CAI*, 922 F.3d at 206. In *CAI*, ethical concerns arose from nonlawyer supervision of lawyers giving legal advice. *Id.* That structure would harm clients because the nonlawyers, who were not bound by the ethics

rules, could impair the lawyers' ability to comply with those ethics rules. *Id.* Here, Plaintiffs' proposed legal practice raises even more acute ethical concerns, because Plaintiffs would like to offer legal services without any lawyer supervision or involvement at all. Under Plaintiffs' plan, no one involved in giving legal advice would be bound by the client protections in the ethics rules.

JFAP's association claim therefore is not properly before this Court. It fails on the merits as well.

## CONCLUSION

Defendants respectfully request that this Court affirm the district court's judgment.

## ORAL ARGUMENT STATEMENT

Defendants do not believe that oral argument is necessary in this appeal. However, if the Court wishes to hold argument, Defendants stand ready to participate.

Respectfully submitted, this the 10th day of September, 2026.

/s/ Stephen M. Russell, Jr.
Alan W. Duncan
N.C. State Bar No. 8736
aduncan@turningpointlit.com
Stephen M. Russell, Jr.
N.C. State Bar No. 35552
srussell@turningpointlit.com
MULLINS DUNCAN HARRELL
& RUSSELL PLLC
300 N. Greene St., Suite 2000
Greensboro, NC 27401
Telephone: 336-645-3320
*Attorneys for Defendant-Appellee Katherine Ann Frye, in her official capacity*

JEFF JACKSON
Attorney General

/s/ James W. Doggett
James W. Doggett
Deputy Solicitor General
N.C. State Bar No. 49753
jdoggett@ncdoj.gov
Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. State Bar No. 28885
ebrien@ncdoj.gov
Tamika L. Henderson
Special Deputy Attorney General
N.C. State Bar No. 42398
tlhenderson@ncdoj.gov
NORTH CAROLINA DEPARTMENT
OF JUSTICE
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-6400
*Attorneys for the District Attorney Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,694 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a 14-point, proportionally spaced typeface.

/s/ Stephen M. Russell, Jr.
Stephen M. Russell, Jr.

## CONTENTS OF ADDENDUM

**Addendum Page**

N.C.G.S. § 84-21 ........ Add. 3

N.C.G.S. § 84-2.2 ........ Add. 5

N.C.G.S. § 84-4 ........ Add. 7

N.C.G.S. § 84-5 ........ Add. 8

N.C.G.S. § 84-5.1 ........ Add. 13

N.C.G.S. § 84-7 ........ Add. 14

N.C.G.S. § 84-7.1 ........ Add. 15

N.C.G.S. § 84-15 ........ Add. 16

N.C.G.S. § 84-21 ........ Add. 17

N.C.G.S. § 84-23 ........ Add. 18

N.C.G.S. § 84-24 ........ Add. 20

N.C.G.S. § 84-28 ........ Add. 23

N.C.G.S. § 84-37 ........ Add. 29

27 N.C. Admin. Code § 01G.0101 ........ Add. 31

27 N.C. Admin. Code § 03.0501 ........ Add. 32

27 N.C. Admin. Code § 03.0601 ........ Add. 35

27 N.C. Admin. Code § 03.0702 ........ Add. 36

N.C. R. Prof'l Conduct, Rule 1.1 ........ Add. 37

N.C. R. Prof'l Conduct, Rule 1.6 ........ Add. 38

N.C. R. Prof'l Conduct, Rule 5.3 .................................................... Add. 40

## General Statutes of North Carolina

## Chapter 84. Attorneys-at-Law

## Article 1. Qualifications of Attorney; Unauthorized Practice of Law

### N.C.G.S. § 84-2.1

### "Practice law" defined

(a) The phrase "practice law" as used in this Chapter is defined to be performing any legal service for any other person, firm or corporation, with or without compensation, specifically including the preparation or aiding in the preparation of deeds, mortgages, wills, trust instruments, inventories, accounts or reports of guardians, trustees, administrators or executors, or preparing or aiding in the preparation of any petitions or orders in any probate or court proceeding; abstracting or passing upon titles, the preparation and filing of petitions for use in any court, including administrative tribunals and other judicial or quasi-judicial bodies, or assisting by advice, counsel, or otherwise in any legal work; and to advise or give opinion upon the legal rights of any person, firm or corporation: Provided, that the above reference to particular acts which are specifically included within the definition of the phrase "practice law" shall not be construed to limit the foregoing general definition of the term, but shall be construed to include the foregoing particular acts, as well as all other acts within the general definition.

(b) The phrase "practice law" does not encompass:

> (1) The drafting or writing of memoranda of understanding or other mediation summaries by mediators at community mediation centers authorized by G.S. 7A-38.5 or by mediators of employment-related matters for The University of North Carolina or a constituent institution, or for an agency, commission, or board of the State of North Carolina.

(2) The selection or completion of a preprinted form by a real estate broker licensed under Chapter 93A of the General Statutes, when the broker is acting as an agent in a real estate transaction and in accordance with rules adopted by the North Carolina Real Estate Commission, or the selection or completion of a preprinted residential lease agreement by any person or website provider. Nothing in this subdivision or in G.S. 84-2.2 shall be construed to permit any person or website provider who is not licensed to practice law in accordance with this Chapter to prepare for any third person any contract or deed conveying any interest in real property, or to abstract or pass upon title to any real property, which is located in this State.

(3) The completion of or assisting a consumer in the completion of various agreements, contracts, forms, and other documents related to the sale or lease of a motor vehicle as defined in G.S. 20-286(10), or of products or services ancillary or related to the sale or lease of a motor vehicle, by a motor vehicle dealer licensed under Article 12 of Chapter 20 of the General Statutes.

## N.C.G.S. § 84-2.2

### Exemption and additional requirements for website providers

(a) The practice of law, including the giving of legal advice, as defined by G.S. 84-2.1 does not include the operation of a website by a provider that offers consumers access to interactive software that generates a legal document based on the consumer's answers to questions presented by the software, provided that all of the following are satisfied:

(1) The consumer is provided a means to see the blank template or the final, completed document before finalizing a purchase of that document.

(2) An attorney licensed to practice law in the State of North Carolina has reviewed each blank template offered to North Carolina consumers, including each and every potential part thereof that may appear in the completed document. The name and address of each reviewing attorney must be kept on file by the provider and provided to the consumer upon written request.

(3) The provider must communicate to the consumer that the forms or templates are not a substitute for the advice or services of an attorney.

(4) The provider discloses its legal name and physical location and address to the consumer.

(5) The provider does not disclaim any warranties or liability and does not limit the recovery of damages or other remedies by the consumer.

(6) The provider does not require the consumer to agree to jurisdiction or venue in any state other than North Carolina for the resolution of disputes between the provider and the consumer.

(7) The provider must have a consumer satisfaction process. All consumer concerns involving the unauthorized practice of law made to the provider shall be referred to the North Carolina State Bar. The consumer satisfaction process must be conspicuously displayed on the provider's website.

(b) A website provider subject to this section shall register with the North Carolina State Bar prior to commencing operation in the State and shall renew its registration with the State Bar annually. The State Bar may not refuse registration.

(c) Each website provider subject to this section shall pay an initial registration fee in an amount not to exceed one hundred dollars ($100.00) and an annual renewal fee in an amount not to exceed fifty dollars ($50.00).

## N.C.G.S. § 84-4

### Persons other than members of State Bar prohibited from practicing law

Except as otherwise permitted by law, it shall be unlawful for any person or association of persons, except active members of the Bar of the State of North Carolina admitted and licensed to practice as attorneys-at-law, to appear as attorney or counselor at law in any action or proceeding before any judicial body, including the North Carolina Industrial Commission, or the Utilities Commission; to maintain, conduct, or defend the same, except in his own behalf as a party thereto; or, by word, sign, letter, or advertisement, to hold out himself, or themselves, as competent or qualified to give legal advice or counsel, or to prepare legal documents, or as being engaged in advising or counseling in law or acting as attorney or counselor-at-law, or in furnishing the services of a lawyer or lawyers; and it shall be unlawful for any person or association of persons except active members of the Bar, for or without a fee or consideration, to give legal advice or counsel, perform for or furnish to another legal services, or to prepare directly or through another for another person, firm or corporation, any will or testamentary disposition, or instrument of trust, or to organize corporations or prepare for another person, firm or corporation, any other legal document. Provided, that nothing herein shall prohibit any person from drawing a will for another in an emergency wherein the imminence of death leaves insufficient time to have the same drawn and its execution supervised by a licensed attorney-at-law. The provisions of this section shall be in addition to and not in lieu of any other provisions of this Chapter. Provided, however, this section shall not apply to corporations authorized to practice law under the provisions of Chapter 55B of the General Statutes of North Carolina.

## N.C.G.S. § 84-5

### Prohibition as to practice of law by corporation

(a) It shall be unlawful for any corporation to practice law or appear as an attorney for any person in any court in this State, or before any judicial body or the North Carolina Industrial Commission, Utilities Commission, or the Department of Commerce, Division of Employment Security, or hold itself out to the public or advertise as being entitled to practice law; and no corporation shall organize corporations, or draw agreements, or other legal documents, or draw wills, or practice law, or give legal advice, or hold itself out in any manner as being entitled to do any of the foregoing acts, by or through any person orally or by advertisement, letter or circular. The provisions of this section shall be in addition to and not in lieu of any other provisions of Chapter 84. Provided, that nothing in this section shall be construed to prohibit a banking corporation authorized and licensed to act in a fiduciary capacity from performing any clerical, accounting, financial or business acts required of it in the performance of its duties as a fiduciary or from performing ministerial and clerical acts in the preparation and filing of such tax returns as are so required, or from discussing the business and financial aspects of fiduciary relationships. Provided, however, this section shall not apply to corporations authorized to practice law under the provisions of Chapter 55B of the General Statutes of North Carolina.

To further clarify the foregoing provisions of this section as they apply to corporations which are authorized and licensed to act in a fiduciary capacity:

(1) A corporation authorized and licensed to act in a fiduciary capacity shall not:

a. Draw wills or trust instruments; provided that this shall not be construed to prohibit an employee of such corporation from conferring and cooperating with an attorney who is not a salaried employee of the corporation, at the request of such attorney, in connection with the attorney's performance of services for a client who desires to appoint the

corporation executor or trustee or otherwise to utilize the fiduciary services of the corporation.

b. Give legal advice or legal counsel, orally or written, to any customer or prospective customer or to any person who is considering renunciation of the right to qualify as executor or administrator or who proposes to resign as guardian or trustee, or to any other person, firm or corporation.

c. Advertise to perform any of the acts prohibited herein; solicit to perform any of the acts prohibited herein; or offer to perform any of the acts prohibited herein.

(2) Except as provided in subsection (b) of this section, when any of the following acts are to be performed in connection with the fiduciary activities of such a corporation, said acts shall be performed for the corporation by a duly licensed attorney, not a salaried employee of the corporation, retained to perform legal services required in connection with the particular estate, trust or other fiduciary matter:

a. Offering wills for probate.

b. Preparing and publishing notice of administration to creditors.

c. Handling formal court proceedings.

d. Drafting legal papers or giving legal advice to spouses concerning rights to an elective share under Article 1A of Chapter 30 of the General Statutes.

e. Resolving questions of domicile and residence of a decedent.

f. Handling proceedings involving year's allowances of widows and children.

g. Drafting deeds, notes, deeds of trust, leases, options and other contracts.

h. Drafting instruments releasing deeds of trust.

i. Drafting assignments of rent.

j. Drafting any formal legal document to be used in the discharge of the corporate fiduciary's duty.

k. In matters involving estate and inheritance taxes, gift taxes, and federal and State income taxes:

 1. Preparing and filing protests or claims for refund, except requests for a refund based on mathematical or clerical errors in tax returns filed by it as a fiduciary.

 2. Conferring with tax authorities regarding protests or claims for refund, except those based on mathematical or clerical errors in tax returns filed by it as a fiduciary.

 3. Handling petitions to the tax court.

l. Performing legal services in insolvency proceedings or before a referee in bankruptcy or in court.

m. In connection with the administration of an estate or trust:

 1. Making application for letters testamentary or letters of administration.

 2. Abstracting or passing upon title to property.

 3. Handling litigation relating to claims by or against the estate or trust.

4. Handling foreclosure proceedings of deeds of trust or other security instruments which are in default.

(3) When any of the following acts are to be performed in connection with the fiduciary activities of such a corporation, the corporation shall comply with the following:

a. The initial opening and inventorying of safe deposit boxes in connection with the administration of an estate for which the corporation is executor or administrator shall be handled by, or with the advice of, an attorney, not a salaried employee of the corporation, retained by the corporation to perform legal services required in connection with that particular estate.

b. The furnishing of a beneficiary with applicable portions of a testator's will relating to such beneficiary shall, if accompanied by any legal advice or opinion, be handled by, or with the advice of, an attorney, not a salaried employee of the corporation, retained by the corporation to perform legal services required in connection with that particular estate or matter.

c. In matters involving estate and inheritance taxes and federal and State income taxes, the corporation shall not execute waivers of statutes of limitations without the advice of an attorney, not a salaried employee of the corporation, retained by the corporation to perform legal services in connection with that particular estate or matter.

d. An attorney, not a salaried employee of the corporation, retained by the corporation to perform legal services required in connection with an estate or trust shall be furnished copies of inventories and

accounts proposed for filing with any court and proposed federal estate and North Carolina inheritance tax returns and, on request, copies of proposed income and intangibles tax returns, and shall be afforded an opportunity to advise and counsel the corporate fiduciary concerning them prior to filing.

(b) Nothing in this section shall prohibit an attorney retained by a corporation, whether or not the attorney is also a salaried employee of the corporation, from representing the corporation or an affiliate, or from representing an officer, director, or employee of the corporation or an affiliate in any matter arising in connection with the course and scope of the employment of the officer, director, or employee. Notwithstanding the provisions of this subsection, the attorney providing such representation shall be governed by and subject to all of the Rules of Professional Conduct of the North Carolina State Bar to the same extent as all other attorneys licensed by this State.

## N.C.G.S. § 84-5.1

### Rendering of legal services by certain nonprofit corporations

(a) Subject to the rules and regulations of the North Carolina State Bar, as approved by the Supreme Court of North Carolina, a nonprofit corporation, tax exempt under 26 U.S.C. § 501(c)(3), organized or authorized under Chapter 55A of the General Statutes of North Carolina and operating as a public interest law firm as defined by the applicable Internal Revenue Service guidelines or for the primary purpose of rendering indigent legal services, may render such services provided by attorneys duly licensed to practice law in North Carolina, for the purposes for which the nonprofit corporation was organized. The nonprofit corporation must have a governing structure that does not permit an individual or group of individuals other than an attorney duly licensed to practice law in North Carolina to control the manner or course of the legal services rendered and must continually satisfy the criteria established by the Internal Revenue Service for 26 U.S.C. § 501(c)(3) status, whether or not any action has been taken to revoke that status.

(b) In no instance may legal services rendered by a nonprofit corporation under subsection (a) of this section be conditioned upon the purchase or payment for any product, good, or service other than the legal service rendered.

## N.C.G.S. § 84-7

### District attorneys, upon application, to bring injunction or criminal proceedings

The district attorney of any of the superior courts shall, upon the application of any member of the Bar, or of any bar association, of the State of North Carolina, bring such action in the name of the State as may be proper to enjoin any such person, corporation, or association of persons who it is alleged are violating the provisions of G.S. 84-4 to 84-8, and it shall be the duty of the district attorneys of this State to indict any person, corporation, or association of persons upon the receipt of information of the violation of the provisions of G.S. 84-4 to 84-8.

## N.C.G.S. § 84-7.1

### Legal clinics of law schools and certain law students and lawyers excepted

The provisions of G.S. 84-4 through G.S. 84-6 shall not apply to any of the following:

(1) Any law school conducting a legal clinic and receiving as its clientage only those persons unable financially to compensate for legal advice or services rendered and any law student permitted by the North Carolina State Bar to act as a legal intern in such a legal clinic.

(2) Any law student permitted by the North Carolina State Bar to act as a legal intern for a federal, State, or local government agency.

(3) Any lawyer licensed by another state and permitted by the North Carolina State Bar to represent indigent clients on a pro bono basis under the supervision of active members employed by nonprofit corporations qualified to render legal services pursuant to G.S. 84-5.1. This provision does not apply to a lawyer whose license has been suspended or revoked in any state.

## General Statutes of North Carolina

## Chapter 84. Attorneys-at-Law

## Article 4. North Carolina State Bar

### N.C.G.S. § 84-15

### Creation of North Carolina State Bar as an agency of the State

There is hereby created as an agency of the State of North Carolina, for the purposes and with the powers hereinafter set forth, the North Carolina State Bar.

**N.C.G.S. § 84-21**

**Organization of Council; publication of rules, regulations and bylaws**

(a) The Council shall adopt the rules pursuant to G.S. 45A-9.

(b) The rules and regulations adopted by the Council under this Article may be amended by the Council from time to time in any manner not inconsistent with this Article. Copies of all rules and regulations and of all amendments adopted by the Council shall be certified to the Chief Justice of the Supreme Court of North Carolina, entered by the North Carolina Supreme Court upon its minutes, and published in the next ensuing number of the North Carolina Reports and in the North Carolina Administrative Code: Provided, that the court shall decline to have so entered upon its minutes any rules, regulations and amendments which in the opinion of the Chief Justice are inconsistent with this Article.

**N.C.G.S. § 84-23**

**Powers of Council**

(a) The Council is vested, as an agency of the State, with the authority to regulate the professional conduct of licensed lawyers and State Bar certified paralegals. Among other powers, the Council shall administer this Article; take actions that are necessary to ensure the competence of lawyers and State Bar certified paralegals; formulate and adopt rules of professional ethics and conduct; investigate and prosecute matters of professional misconduct; expunge disciplinary actions; grant or deny petitions for reinstatement; resolve questions pertaining to membership status; arbitrate disputes concerning legal fees; certify legal specialists and paralegals and charge fees to applicants and participants necessary to administer these certification programs; determine whether a member is disabled; maintain an annual registry of interstate and international law firms doing business in this State; and formulate and adopt procedures for accomplishing these purposes. The Council may do all things necessary in the furtherance of the purposes of this Article that are not otherwise prohibited by law.

(b) The Council or any committee of the Council, including the Client Security Fund and the Disciplinary Hearing Commission or any committee of the Commission, may subpoena financial records of any licensed lawyers, lawyers whose licenses have been suspended, or disbarred lawyers, relating to any account into which client or fiduciary funds have been deposited.

(c) The Council may publish an official journal concerning matters of interest to the legal profession.

(d) The Council may acquire, hold, rent, encumber, alienate, lease, and otherwise deal with real or personal property in the same manner as any private person or corporation, subject only to the approval of the Governor and the Council of State as to the acquisition, rental, encumbering, leasing and sale of real property. The Council may borrow money upon its bonds, notes, debentures, or other evidences of indebtedness sold through public or private sale pursuant to a loan agreement or a trust agreement or indenture with a trustee, with such

borrowing either unsecured or secured by a mortgage on the Council's interest in real or personal property, and engage and contract with attorneys, underwriters, financial advisors, and other parties as necessary for such borrowing, with such borrowing and security subject to the approval of the Governor and the Council of State. The Council may utilize the services of the Purchase and Contract Division of the Department of Administration to procure personal property, in accordance with the provisions of Article 3 of Chapter 143 of the General Statutes. However, the Council shall: (i) submit all proposed contracts for supplies, materials, printing, equipment, and contractual services that exceed one million dollars ($1,000,000) authorized by this subsection to the Attorney General or the Attorney General's designee for review as provided in G.S. 114-8.3; and (ii) include in all contracts to be awarded by the Council under this subsection a standard clause which provides that the State Auditor and internal auditors of the Council may audit the records of the contractor during and after the term of the contract to verify accounts and data affecting fees and performance. The Council shall not award a cost plus percentage of cost agreement or contract for any purpose.

## N.C.G.S. § 84-24

### Admission to practice

For the purpose of examining applicants and providing rules and regulations for admission to the Bar including the issuance of license therefor, there is hereby created the Board of Law Examiners, which shall consist of 11 members of the Bar, elected by the Council, who need not be members of the Council. No teacher in any law school, however, shall be eligible. The members of the Board of Law Examiners elected from the Bar shall each hold office for a term of three years.

The Board of Law Examiners shall elect a member of the Board as chair thereof, and the Board may employ an executive secretary and provide such assistance as may be required to enable the Board to perform its duties promptly and properly. The chair and any employees shall serve for a period of time determined by the Board.

The examination shall be held in the manner and at the times as the Board of Law Examiners may determine.

The Board of Law Examiners shall have full power and authority to make or cause to be made such examinations and investigations as may be deemed by it necessary to satisfy it that the applicants for admission to the Bar possess the qualifications of character and general fitness requisite for an attorney and counselor-at-law and to this end the Board of Law Examiners shall have the power of subpoena and to summons and examine witnesses under oath and to compel their attendance and the production of books, papers and other documents and writings deemed by it to be necessary or material to the inquiry and shall also have authority to employ and provide assistance as may be required to enable it to perform its duties promptly and properly. Records, papers, and other documents containing information collected and compiled by the Board or its members or employees as a result of investigations, inquiries, or interviews conducted in connection with examinations or licensing matters, are not public records within the meaning of Chapter 132 of the General Statutes.

All applicants for admission to the Bar shall be fingerprinted to determine whether the applicant has a record of criminal conviction in this State or in any other state or jurisdiction. The information obtained as a result of the fingerprinting of an applicant shall be limited to the official use of the Board of Law Examiners in determining the character and general fitness of the applicant.

The Department of Public Safety may provide a criminal record check to the Board of Law Examiners for a person who has applied for a license through the Board. The Board shall provide to the Department of Public Safety, along with the request, the fingerprints of the applicant, any additional information required by the Department of Public Safety, and a form signed by the applicant consenting to the check of the criminal record and to the use of the fingerprints and other identifying information required by the State or national repositories. The applicant's fingerprints shall be forwarded to the State Bureau of Investigation for a search of the State's criminal history record file, and the State Bureau of Investigation shall forward a set of the fingerprints to the Federal Bureau of Investigation for a national criminal history check. The Board shall keep all information pursuant to this subsection privileged, in accordance with applicable State law and federal guidelines, and the information shall be confidential and shall not be a public record under Chapter 132 of the General Statutes.

The Department of Public Safety may charge each applicant a fee for conducting the checks of criminal history records authorized by this section.

The Board of Law Examiners, subject to the approval of the Council, shall by majority vote, from time to time, make, alter, and amend such rules and regulations for admission to the Bar as in their judgment shall promote the welfare of the State and the profession: Provided, that no change in the educational requirements for admission to the Bar that establishes an additional or greater requirement shall become effective until two years after the date of the adoption of the change.

All rules and regulations, and modifications, alterations and amendments thereof, shall be recorded and promulgated as provided in

G.S. 84-21 in relation to the certificate of organization and the rules and regulations of the Council.

Whenever the Council shall order the restoration of license to any person as authorized by G.S. 84-32, it shall be the duty of the Board of Law Examiners to issue a written license to the person, noting thereon that the license is issued in compliance with an order of the Council, whether the license to practice law was issued by the Board of Law Examiners or the Supreme Court in the first instance.

Appeals from the Board shall be had in accordance with rules or procedures as may be approved by the Supreme Court as may be submitted under G.S. 84-21 or as may be promulgated by the Supreme Court.

## N.C.G.S. § 84-28

## Discipline and disbarment

(a) Any attorney admitted to practice law in this State, any attorney admitted for limited practice under G.S. 84-4.1, or any attorney not admitted to practice law in this State who engages in or offers to engage in the practice of law within this State is subject to the disciplinary jurisdiction of the Council under such rules and procedures as the Council shall adopt as provided in G.S. 84-23.

(a1) If the North Carolina State Bar serves a letter of notice alleging attorney misconduct upon a respondent attorney, the North Carolina State Bar shall, upon the request of the respondent attorney, provide the respondent attorney with a complete copy of the complaint, including supporting materials submitted with the complaint. For complaints submitted by an attorney or judge pursuant to the obligation to report misconduct in accordance with the Rules of Professional Conduct, the North Carolina State Bar may redact the complainant's identifying information.

(a2) If the North Carolina State Bar's Office of Counsel recommends disciplinary action against a respondent attorney, the North Carolina State Bar shall, pursuant to rules adopted by the Council, provide the attorney with the following:

(1) All non-privileged, non-work product material and financial audits provided to the Grievance Committee in the respondent attorney's matter, and any evidence in the North Carolina State Bar's possession which indicates the respondent attorney did not engage in the alleged misconduct, or a certification that no such evidence is in the North Carolina State Bar's possession. The materials provided pursuant to this section shall be provided at least 30 days prior to the Grievance Committee's consideration of the Office of Counsel's recommendation.

(2) An opportunity to address the Grievance Committee or a subcommittee thereof and to hear the Office of Counsel's presentation of the factual basis for its recommendation.

(b) The following acts or omissions by any attorney subject to the disciplinary jurisdiction of the Council as provided in subsection (a) of this section, individually or in concert with any other person or persons, shall constitute misconduct and shall be grounds for discipline whether the act or omission occurred in the course of an attorney-client relationship or otherwise:

(1) Conviction of, or a tender and acceptance of a plea of guilty or no contest to, a criminal offense showing professional unfitness;

(2) The violation of the Rules of Professional Conduct adopted and promulgated by the Council in effect at the time of the act;

(3) Knowing misrepresentation of any facts or circumstances surrounding any complaint, allegation or charge of misconduct; failure to answer any formal inquiry or complaint issued by or in the name of the North Carolina State Bar in any disciplinary matter; or contempt of the Council or any committee of the North Carolina State Bar.

(c) Misconduct by any attorney shall be grounds for:

(1) Disbarment;

(2) Suspension for a period up to but not exceeding five years, any portion of which may be stayed upon reasonable conditions to which the offending attorney consents;

(3) Censure - A censure is a written form of discipline more serious than a reprimand issued in cases in which an attorney has violated one or more provisions of the Rules of Professional Conduct and has caused significant harm or potential significant harm to a client, the administration of

justice, the profession or members of the public, but the protection of the public does not require suspension of the attorney's license;

(4) Reprimand - A reprimand is a written form of discipline more serious than an admonition issued in cases in which an attorney has violated one or more provisions of the Rules of Professional Conduct, but the protection of the public does not require a censure. A reprimand is generally reserved for cases in which the attorney's conduct has caused harm or potential harm to a client, the administration of justice, the profession, or members of the public; or

(5) Admonition - An admonition is a written form of discipline imposed in cases in which an attorney has committed a minor violation of the Rules of Professional Conduct.

Any order disbarring or suspending an attorney may impose reasonable conditions precedent to reinstatement. No attorney who has been disbarred by the Disciplinary Hearing Commission, the Council, or by order of any court of this State may seek reinstatement to the practice of law prior to five years from the effective date of the order of disbarment. Any order of the Disciplinary Hearing Commission or the Grievance Committee imposing an admonition, reprimand, censure, or stayed suspension may also require the attorney to complete a reasonable amount of continuing legal education in addition to the minimum amount required by the North Carolina Supreme Court.

(c1) There is created a grievance review panel of the Grievance Committee of the North Carolina State Bar. For each review, the chair of the Grievance Committee will appoint a panel consisting of the chair, two vice-chairs, and two other members of the Grievance Committee, including one member of the public. The grievance review panel shall operate pursuant to rules and procedures adopted by the Council and approved by the Supreme Court. Upon a request timely filed by a grievance respondent, the panel shall review a decision by the Grievance Committee that imposes public discipline upon the respondent. The respondent is entitled to be represented by counsel and to appear before

and present oral argument to the grievance review panel. The respondent shall not have the right to compel the attendance of witnesses or the production of books, papers, and other writing and documents. The grievance review panel may concur in the decision of the Grievance Committee or may remand the grievance file to the Grievance Committee with its recommendation for a different disposition. Upon remand, the Grievance Committee may affirm its decision or may impose a different disposition of the grievance file. All proceedings of the grievance review panel are confidential. Documents, papers, recordings, electronic records, or other documentary materials in the possession of the grievance review panel are confidential and are not public records within the meaning of Chapter 132 of the General Statutes.

(d) Any attorney subject to the disciplinary jurisdiction of the Council as provided in subsection (a) of this section who is convicted of or has tendered and has had accepted, a plea of guilty or no contest to, a criminal offense showing professional unfitness, may be disciplined based upon the conviction, without awaiting the outcome of any appeals of the conviction. An order of discipline based solely upon a conviction of a criminal offense showing professional unfitness shall be vacated immediately upon receipt by the Secretary of the North Carolina State Bar of a certified copy of a judgment or order reversing the conviction. The fact that the attorney's criminal conviction has been overturned on appeal shall not prevent the North Carolina State Bar from conducting a disciplinary proceeding against the attorney based upon the same underlying facts or events that were the subject of the criminal proceeding.

(d1) An attorney who is disciplined as provided in subsection (d) of this section may petition the court in the trial division in the judicial district where the conviction occurred for an order staying the disciplinary action pending the outcome of any appeals of the conviction. The court may grant or deny the stay in its discretion upon such terms as it deems proper. A stay of the disciplinary action by the court shall not prevent the North Carolina State Bar from going forward with a disciplinary proceeding against the attorney based upon the same underlying facts or events that were the subject of the criminal proceeding.

(e) Any attorney subject to the disciplinary jurisdiction of the Council as provided in subsection (a) of this section who is disciplined in another jurisdiction shall be subject to the same discipline in this State: Provided, that the discipline imposed in the other jurisdiction does not exceed that provided for in subsection (c) of this section and that the attorney was not deprived of due process in the other jurisdiction.

(f) Upon application by the North Carolina State Bar, misconduct by an attorney subject to the disciplinary jurisdiction of the Council as provided in subsection (a) of this section may be restrained or enjoined where the necessity for prompt action exists regardless of whether a disciplinary proceeding in the matter of the conduct is pending. The application shall be filed in the Superior Court of Wake County and shall be governed by the procedure set forth in G.S. 1A-1, Rule 65.

(g) Any member of the North Carolina State Bar may be transferred to disability inactive status for mental incompetence, physical disability, or substance abuse interfering with the attorney's ability to competently engage in the practice of law under the rules and procedures the Council adopts pursuant to G.S. 84-23.

(h) There shall be an appeal of right by either party from any final order of the Disciplinary Hearing Commission to the North Carolina Court of Appeals. Review by the appellate division shall be upon matters of law or legal inference. The procedures governing any appeal shall be as provided by statute or court rule for appeals in civil cases. A final order which imposes disbarment or suspension for 18 months or more shall not be stayed except upon application, under the rules of the Court of Appeals, for a writ of supersedeas. A final order imposing suspension for less than 18 months or any other discipline except disbarment shall be stayed pending determination of any appeal of right.

(i) The North Carolina State Bar may invoke the process of the General Court of Justice to enforce the powers of the Council or any committee to which the Council delegates its authority.

(j) The North Carolina State Bar may apply to appropriate courts for orders necessary to protect the interests of clients of missing, suspended, disbarred, disabled, or deceased attorneys.

The senior regular resident judge of the superior court of any district wherein a member of the North Carolina State Bar resides or maintains an office shall have the authority and power to enter orders necessary to protect the interests of the clients, including the authority to order the payment of compensation by the member or the estate of a deceased or disabled member to any attorney appointed to administer or conserve the law practice of the member. Compensation awarded to a member serving under this section awarded from the estate of a deceased member shall be considered an administrative expense of the estate for purposes of determining priority of payment.

**N.C.G.S. § 84-37**

**State Bar may investigate and enjoin unauthorized activities**

(a) The Council or any committee appointed by it for that purpose may inquire into and investigate any charges or complaints of (i) unauthorized or unlawful practice of law or (ii) the use of the designations, "North Carolina Certified Paralegal," "North Carolina State Bar Certified Paralegal," or "Paralegal Certified by the North Carolina State Bar Board of Paralegal Certification," by individuals who have not been certified in accordance with the rules adopted by the North Carolina State Bar. The Council may bring or cause to be brought and maintained in the name of the North Carolina State Bar an action or actions, upon information or upon the complaint of any person or entity against any person or entity that engages in rendering any legal service, holds himself or herself out as a North Carolina certified paralegal by use of the designations set forth in this subsection, or makes it a practice or business to render legal services that are unauthorized or prohibited by law. No bond for cost shall be required in the proceeding.

(b) In an action brought under this section, the final judgment if in favor of the plaintiff shall perpetually restrain the defendant or defendants from the commission or continuance of the unauthorized or unlawful act or acts. A temporary injunction to restrain the commission or continuance of the act or acts may be granted upon proof or by affidavit, that the defendant or defendants have violated any of the laws applicable to unauthorized or unlawful practice of law or the unauthorized use of the designations set forth in subsection (a) of this section or any other designation implying certification by the State Bar. The provisions of law relating generally to injunctions as provisional remedies in actions shall apply to a temporary injunction and the proceedings for temporary injunctions.

(c) The venue for actions brought under this section shall be the superior court of any county in which the relevant acts are alleged to have been committed or in which there appear reasonable grounds that they will be committed in the county where the defendants in the action reside, or in Wake County.

(d) The plaintiff in the action shall be entitled to examine the adverse party and witnesses before filing complaint and before trial in the same manner as provided by law for examining parties.

(e) This section shall not repeal or limit any remedy now provided in cases of unauthorized or unlawful practice of law. Nothing contained in this section shall be construed as disabling or abridging the inherent powers of the court in these matters.

(f) The Council or its duly appointed committee may issue advisory opinions in response to inquiries from members or the public regarding whether contemplated conduct would constitute the unauthorized practice of law.

**North Carolina Administrative Code**

**Title 27. North Carolina State Bar**

**Chapter 1. Rules and Regulations of the North Carolina State Bar**

**Subchapter 1G. [No Title]**

**Section 0.100. The Plan for Certification of Paralegals**

## 27 N.C. Admin. Code § 01G.0101

### Purpose

The purpose of this plan for certification of paralegals (plan) is to assist in the delivery of legal services to the public by identifying individuals who are qualified by education and training and have demonstrated knowledge, skill, and proficiency to perform substantive legal work under the direction and supervision of a licensed lawyer, and including any individual who may be otherwise authorized by applicable state or federal law to provide legal services directly to the public; and to improve the competency of those individuals by establishing mandatory continuing legal education and other requirements of certification.

**North Carolina Administrative Code**

**Title 27. North Carolina State Bar**

**Chapter 3. Rules Governing Admission to the Practice of Law in the State of North Carolina**

**Section 0.500. Requirement for Applicants**

**27 N.C. Admin. Code § 03.0501**

**Requirements for General Applicants**

As a prerequisite to being licensed by the Board to practice law in the State of North Carolina, a general applicant shall:

(1) possess the qualifications of character and general fitness requisite for an attorney and counselor-at- law, and be of good moral character and entitled to the high regard and confidence of the public and have satisfied the requirements of Section .0600 of this Chapter at the time the license is issued;

(2) possess the legal educational qualifications as prescribed in Section .0700 of this Chapter;

(3) be at least 18 years of age;

(4) have filed formal application as a general applicant in accordance with Section .0400 of this Chapter;

(5) pass the written bar examination prescribed in Section .0900 of this Chapter, provided that an applicant who has failed to achieve licensure for any reason within three years after the date of the written bar examination in which the applicant received a passing score will be required to take and pass the examination again before being admitted as a general applicant;

(6) have taken and passed the Multistate Professional Responsibility Examination within the 24 month period next preceding the beginning day of the written bar examination which applicant passes as prescribed above, or shall take and pass the Multistate Professional Responsibility Examination within the 12 month period thereafter; the time limits are tolled for a period not exceeding four years for any applicant who is a servicemember as defined in the Servicemembers Civil Relief Act, 50 U.S.C. Appx. § 511, while engaged in active service as defined in 10 U.S.C. § 101, and who provides a letter or other communication from the servicemember's commanding officer stating that the servicemember's current military duty prevents attendance for the examination, stating that military leave is not authorized for the servicemember at the time of the letter, and stating when the servicemember would be authorized military leave to take the examination.

(7) if the applicant is or has been a licensed attorney, be in good standing in each state, territory of the United Sates, or the District of Columbia, in which the applicant is or has been licensed to practice law and not under any charges of misconduct while the application is pending before the Board.

(a) For purposes of this rule, an applicant is "in good standing" in a jurisdiction if:

(i) the applicant is an active member of the bar of the jurisdiction and the jurisdiction issues a certificate attesting to the applicant's good standing therein; or

(ii) the applicant was formerly a member of the jurisdiction, and the jurisdiction certifies the applicant was in good standing at the time that the applicant ceased to be a member; and

(b) if the jurisdiction in which the applicant is inactive or was formerly a member will not certify the applicant's

good standing solely because of the non-payment of dues, the Board, in its discretion, may waive such certification from that jurisdiction.

## North Carolina Administrative Code

## Title 27. North Carolina State Bar

## Chapter 3. Rules Governing Admission to the Practice of Law in the State of North Carolina

## Section 0.600. Moral Character and General Fitness

### 27 N.C. Admin. Code § 03.0601

### Burden of Proof

Every applicant shall have the burden of proving that the applicant possesses the qualifications of character and general fitness requisite for an attorney and counselor-at-law, is possessed of good moral character, and is entitled to the high regard and confidence of the public.

## North Carolina Administrative Code

## Title 27. North Carolina State Bar

## Chapter 3. Rules Governing Admission to the Practice of Law in the State of North Carolina

## Section 0.700. Educational Requirements

### 27 N.C. Admin. Code § 03.0702

### Legal Education

Every applicant applying for admission to practice law in the State of North Carolina, before being granted a license to practice law, shall prove to the satisfaction of the Board that said applicant has graduated from a law school approved by the Council of The North Carolina State Bar or that said applicant will graduate within 30 days after the date of the written bar examination from a law school approved by the Council of the North Carolina State Bar. There shall be filed with the Executive Director a certificate of the dean, or other proper official of said law school, certifying the date of the applicant's graduation. A list of the approved law schools is available in the office of the Executive Director.

## North Carolina Rules of Professional Conduct

### N.C. R. Prof'l Conduct, Rule 1.1

### Competence

A lawyer shall not handle a legal matter that the lawyer knows or should know he or she is not competent to handle without associating with a lawyer who is competent to handle the matter. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

**N.C. R. Prof'l Conduct, Rule 1.6**

**Confidentiality of Information**

(a) A lawyer shall not reveal information acquired during the professional relationship with a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b).

(b) A lawyer may reveal information protected from disclosure by paragraph (a) to the extent the lawyer reasonably believes necessary:

(1) to comply with the Rules of Professional Conduct, the law or court order;

(2) to prevent the commission of a crime by the client;

(3) to prevent reasonably certain death or bodily harm;

(4) to prevent, mitigate, or rectify the consequences of a client's criminal or fraudulent act in the commission of which the lawyer's services were used;

(5) to secure legal advice about the lawyer's compliance with these Rules;

(6) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client; to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved; or to respond to allegations in any proceeding concerning the lawyer's representation of the client;

(7) to comply with the rules of a lawyers' or judges' assistance program approved by the North Carolina State Bar or the North Carolina Supreme Court; or

(8) to detect and resolve conflicts of interest arising from the lawyer's change of employment or from changes in the composition or ownership of a firm, but only if the revealed

information would not compromise the attorney-client privilege or otherwise prejudice the client.

(c) A lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client.

(d) The duty of confidentiality described in this Rule encompasses information received by a lawyer then acting as an agent of a lawyers' or judges' assistance program approved by the North Carolina State Bar or the North Carolina Supreme Court regarding another lawyer or judge seeking assistance or to whom assistance is being offered. For the purposes of this Rule, "client" refers to lawyers seeking assistance from lawyers' or judges' assistance programs approved by the North Carolina State Bar or the North Carolina Supreme Court.

## N.C. R. Prof'l Conduct, Rule 5.3

## Responsibilities Regarding Nonlawyer Assistance

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a) a principal, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm or organization shall make reasonable efforts to ensure that the firm or organization has in effect measures giving reasonable assurance that the nonlawyer's conduct is compatible with the professional obligations of the lawyer;

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the nonlawyer's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a nonlawyer that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

> (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
>
> (2) the lawyer is a principal or has comparable managerial authority in the law firm or organization in which the person is employed, or has direct supervisory authority over the nonlawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action to avoid the consequences.

Comment

[1] Paragraph (a) requires lawyers with managerial authority within a law firm or organization to make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that nonlawyers in the firm and nonlawyers outside the firm who work on firm matters act in a way compatible with the professional obligations of the lawyer.

See Comment [6] to Rule 1.1 (retaining lawyers outside the firm) and Comment [1] to Rule 5.1 (responsibilities with respect to lawyers within a firm). Paragraph (b) applies to lawyers who have supervisory authority over such nonlawyers within or outside the firm. Paragraph (c) specifies the circumstances in which a lawyer is responsible for the conduct of such nonlawyers within or outside the firm that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer.

[2] Lawyers generally employ assistants in their practice, including secretaries, investigators, law student interns, and paraprofessionals. Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. A lawyer must give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to representation of the client, and should be responsible for their work product. The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline.

Nonlawyers Outside the Firm

[3] A lawyer may use nonlawyers outside the firm to assist the lawyer in rendering legal services to the client. Examples include the retention of an investigative or paraprofessional service, hiring a document management company to create and maintain a database for complex litigation, sending client documents to a third party for printing or scanning, and using an Internet-based service to store client information. When using such services outside the firm, a lawyer must make reasonable efforts to ensure that the services are provided in a manner that is compatible with the lawyer's professional obligations and, depending upon the risk of unauthorized disclosure of confidential client information, should consider whether client consent is required. See Rule 1.1, cmt. [7]. The extent of this obligation will depend upon the circumstances, including the education, experience, and reputation of the nonlawyer; the nature of the services involved; the terms of any arrangements concerning the protection of client information; and the legal and ethical environments of the jurisdictions in which the services will be performed, particularly with regard to confidentiality. See also

Rules 1.1 (competence), 1.2 (allocation of authority), 1.4 (communication with client), 1.6 (confidentiality), 5.4(a)(professional independence of the lawyer), and 5.5(a)(unauthorized practice of law). When retaining or directing a nonlawyer outside the firm, a lawyer should communicate directions appropriate under the circumstances to give reasonable assurance that the nonlawyer's conduct is compatible with the professional obligations of the lawyer.

[4] Where the client directs the selection of a particular nonlawyer service provider outside the firm, the lawyer ordinarily should agree with the client concerning the allocation of responsibility for monitoring as between the client and the lawyer. See Rule 1.2. When making such an allocation in a matter pending before a tribunal, lawyers and parties may have additional obligations that are a matter of law beyond the scope of these rules.

[5] A lawyer who discovers that a nonlawyer has wrongfully misappropriated money from the lawyer's trust account must inform the North Carolina State Bar pursuant to Rule 1.15-2(o).