**No. 25-1038**

In the
# United States Court of Appeals
for the Fourth Circuit

**MORAG BLACK POLASKI**; **SHAWANA ALMENDAREZ**; **NORTH CAROLINA JUSTICE FOR ALL PROJECT**,

*Plaintiffs–Appellants,*

*v.*

**ERNIE LEE**, in his official capacity as District Attorney for the 5th Prosecutorial District of the State of North Carolina; **NANCY LORRIN FREEMAN**, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; **ASHLIE SHANLEY**, in her official capacity as District Attorney for the 25th Prosecutorial District of the State of North Carolina; S**PENCER B. MERRIWEATHER, III**, in his official capacity as District Attorney for the 26th Prosecutorial District of the State of North Carolina; **KATHERINE ANN FRYE**, in her official capacity as President of the North Carolina State Bar and Chair of the Executive Committee of the North Carolina State Bar; **JASON W. SMITH**, in his official capacity as District Attorney for the 6th Prosecutorial District of the State of North Carolina,

*Defendants–Appellees.*

**On Appeal from the United States District Court for the Eastern District of North Carolina**

---

## REPLY BRIEF OF APPELLANTS

---

Vince Eisinger
CRANFILL SUMNER LLP
5420 Wade Park Blvd., Suite 300
Raleigh, NC 27607
(919) 863-8703

Paul M. Sherman
Christian W. Lansinger
INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320

*Counsel for Plaintiffs–Appellants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................ iv

INTRODUCTION ........................................................ 1

ARGUMENT ........................................................ 3

I. Under the Court's precedent, the Supreme Court's ruling in *Chiles* has displaced the mode of analysis used in *CAI* and *360 Virtual Drone* ........................................................ 3

A. This Circuit's prior-panel rule requires the Court to follow the reasoning of an intervening Supreme Court decision, not merely distinguish its facts ........................................................ 4

B. The propositions necessary to affirm cannot be reconciled with *Chiles* ........................................................ 7

C. The government's efforts to reconcile *CAI* and *360 Virtual Drone* with *Chiles* all rely on reasoning *Chiles* rejected ...... 12

II. North Carolina's advice ban is content based, and no recognized exception removes it from ordinary First Amendment scrutiny ........................................................ 17

A. A law does not become content neutral because it regulates every viewpoint on a prohibited subject equally .................. 18

B. *City of Austin* does not transform legal subject matter into a neutral "manner" restriction ........................................................ 20

C. Neither recognized exception for professional speech applies ........................................................ 22

D. The government does not answer Plaintiffs' showing that no historical exception applies ........................................................ 23

III. Because the First Amendment applies, this case cannot be dismissed at the pleadings stage ..... 25

A. *Reynolds* and *Billups* require evidence that the restriction fits the State's asserted interests ..... 26

B. The government's own arguments show why fit cannot be resolved on a motion to dismiss ..... 29

IV. JFAP independently states a free speech claim ..... 32

CONCLUSION ..... 34

CERTIFICATE OF COMPLIANCE ..... 36

# TABLE OF AUTHORITIES

Page(s)

**CASES**


*360 Virtual Drone Servs. LLC v. Ritter*,
102 F.4th 263 (4th Cir. 2024) .............................................. 2, 9, 10, 26

*Billups v. City of Charleston*,
961 F.3d 673 (4th Cir. 2020) ...................................................... 27, 28

*Brokamp v. District of Columbia*,
836 F. Supp. 3d 116 (D.D.C. 2026) .................................................. 15

*Buckley v. Am. Const. L. Found., Inc.*,
525 U.S. 182 (1999) ............................................................................ 5

*Cap. Associated Indus., Inc. v. Stein*,
922 F.3d 198 (4th Cir. 2019) .................................................... 2, 9, 33

*Chesapeake & Ohio Ry. Co. v. Schwalb*,
493 U.S. 40 (1989) .............................................................................. 6

*Chiles v. Salazar*,
116 F.4th 1178 (10th Cir. 2024) ................................................. 10–11

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ............................................................... *passim*

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) ......................................................................... 18, 20

*Crownholm v. Moore*,
No. 23-15138, 2024 WL 1635566 (9th Cir. Apr. 16, 2024),
*cert. denied*, 146 S. Ct. 2567, 224 L. Ed. 2d 496 (2026) ...................... 17

*Etheridge v. Norfolk & W. Ry. Co.*,
9 F.3d 1087 (4th Cir. 1993) .............................................................. 5, 6

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) .................... 8, 9, 12, 13

*In re Primus*,
436 U.S. 412 (1978) .................... 33

*Kingsley v. Hendrickson*,
576 U.S. 389 (2015) .................... 7

*Lux v. Judd*,
651 F.3d 396 (4th Cir. 2011) .................... 4, 5

*MacDonald v. President of N.J. State Bd. of Med. Exam'rs*,
No. 25-2090 (3d Cir. Aug. 31, 2026) .................... 13, 14, 19–21, 25

*McCullen v. Coakley*,
573 U.S. 464 (2014) .................... 28

*Meyer v. Grant*,
486 U.S. 414 (1988) .................... 5

*NAACP v. Button*,
371 U.S. 415 (1963) .................... 33

*Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Castille*,
799 F.3d 216 (3d Cir. 2015) .................... 13–14

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) .................... 14, 22

*Qingyun Li v. Holder*,
666 F.3d 147 (4th Cir. 2011) .................... 6

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .................... 18

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015) .................... 27–30

*Short v. Hartman*,
87 F.4th 593 (4th Cir. 2023) .................................................... 4, 7, 16

*Teague v. Lane*,
489 U.S. 288 (1989) ............................................................................ 17

*United States v. Carver*,
260 U.S. 482 (1923) ............................................................................ 17

*United States v. Stevens*,
559 U.S. 460 (2010) ............................................................................ 24

*Upsolve, Inc. v. James*,
155 F.4th 133 (2d Cir. 2025) ............................................................. 21

*Wag More Dogs, LLC v. Cozart*,
680 F.3d 359 (4th Cir. 2012) ......................................................... 28, 29

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I ........................................................... *passim*

**RULES AND STATUTES**

N.C. Gen. Stat. § 84-2.2 ........................................................................ 31

N.C. Gen. Stat. § 84-23(a) ..................................................................... 31

## INTRODUCTION

North Carolina publishes court forms so that people can handle evictions, divorces, protective orders, and probate matters without a lawyer. It then makes it a crime for anyone who is not a lawyer to tell a person which box on the form applies to her. Shawana Almendarez spent years running the court system's own self-service clinics for pro se litigants, where, because she is not a lawyer, she declined questions she knew the answers to. JA 27. Morag Black Polaski has completed these forms under attorney supervision for more than twenty years. JA 27. Either may describe a form in general terms to anyone who will listen. Neither may answer the question the person across the table actually asked. This same prohibition prevents the North Carolina Justice for All Project (JFAP) from providing free advice about these forms to North Carolinians who cannot afford a lawyer.

This appeal asks whether that prohibition regulates speech. As explained in Plaintiffs' opening brief, the answer is yes—talking to people and giving them advice, no matter the subject, is speech within the scope of the First Amendment's protection. Regulations that single out that

speech for disfavored treatment, including laws that prohibit speech by unlicensed speakers, are thus presumptively unconstitutional.

The government resists this conclusion, arguing that this case involves only "professional conduct" that may be regulated without meaningful First Amendment scrutiny. It relies principally on this Court's earlier rulings in *Capital Associated Industries v. Stein* (*CAI*), 922 F.3d 198 (4th Cir. 2019), and *360 Virtual Drone Services LLC v. Ritter*, 102 F.4th 263 (4th Cir. 2024). But the government's reliance on those cases cannot be reconciled with the Supreme Court's intervening decision in *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), which held that the ordinary rules for distinguishing speech from conduct and content-based laws from content-neutral laws apply in the professional context too.

The threshold issue is therefore whether this panel remains bound by *CAI* and *360 Virtual Drone* insofar as those cases classify North Carolina's UPL prohibition as a regulation of "professional conduct" even when applied to pure advice, and review that restriction under a lower form of intermediate scrutiny than would otherwise apply. Under this Court's prior-panel rule, it is not. Those holdings depend on a mode of analysis that *Chiles* rejected and hence are abrogated.

That conclusion resolves this appeal. Under the standard of review required by Supreme Court precedent, Plaintiffs have stated a First Amendment claim. The government cannot carry its burden at the motion-to-dismiss stage. The district court's contrary holding was error.

The Court should reverse and remand.

## ARGUMENT

### I. Under the Court's precedent, the Supreme Court's ruling in *Chiles* has displaced the mode of analysis used in *CAI* and *360 Virtual Drone*.

As explained in Section A, this Court's prior-panel rule holds that a ruling by the U.S. Supreme Court abrogates an earlier decision by this Circuit when it rejects the reasoning or analytical premise on which the earlier decision depended. As explained in Section B, *Chiles* does exactly that to the propositions from *CAI* and *360 Virtual Drone* that the district court relied on in dismissing this case and that the government urges this Court to reaffirm here. Finally, as explained in Section C, the government's efforts to reconcile *CAI* and *360 Virtual Drone* with *Chiles* all fail, because they all employ modes of analysis that the Supreme Court expressly rejected in *Chiles*.

### A. This Circuit's prior-panel rule requires the Court to follow the reasoning of an intervening Supreme Court decision, not merely distinguish its facts.

The parties agree that this appeal turns largely on this Circuit's prior-panel rule. The government relies heavily on *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023), which states that Circuit precedent remains binding unless it is "impossible to reconcile" with an intervening Supreme Court decision and that a panel "must" adopt a harmonious reading if one exists. Resp. Br. 32–33. True enough. But this Court's cases make clear what that standard means in practice. A later Supreme Court decision need not involve the same statute or facts, nor must it expressly overrule the earlier circuit case. What matters is whether the Supreme Court has rejected the reasoning or analytical premise on which the Circuit precedent depended.

This Court's ruling in *Lux v. Judd*, another First Amendment case, is especially instructive. 651 F.3d 396 (4th Cir. 2011). There, this Court considered a state law requiring petition signatures to be witnessed by a registered voter from the district where the signatures were gathered. An earlier Fourth Circuit decision had upheld a district-residency requirement for petition witnesses because it supposedly helped

demonstrate local grassroots support. *Id.* at 402–03. But the Supreme Court later considered different petition restrictions in *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), and rejected grassroots support as a sufficient rationale for restricting petition circulation. *Lux*, 651 F.3d at 403–04. The restrictions were not identical. *Meyer* concerned a ban on paying petition circulators; *Buckley* concerned, among other things, a requirement that circulators be registered voters. Yet although neither case addressed "the particular witness residency requirement at issue," this Court held that the rationale of its earlier decision had been superseded and remanded for an independent constitutional analysis. *Id.* at 404.

*Lux* did not break new ground. It applied the same standard this Court has applied for decades. Consider *Etheridge v. Norfolk & Western Railway Co.*, 9 F.3d 1087 (4th Cir. 1993). There, this Court considered whether a railroad employee injured while moving a railcar toward a pier was engaged in "maritime employment." An earlier Fourth Circuit decision, under nearly identical facts, had treated the traditional nature of the employee's occupation as important to that inquiry. *Id.* at 1090.

Later, however, the Supreme Court held in *Chesapeake & Ohio Railway Co. v. Schwalb*, 493 U.S. 40 (1989), that the traditional nature of the occupation "makes no difference." *Etheridge*, 9 F.3d at 1090 (cleaned up). Because *Schwalb* had "specifically repudiated the reasoning" on which this Court's earlier decision rested, this Court held that decision "no longer controlling." *Id.* at 1090–91. The conflict was methodological: the Supreme Court had declared irrelevant a consideration the earlier panel treated as important and supplied a different inquiry.

The converse is also true. In *Qingyun Li v. Holder*, this Court declined to find abrogation because the intervening Supreme Court decision, although relevant to the broader legal landscape, had not rejected the reasoning of the earlier Circuit cases "either expressly or implicitly." 666 F.3d 147, 150–51 (4th Cir. 2011). The question is thus not whether a later Supreme Court decision is merely related. It is whether that decision displaces the reasoning that made the earlier Circuit rule controlling.

And *Short* confirms that this focus on reasoning remains the rule today. There, Circuit precedent required pretrial detainees asserting deliberate-indifference claims to prove a subjective state of mind. The

intervening Supreme Court decision, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), addressed excessive force, not deliberate indifference. *Short* nevertheless held this Court's precedent abrogated because *Kingsley* reaffirmed an older Supreme Court rule and repudiated the premise on which this Court's later cases had relied in departing from it. 87 F.4th at 606, 611–14. This Court refused to read *Kingsley* as addressing excessive force and "nothing more, nothing less," because courts "cannot avoid the conflict" with an intervening Supreme Court decision "by ignoring [its] rationale." *Id.* at 610.

These cases thus frame the inquiry here. The question is not whether *Chiles* involved unauthorized practice of law or expressly overruled *CAI* or *360 Virtual Drone*. It is whether *Chiles* rejected the reasoning or mode of analysis employed in those cases. As the following section will explain, *Chiles* did exactly that, so those earlier rulings no longer bind this panel.

### B. The propositions necessary to affirm cannot be reconciled with *Chiles*.

*Chiles* forecloses the district court's reliance on *CAI* and *360 Virtual Drone* for the conclusion that North Carolina's UPL laws regulate only professional conduct as applied to Plaintiffs. As applied to pure legal

advice, the mode of analysis in those cases cannot be reconciled with the mode of analysis *Chiles* requires.

Start with *Chiles*. There, Colorado made essentially the same argument the government makes here and the district court accepted below: It characterized talk therapy as professional conduct that only incidentally involved speech. But *Chiles* rejected that relabeling. "The First Amendment is no word game." 146 S. Ct. at 1023. For First Amendment purposes, what mattered was that, as applied to the plaintiff, "[a]ll [she] does is speak—and, as far as she is concerned, speech is all Colorado seeks to regulate." *Id.* at 1025.

The Court then delineated the limits of the incidental-speech doctrine. Pure speech does not become "incidental" merely because it is subject to broader professional regulation. Instead, speech is incidental to conduct only when it is integrally related to independently unlawful conduct, or when expressive conduct is regulated for reasons unrelated to its message. *Chiles*, 146 S. Ct. at 1025–26.

*Chiles* further confirmed that, even in the professional context, the speech/conduct inquiry follows *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28 (2010). *Holder* asks whether "the conduct triggering

coverage under the statute consists of communicating a message." *Id.* at 28. There, the plaintiffs could impart "general or unspecialized knowledge" but not a "specific skill" or "specialized knowledge"; because liability "depend[ed] on what they say," the challenged application was content based. *Id.* at 27. That is the same as-applied inquiry *Chiles* reaffirmed.

That is not the mode of analysis employed in either *CAI* or *360 Virtual Drone*. *CAI* did not ask whether the challenged application was triggered by speech or whether that speech was incidental to some independently unlawful conduct. It reasoned instead that "any impact the UPL statutes have on speech is incidental to the overarching purpose of regulating who may practice law." 922 F.3d at 207. Nor did *360 Virtual Drone* simply ask what triggered the challenged application. It identified "guideposts" for classifying professional speech as conduct, asking among other things whether the activity carries legal, health, economic, or public-safety consequences, whether the speech occurs in a traditionally public sphere, and whether the regulation threatens unpopular or dissenting speech. *360 Virtual Drone*, 102 F.4th at 272–76. Applying those guideposts, the Court described the UPL restriction upheld in *CAI*

as a "classic regulation of conduct with an incidental burden on speech." *Id.* at 275.

The government emphasizes that *CAI* itself involved giving legal advice, answering legal questions, and preparing documents, without appearing in court. Resp. Br. 30–32. True enough. But that similarity does not resolve the conflict with *Chiles*. It makes the conflict unavoidable. *CAI* treated the restriction on that speech as incidental because the UPL statutes more broadly regulate who may practice law. *Chiles* rejected that mode of analysis. The question is not whether the broader profession includes conduct. It is whether the challenged application regulates speech. Here, it does.

And the conflict extends beyond *CAI* to *360 Virtual Drone*. Unlike that decision, *Chiles* did not ask whether talk therapy had health consequences or occurred in a traditional public sphere. Indeed, the reasoning in *CAI* and *360 Virtual Drone* closely resembles the Tenth Circuit analysis the Supreme Court reversed. The Tenth Circuit had reasoned that "[t]he subject of these regulations is the professional care that mental health providers give their patients. That is, undoubtedly, professional conduct." *Chiles v. Salazar*, 116 F.4th 1178, 1205 (10th Cir.

2024), *rev'd*, 146 S. Ct. 1010 (2026). The Supreme Court instead asked whether, in the case before it, the law regulated speech with a particular content.

In short, *Chiles* supplies the controlling mode of analysis. Under *Chiles* and *Holder*, when the conduct triggering the challenged application consists of communicating a message, the law regulates speech. Under *CAI* and *360 Virtual Drone*, as the government reads them, that same fact is not enough because courts must still ask whether the speech is professional, consequential, private, or uncontroversial. Those tests cannot both govern this case.

Recognizing that conflict does not require overruling *CAI* or *360 Virtual Drone* in their entirety. Those cases remain good law to the extent their reasoning survives *Chiles*. North Carolina thus remains free to regulate the many noncommunicative incidents of legal practice Plaintiffs do not challenge: appearing in court for another, exercising agency authority, holding client funds, signing filings as counsel, and other acts carrying independent legal effect. JA 38–41. But where, as here, the law applies to pure advice because of what the speaker says,

*Chiles* controls. Under *Chiles*, the question is what the law regulates in the application before the Court. Here, the answer is words.

### C. The government's efforts to reconcile *CAI* and *360 Virtual Drone* with *Chiles* all rely on reasoning *Chiles* rejected.

The government offers several reasons why, notwithstanding *Chiles*, this Court should continue to apply the speech/conduct analysis from *CAI* and *360 Virtual Drone*. None works.

First, the government repeatedly emphasizes that *Chiles* involved viewpoint discrimination. Resp. Br. 33–37, 44–46. But that gets the sequence backwards. *Chiles* first asked whether Colorado regulated speech or conduct. Only after concluding that talk therapy was speech did the Court explain that Colorado went "a step further" by discriminating among viewpoints. 146 S. Ct. at 1024. Viewpoint discrimination made Colorado's law more constitutionally suspect; it did not transform otherwise regulable conduct into speech.

Indeed, *Holder* forecloses that argument. The material-support law there did not discriminate based on whether the government agreed with the speaker's viewpoint. In fact, the speakers there wanted to provide advice only about how terrorist groups could achieve "lawful, nonviolent purposes." 561 U.S. at 8. But even though the viewpoint was surely

agreeable to the State Department, the statute nevertheless forbade the speech through content-based distinctions. It allowed speakers to impart "general or unspecialized knowledge" but prohibited the communication of a "specific skill" or "specialized knowledge." *Id.* at 27. Because liability "depend[ed] on what they say," regardless of viewpoint, the law regulated speech based on content, triggering strict scrutiny. *Id.* at 27–28. *Chiles* expressly reaffirmed that analysis.

Second, the government argues that *Chiles* is different because this case involves licensing. Resp. Br. 34, 40. But that merely restates the reasoning *Chiles* rejected. A State's authority to license a profession does not answer whether a particular application of its licensing law regulates speech.

The Third Circuit's post-*Chiles* decision in *MacDonald v. President of New Jersey State Board of Medical Examiners* makes the point directly. No. 25-2090, slip op. at 6, 13 (3d Cir. Aug. 31, 2026). That case involved a challenge by out-of-state physicians to New Jersey's prohibition on the unlicensed practice of medicine as applied to pure advice. There, New Jersey relied on *National Association for the Advancement of Multijurisdiction Practice v. Castille*, 799 F.3d 216 (3d

Cir. 2015), which upheld bar-admission requirements. But *MacDonald* explained that the power to impose licensing requirements presents "a different kind of First Amendment issue" from "the scope of a state's power to require a license before speaking." Slip op. at 13. "*Castille* did not discuss whether there are aspects of legal practice that constitute speech (of course there are), nor whether a licensure requirement to engage in that speech is a regulation of speech (of course it is)." *Id.* (citation omitted). Thus, the fact that New Jersey had the power to impose admission requirements did not change the fact that "[r]equiring a license to speak is, of course, a regulation of speech." *Id.* at 6. Particularly relevant to this case, the court in *MacDonald* further held that even if its earlier precedent had required diminished scrutiny for the speech aspects of professional practice, the Supreme Court's decisions in *NIFLA* and *Chiles* would require the Third Circuit to revisit that holding. *Id.* at 13.

So too here. Plaintiffs do not challenge North Carolina's authority to decide who may appear in court as a lawyer, hold client funds, bind clients, or perform the many other noncommunicative acts that accompany legal representation. They challenge the State's authority to

prohibit them from speaking. Calling that prohibition a "licensing" requirement does not change what it regulates.

*Brokamp v. District of Columbia* confirms the point. Applying *Chiles* and *Holder* to a licensing restriction on teletherapy, the court found it "clear" that the challenged application regulated "protected speech, not conduct that only incidentally involves speech." 836 F. Supp. 3d 116, 129 (D.D.C. 2026). The government describes *Brokamp* as holding that the licensing regime "regulated conduct." Resp. Br. 47. As to the application before it, the court held the opposite.

Third, the government argues that *360 Virtual Drone*'s guideposts remain consistent with *Chiles* because one of them asks whether a regulation threatens unpopular or dissenting speech. Resp. Br. 44–46. But a test does not become consistent with *Chiles* merely because it correctly identifies one especially obvious First Amendment problem. The question is whether *360 Virtual Drone*'s other guideposts may still be used to classify speech as conduct because it occurs in private, has important consequences, or takes place in a professional setting. *Chiles* answers that question no. Talk therapy had health consequences, occurred privately, and took place within a licensed professional

relationship. Yet because "[a]ll [she] does is speak," the Court treated the challenged application as a regulation of speech. 146 S. Ct. at 1025.

The government emphasizes that *Holder* predates *CAI* and *360 Virtual Drone*. Resp. Br. 37–39. But that is the same argument *Short* rejected. The Supreme Court rule that *Kingsley* reaffirmed likewise predated the Circuit precedent *Short* held abrogated. *Short*, 87 F.4th at 611–15. What mattered was that the intervening Supreme Court decision restored the governing mode of analysis and thereby undermined the reasoning of this Court's later cases. The same is true here. The question is not whether *Holder* existed when *CAI* was decided. It is whether *Chiles* reaffirmed *Holder* in a way that cannot be reconciled with the analysis the government asks this Court to apply. It did.

Nor does the government's appeal to "routine percolation" change the result. Resp. Br. 48. The circuits were divided over *Kingsley* when this Court decided *Short*, and this Court nevertheless recognized abrogation at the panel level. *Short*, 87 F.4th at 605 & n.8, 610 n.9. Once Supreme Court precedent rejects the reasoning necessary to extend an earlier Circuit decision, a panel must follow the Supreme Court.

Finally, the government points to denials of certiorari and rehearing in *360 Virtual Drone* and denial of certiorari in *Crownholm*. Resp. Br. 18, 43–44 n.5, 46. But denial of certiorari "imports no expression of opinion upon the merits." *Teague v. Lane*, 489 U.S. 288, 296 (1989) (quoting *United States v. Carver*, 260 U.S. 482, 490 (1923)). Those unexplained orders do not alter what *Chiles* holds or its implications for this Circuit's precedent.

The government's proposed reconciliations thus all suffer from the same problem: each finds some reason to treat professional advice differently from other speech—because it is licensed, consequential, private, or viewpoint neutral. *Chiles* rejected that mode of analysis. As applied to Plaintiffs, North Carolina prohibits speech because of what Plaintiffs propose to say. That is a speech restriction, and it must be reviewed as one.

## II. North Carolina's advice ban is content based, and no recognized exception removes it from ordinary First Amendment scrutiny.

Once the abrogation question is resolved, the remaining First Amendment analysis is straightforward. North Carolina permits Plaintiffs to discuss law generally but prohibits them from giving

individualized advice about another person's legal rights. That is a subject-matter restriction. Opening Br. 30–35.

The government responds that the law is content neutral because licensed or supervised speakers may give any legal advice they want, and because *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), permits some examination of speech under content-neutral laws. Neither argument works. Nor has the government shown that Plaintiffs' speech fits into some other recognized exception to ordinary First Amendment scrutiny or provided a historical basis for departing from that ordinary scrutiny.

### A. A law does not become content neutral because it regulates every viewpoint on a prohibited subject equally.

Seeking to avoid the conclusion that North Carolina's law is content-based, the government emphasizes that North Carolina does not care which legal view Plaintiffs express. Resp. Br. 36–37, 43. But this argument confuses content neutrality with viewpoint neutrality. *See Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015). *Reed* explains that laws singling out categories of speech based on "subject matter" are content based regardless of whether they discriminate among viewpoints.

*Chiles* confirms the point. A law regulating talk therapy "trains directly on the content of . . . speech," 146 S. Ct. at 1026, and "[a]s a general rule, such 'content-based' restrictions trigger 'strict scrutiny,'" *id.* at 1021. To be sure, Colorado's law then went "a step further" by discriminating among viewpoints. *Id.* at 1024. That made the discrimination more obvious, but it was not what made the law content based in the first place.

The Third Circuit's post-*Chiles* decision in *MacDonald* confirms the point. There, the parties agreed that New Jersey's physician-licensing law was not viewpoint based. But the Third Circuit held that this did not make the law content neutral: "[W]hile less inimical to the free speech right than viewpoint-based laws, a law whose application turns on 'the topic discussed or the idea or message expressed' still threatens free speech and is normally subject to strict scrutiny." Slip op. at 7. Because New Jersey prohibited unlicensed speakers from offering "expert advice," *id.* at 6, 9, including "recommended courses of medical treatment," *id.* at 8, the law was content based despite being viewpoint neutral.

The same distinction applies here. In North Carolina, a person may discuss housing conditions, family problems, finances, politics, or the

court system. She may give general legal information. But if she tells a tenant what the law means for the tenant's eviction answer, or tells a domestic-violence victim which facts matter to the victim's protective-order application, the UPL prohibition applies. Opening Br. 30–32. The subject matter and individualized character of the message are elements of the restriction. That is a content-based restriction.

### B. *City of Austin* does not transform legal subject matter into a neutral "manner" restriction.

The government next invokes *City of Austin* for the proposition that a law may remain content neutral even if its enforcement requires officials to examine the content of speech. Resp. Br. 42–43. But the government overreads that decision. *City of Austin* did not disturb the rule that "overt subject-matter discrimination is facially content based." 596 U.S. at 74. It recognized only that officials may sometimes refer to content to determine whether speech satisfies a criterion unrelated to its message, such as an on-/off-premises distinction.

Here again, *MacDonald* is instructive. The Third Circuit held that *City of Austin* did not save New Jersey's physician-licensing law from being content-based. That is because the law at issue in *City of Austin* "made no distinctions based on topic, message, idea, or subject matter as

such," and "the only reason a regulator needed to know the sign's content was to make that location-based determination." Slip op. at 8. By contrast, when a licensing law turns on medical or legal advice, "[t]he content is not merely a tool for ascertaining some other content-neutral criterion like purpose or physical location." *Id.* at 9–10. The "speaker's message is itself the relevant criterion." *Id.* at 9. North Carolina prohibits Plaintiffs' speech because of what it communicates to listeners. Again, that is a content-based restriction.

Nor does the Second Circuit's decision in *Upsolve, Inc. v. James*, 155 F.4th 133 (2d Cir. 2025), support the government's position. *See* Resp. Br. 43–44 n.5. *Upsolve* treated New York's prohibition on unlicensed legal advice as content neutral because it regulated the professional purpose and context of the speech rather than its message. 155 F.4th at 143–44. But *Upsolve* predates *Chiles*. And as *MacDonald* subsequently explained, a licensing law is content based when the speaker's message itself determines whether the law applies, even if the law also imposes conditions based on the speaker's status or professional setting. Slip op. at 8–11. That is precisely how North Carolina's UPL prohibition operates.

### C. Neither recognized exception for professional speech applies.

The opening brief explained that *NIFLA* and *Chiles* recognize only two circumstances in which professional speech may receive less than ordinary First Amendment protection. Opening Br. 32–35. The government does not contend that the first—compelled disclosure of factual, noncontroversial information—applies.

As for the second, the government does invoke *Chiles*'s rule for laws regulating conduct that only incidentally burden speech. Resp. Br. 35–37. But its only reason for placing this case within that exception is the *CAI*/*360 Virtual Drone* conduct analysis that *Chiles* rejected. Once that premise falls, there is no independently regulated conduct left.

As the opening brief explains, Plaintiffs do not seek to appear in court, hold client funds, bind clients, sign filings as counsel, or perform any other independently regulable act. Opening Br. 33–35. Their clients will remain pro se and will complete and file their own court-created forms. Plaintiffs seek only to give them advice. And the State cannot make that advice "incidental" to unlawful conduct simply by defining the advice itself as the unlawful practice of law. *Chiles*, 146 S. Ct. at 1025–

26. There is therefore no recognized exception that removes Plaintiffs' speech from ordinary First Amendment scrutiny.

### D. The government does not answer Plaintiffs' showing that no historical exception applies.

Finally, the opening brief explained that history supplies no previously unrecognized exception for this speech. Opening Br. 35–40. Of course, Plaintiffs do not contend that lawyer regulation is new. Instead, they argued—and showed—that broad prohibitions on nonlawyers giving out-of-court legal advice are new. In the colonial period, nonlawyers openly gave legal advice and prepared legal documents. *Id.* at 36–37. Early American regulation concentrated on admission, courtroom conduct, discipline, and litigation-related abuses. *Id.* at 37–38. From 1870 through 1920, "most" UPL statutes addressed courtroom appearances, while nonlawyers kept providing law-related services outside court. *Id.* at 38–39. Broad campaigns against out-of-court nonlawyer practice—pushed by the organized bar—expanded only in the late 1920s and 1930s. *Id.* at 39.

The government does not contest that showing. It identifies no colonial prohibition on pure legal advice, no Founding-era analogue, no nineteenth-century tradition, and no broad pre-twentieth-century rule

reserving out-of-court advice to licensed lawyers. Instead, it cites cases establishing that lawyers have long been licensed and regulated. Resp. Br. 51–53. But *Chiles* specifically warns against defining the tradition at that level of generality. Colorado pointed to a longstanding history of medical regulation. The Court asked instead whether Colorado had shown a tradition supporting the particular speech restriction before it. 146 S. Ct. at 1026–28. It had not.

The government bears the burden of establishing a historical tradition sufficient to remove Plaintiffs' speech from ordinary First Amendment scrutiny. *United States v. Stevens*, 559 U.S. 460, 468–70 (2010); *Chiles*, 146 S. Ct. at 1026–28. It has not done so. Rather than identifying a tradition of prohibiting nonlawyers from giving out-of-court legal advice, the government relies on the undisputed history of lawyer licensing. But those are different propositions. The relevant history is not merely absent from the government's brief; the history Plaintiffs presented affirmatively contradicts the government's position. Ordinary First Amendment scrutiny therefore applies.[1]

---

[1] The government may point to the Third Circuit's conclusion in *MacDonald* that historical tradition justified reviewing New Jersey's physician licensure law with reduced scrutiny as applied to pure speech.

## III. Because the First Amendment applies, this case cannot be dismissed at the pleadings stage.

The district court dismissed this case because it treated North Carolina's prohibition on Plaintiffs' advice as a regulation of professional conduct subject to *CAI*'s relaxed scrutiny. For the reasons explained above, that premise cannot survive *Chiles*. As applied here, North Carolina regulates speech based on its content. Thus, strict scrutiny presumptively applies.

The government makes no effort to satisfy strict scrutiny. Instead, it spends the final portion of its response brief defending the district court's application of the reduced form of intermediate scrutiny applied in *CAI*. Resp. Br. 49–57. But that reduced scrutiny was based on the premise that UPL laws, as applied to pure speech, restrict only professional conduct. Once that reasoning falls away, so does the reduced scrutiny that depends on it.

---

There, however, the panel limited its historical holding to speech the parties agreed fell within the traditional scope of medical practice and expressly declined to consider "what other speech has traditionally been restricted by medical-licensing laws." Slip op. at 21 n.5. Whether *MacDonald* drew the correct inference from that history is beside the point here. The government has supplied no relevant history of regulating out-of-court advice of the sort Plaintiffs wish to provide. Instead, as explained above, the uncontested history runs the other way.

The only possibility then left—besides strict scrutiny—is the ordinary form of intermediate scrutiny that this Court applies in other First Amendment cases. As explained below, that standard requires the State to justify the fit between its restriction and its asserted interests. Nothing in the complaint establishes that fit. To the contrary, Plaintiffs allege facts making narrower alternatives plausible, and the government's arguments about the benefits of lawyer licensing raise factual questions that cannot be resolved against Plaintiffs on a motion to dismiss.

### A. *Reynolds* and *Billups* require evidence that the restriction fits the State's asserted interests.

The government argues that no evidentiary record is necessary because courts may rely on precedent and "common sense" when applying intermediate scrutiny. Resp. Br. 49–51. But that argument depends on the same premise rejected above: that North Carolina's law regulates professional conduct rather than speech.

In *360 Virtual Drone*, this Court recognized two forms of intermediate scrutiny: traditional intermediate scrutiny and the "loosened intermediate-scrutiny test for professional-conduct[]-focused regulations" applied in *CAI*. *360 Virtual Drone*, 102 F.4th at 276. The

government defends North Carolina's UPL laws under that "loosened" test. But, as shown above, that argument no longer works. As applied to Plaintiffs, North Carolina's UPL laws are not regulations of "professional conduct." They are regulations of speech subject, at minimum, to ordinary intermediate scrutiny.

That ordinary intermediate scrutiny, as *360 Virtual Drone* confirms, is the test set forth in *Reynolds v. Middleton*. And that test requires evidence in ways that preclude dismissal here. Under *Reynolds*, the government may use precedent and common sense to establish the existence of an important governmental interest, but it cannot use them to establish tailoring. 779 F.3d 222, 227–29 (4th Cir. 2015). When it comes to fit, "argument unsupported by the evidence will not suffice to carry the government's burden." *Id.* at 229. Thus, even though the county in *Reynolds* invoked roadway safety, this Court required evidence supporting the breadth of its restriction and showing why less intrusive alternatives would not work. *Id.* at 229–32.

*Billups v. City of Charleston* applied the same rule to occupational licensing. 961 F.3d 673, 688–89 (4th Cir. 2020). There, Charleston defended its tour-guide licensing requirement by identifying familiar

interests in protecting tourists and the city's reputation. But that was not enough. Applying *Reynolds* and *McCullen v. Coakley*, 573 U.S. 464 (2014), this Court required the government to show that it had "seriously undert[aken] to address the problem with less intrusive tools readily available to it." *Billups*, 961 F.3d at 688 (cleaned up).

The government has made no such showing here. It instead devotes pages to explaining why lawyer licensing is generally useful. Lawyers have duties of competence and confidentiality. Resp. Br. 13–14. They are subject to conflict rules and professional discipline. *Id.* at 14–15. Bad legal advice can have serious consequences. *Id.* at 54–56. But none of that establishes that North Carolina must categorically prohibit nonlawyers from giving the limited advice challenged here. That is the question of fit, and *Reynolds* requires evidence to answer it.

The government's reliance on *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359 (4th Cir. 2012), does not change things. Resp. Br. 50. *Reynolds* itself explains when *Wag More Dogs* permits reliance on precedent rather than evidence: when the challenged restriction is "materially indistinguishable" from one already upheld by this Court or the Supreme Court on the basis of an appropriate evidentiary record. *Reynolds*, 779

F.3d at 227 & n.3. That makes some sense; government "need not reinvent the wheel by coming forward with voluminous evidence justifying a regulation of the type that has been upheld several times over." *Wag More Dogs*, 680 F.3d at 365 n.3.

But here, unlike in *Wag More Dogs*, there is no wheel. There is no relevant evidence developed in *CAI* that this Court can borrow from that case because *CAI* did not hold the government to the evidentiary standard called for under *Reynolds*. That evidence must be developed here, in this case.

### B. The government's own arguments show why fit cannot be resolved on a motion to dismiss.

The government's remaining arguments only underscore why dismissal was premature. It says independent nonlawyer advice may not receive attorney-client privilege. Resp. Br. 13. It invokes confidentiality, competence, conflicts, solicitation, malpractice, judicial oversight, professional discipline, and client remedies. *Id.* at 13–15. And it argues that some of the underlying legal matters can have serious consequences. *Id.* at 54–56.

Those are potential arguments for regulating Plaintiffs' speech. They do not establish that the State may prohibit it altogether. And each

immediately raises the question *Reynolds* requires the government to answer: Why will something less restrictive not work?

Whether particular alternatives would adequately protect the State's asserted interests is a merits question on which the government bears the burden. "[I]ntermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden." *Reynolds*, 779 F.3d at 229. Further, "the burden of proving narrow tailoring requires the [government] to *prove* that it actually *tried* other methods to address the problem." *Id.* at 231.

The government cannot make those required showings at this stage. Indeed, the complaint identifies several obvious alternatives to North Carolina's total prohibition on unlicensed legal advice. North Carolina could require disclosures, training, testing, registration, or limits on the scope of permissible advice. It could regulate directly the noncommunicative activities Plaintiffs do not seek to perform. And it could adopt some form of limited licensing—an alternative that a State Bar subcommittee itself unanimously recommended exploring. JA 26.

The government's own brief supplies still more reason not to resolve those questions on the pleadings. It says Plaintiffs "propose no analogous duty of paralegal competence" and no "oversight of paralegals." Resp. Br. 14–15. But the government's own addendum reproduces a statute giving the State Bar authority to regulate the professional conduct of State Bar certified paralegals—which Plaintiffs are, JA 20—and to "take actions that are necessary to ensure" their competence. N.C. Gen. Stat. § 84-23(a) (Resp. Br. Add. 18). That does not establish that existing regulation is sufficient. It does show that narrower forms of regulation are hardly speculative.

The same is true of North Carolina's legal-document-software exception. The State permits interactive legal-document software subject to targeted requirements including attorney review of templates, disclosures, registration, liability rules, and a consumer-complaint process. N.C. Gen. Stat. § 84-2.2 (Resp. Br. Add. 5–6). Software and individualized human advice may present different concerns. But the exception again demonstrates that North Carolina can regulate particular forms of legal assistance through targeted safeguards rather than full attorney licensure.

At the motion-to-dismiss stage, the court must accept Plaintiffs' allegations as true and draw reasonable inferences in their favor. It cannot assume without evidence that every protection associated with attorney licensure is necessary for every form of legal advice. The district court could dismiss only by assuming the answer to those factual questions in the government's favor. At the pleading stage, it could not do that. This Court should reverse.

## IV. JFAP independently states a free speech claim.

Finally, even if this Court concludes that *CAI* continues to govern some aspects of Plaintiffs' claims, the district court was wrong to dismiss JFAP's claim regarding free legal advice. As explained in the Opening Brief, JFAP is a nonprofit access-to-justice organization whose members—including Polaski and Almendarez—want to provide uncompensated advice to people who often cannot obtain lawyers. Opening Br. 46–48; *see also* JA 25, JA 31. Those circumstances differ materially from the arrangement considered in *CAI*.

The government's brief responds to a different argument. It devotes several pages to explaining why JFAP did not plead or preserve a freestanding associational claim under the Assembly Clause. Resp. Br.

57–61. But JFAP does not need such a claim. Count I of the Amended Complaint pleads a free speech claim. JA 38. And Section IV of the opening brief argues that the factual distinctions between JFAP and *CAI* supply an independent reason why *CAI* does not require dismissal of that speech claim.

The government's argument appears to rest on the opening brief's citation of *NAACP v. Button*, 371 U.S. 415 (1963), *In re Primus*, 436 U.S. 412 (1978), and *CAI*'s discussion of those cases. But Plaintiffs discussed those cases because they illuminate the regulatory interests at stake here and how they differ from those in *CAI*.

As that discussion shows, the interests asserted here and in *CAI* are substantially different. *CAI* specifically distinguished the *Button* line of cases in part because CAI's proposed services would serve commercial ends, its members already had access to counsel, and its corporate structure presented concerns about nonlawyer control of lawyers. 922 F.3d at 203, 206. That was consistent with *CAI*'s separate speech analysis, which likewise relied on organizational structure, attorney independence, and the risks created by nonlawyer control of lawyer-employees. *Id.* at 209–10.

Those considerations are relevant facts regardless of the precise First Amendment claim pleaded. Here, unlike in *CAI*, JFAP exists to address unmet legal need. It proposes free clinics at which the individual Plaintiffs would provide the advice. JA 31. It does not seek to employ attorneys and control their judgment, collect attorney fees, or operate a legal department for employer-members who already have counsel. The district court's application of *CAI* to these very different facts was error, and this Court should reverse.

## CONCLUSION

The judgment should be reversed and the case remanded for further proceedings.

Dated: October 8, 2026

Respectfully submitted,

*/s/ Paul M. Sherman*
Paul M. Sherman
Virginia Bar No. 73410
Christian W. Lansinger
Maryland Bar No. 2211290007
INSTITUTE FOR JUSTICE
901 North Glebe Rd., Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org
clansinger@ij.org

Vince Eisinger
North Carolina Bar No. 57646
CRANFILL SUMNER LLP
5420 Wade Park Blvd., Suite 300
Raleigh, NC 27607
Phone: (919) 863-8703
Fax: (919) 863-3459
Email: veisinger@cshlaw.com

*Counsel for Plaintiffs–Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Federal Rule of Appellate Procedure 32(a)(7) because it contains 6,446 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Century Schoolbook.

Dated: October 8, 2026

*/s/ Paul M. Sherman*
Paul M. Sherman
*Counsel for Plaintiffs–Appellants*